No. 20-1132

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**
───────────────────────────

**KRISTA EDMONDS-RADFORD**, Plaintiff-Appellee,

v.

**SOUTHWEST AIRLINES CO.,** Defendant-Appellant
───────────────────────────

On Appeal from the United States District Court
For the District of Colorado
The Honorable Lewis T. Babcock, Senior District Judge
D.C. No. 1:16−cv−02860−LTB−STV

─────────────────────────────────────────────

**APPELLANT'S OPENING BRIEF**

─────────────────────────────────────────────

Katayoun A. Donnelly
*Azizpour Donnelly LLC*
2373 Central Park Blvd., Suite 100
Denver, CO 80238
720-675-8584
katy@kdonnellylaw.com

Blain Myhre
*Blain Myhre LLC*
PO Box 3600
Englewood, CO 80155
(303) 250-3932
blainmyhre@gmail.com

Attorneys for Plaintiff-Appellant

**ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS

STATEMENT OF PRIOR OR RELATED APPEALS ............................................. 7

STATEMENT OF JURISDICTION ....................................................................... 7

    Introduction ....................................................................................................... 7

    Issues ................................................................................................................. 7

STATEMENT OF THE CASE ............................................................................... 8

    Krista Edmonds-Radford begins work for Southwest and notifies Southwest of her disability during her training in Dallas. ............................................................................. 8

    Despite knowing of her disability and request for training, Southwest fails to provide appropriate training in Denver and terminated Edmonds-Radford without engaging in interactive process. .................................................................................................. 10

    Southwest continuously praised Edmonds-Radford for how she interacted with people. ......... 12

    Southwest does not permit Ms. Edmonds-Radford to acquire her SIDA Badge. ...................... 13

    Southwest retaliates against Edmonds-Radford but does not inform her that it terminated her. ............................................................................................................. 15

SUMMARY OF THE ARGUMENT .................................................................... 16

ARGUMENT ......................................................................................................... 17

    The district court reversibly erred in concluding the Rehabilitation Act did not apply. .......... 17

        Preservation and Standard of Review ............................................................. 18

        Southwest receives federal financial assistance, and therefore the district court erred in concluding the Rehabilitation Act did not apply. ................................................. 18

    The district court erred in granting summary judgment on Edmonds-Radford's disparate treatment claim. ................................................................................................. 28

        Preservation and Standard of Review ............................................................. 28

        On this record, triable issues of fact existed precluding summary judgment on Edmonds-Radford's ADA disparate treatment claim. ............................................ 29

    On this record, a reasonable jury could find in favor of Edmonds-Radford on her failure to accommodate claim. .............................................................................................. 42

        Preservation and Standard of Review. ............................................................ 42

        The McDonnell Douglas test is inapplicable. ................................................ 42

        A reasonable jury could find in favor of Edmonds-Radford on her failure to accommodate claim. .................................................................................................... 43

    On this record, a reasonable jury could find in favor of Edmonds-Radford on her retaliation claim. .............................................................................................................. 49

        Preservation and Standard of Review. ............................................................ 49

    Triable issues exist on the retaliation claim; therefore, the district court reversibly erred in granting summary judgment. ............................................................................... 49

   Equitable tolling applies ......................................................................................... 52

    Preservation and standards of review. ..................................................................... 52

    The district court erred in requiring Ms. Edmonds-Radford to exhaust administrative remedies where the failure to exhaust was a result of Southwest's actions. ......................... 53

CONCLUSION ............................................................................................................57

STATEMENT REGARDING ORAL ARGUMENT ............................................58

ATTACHMENT (FINAL JUDGEMENT)…………………………………....60

# TABLE OF AUTHORITIES

Page(s)

Cases

*Albert v. Smith's Food & Drug Ctrs., Inc.*,
356 F.3d 1242 (10th Cir. 2004)......................................................................35, 49

*Al-Yousif v. Trani*,
779 F.3d 1173 (10th Cir. 2015).................................................................54

*Astralis Condo. Ass'n v. Sec'y of U.S. Dep't of Hous. & Urban Dev.*,
620 F.3d 62 (1st Cir. 2010)..................................................................44

*Bentley v. Cleveland County Bd. of County Comm'rs*,
41 F.3d 600 (10th Cir. 1994)...............................................................20

*Bones v. Honeywell Int'l, Inc.*,
366 F.3d 869 (10th Cir. 2004)..............................................................37

*Brumley v. UPS*,
909 F.3d 834 (6th Cir. 2018)................................................................44

*Bryant Woods Inn, Inc. v. Howard Cnty.*,
124 F.3d 597 (4th Cir. 1997)................................................................44

*DeVargas v. Mason & Hanger-Silas Mason Co.*,
911 F.2d 1377 (10th Cir. 1990)............................................................20

*Duffy v. Riveland*,
98 F.3d 447 (9th Cir. 1996)..................................................................29

*E.E.O.C. v. LHC Grp., Inc.*,
773 F.3d 688 (5th Cir. 2014)................................................................46

*EEOC v. C.R. England, Inc.*,
644 F.3d 1028 (10th Cir. 2011).............................................................31

*Feist v. La., Dep't of Justice, Office of the Att'y Gen.*,
730 F.3d 450 (5th Cir. 2013)................................................................44

*Foster* v. Arthur Andersen, LLP,
168 F.3d 1029 (7th Cir.1999)...............................................................37

*Foster v. Mountain Coal Co., LLC*,
830 F.3d 1178 (10th Cir. 2016).......................................................50, 53

*Foster v. Ruhrpumpen, Inc.*,
365 F.3d 1191 (10th Cir. 2004)............................................................55

*Frazier v. Board of Trustees of Northwest Mississippi Regional Medical*,
765 F.2d 1278 (5th Cir. 1985)..........................................................20, 21

*Giebeler v. M&B Assocs.*,
343 F.3d 1143 (9th Cir. 2003)..............................................................44

*Granger v. Aaron's, Inc.*,
  636 F.3d 708 (5th Cir. 2011)........................................................56, 57
*Grove City College v. Bell*,
  465 U.S. 555 (1986) ..................................................................20
*Hardy v. New York News, Inc.*,
  114 F.R.D. 633 (S.D. N.Y. 1987) ................................................42
*Health Grades, Inc. v. Decatur Mem'l Hosp.*,
  190 F. App'x 586 (10th Cir. 2006)..............................................22
*Hollis v. Chestnut Bend Homeowners Ass'n*,
  760 F.3d 531 (6th Cir. 2014).....................................................44
*Hovsons, Inc. v. Twp. of Brick*,
  89 F.3d 1096 (3d Cir. 1996).......................................................44
*Hulsey v. Kmart, Inc.*,
  43 F.3d 555 (10th Cir. 1994)......................................................54
*Jaramillo v. Colo. Judicial Dep't*,
  427 F.3d 1303 (10th Cir. 2005)..................................................39
*Jones v. Oklahoma City Pub. Sch.*,
  617 F.3d 1273 (10th Cir. 2010)..................................................38
*Kiel v. Select Artificials, Inc.*,
  169 F.3d 1131 (8th Cir. 1999).....................................................43
*Koessel v. Sublette County Sheriff's Dep't*,
  717 F.3d 736 (10th Cir. 2013).............................................35, 49
*Lincoln v. BNSF Ry. Co.*,
  900 F.3d 1166 (10th Cir. 2018)............................................50, 51
*Montoya v. Chao*,
  296 F.3d 952 (10th Cir. 2002)....................................................54
*Peebles v. Potter*,
  354 F.3d 761 (8th Cir. 2004).......................................................44
*Plotke*,
  405 F.3d ............................................................................ Passim
*Punt v. Kelly Servs.*,
  862 F.3d 1040 (10th Cir. 2017).............................................45, 47
*Ralls v. United States*,
  52 F.3d 223 (9th Cir. 1995).......................................................40
*Schwarz v. City of Treasure Island*,
  544 F.3d 1201 (11th Cir. 2008)..................................................44
*Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Services*,
  165 F.3d 1321 (10th Cir.)..........................................................30
*Stinnett v. Safeway, Inc.*,
  337 F.3d 1213 (10th Cir. 2003)..................................................30

*Tademy v. Union Pacific Corp.*,
   614 F.3d 1132 (10th Cir. 2008)..............................................30
*Toomer v. City Cab*,
   443 F.3d 1191 (10th Cir. 2006)..............................................19
*United States DOT v. Paralyzed Veterans of Am.*,
   477 U.S. 597 (1986) ......................................20, 25, 26, 27
*United States v. Bauer*,
   132 F.3d 504 (9th Cir. 1997)..............................................41
*United States v. Blackman*,
   72 F.3d 1418 (9th Cir. 1995)..............................................41
*Wis. Cmty. Servs., Inc. v. City of Milwaukee*,
   465 F.3d 737 (7th Cir. 2006)..............................................44

Statutes

28 U.S.C.A. § 1291 (West) ..................................................8
28 U.S.C.A. § 1331 (West) ..................................................8
29 U.S.C.A. § 701 (West) ...................................................17
29 U.S.C.A. § 794(a) (West) ...........................................19, 20
42 U.S.C.A. § 12203(a) (West) .......................................17, 50
PL 110–325 ..................................................................17

Rules

Fed. R. App. P. 32(a)(5) ...................................................60
Fed. R. App. P. 32(a)(6) ...................................................60
Fed. R. App. P. 32(a)(7)(B) ...............................................60
Fed. R. App. P. 32(f) ......................................................60

Regulations

28 C.F.R. § 42.540(f) ......................................................20
29 C.F.R. § 1630, app. (2003) .............................................43

## STATEMENT OF PRIOR OR RELATED APPEALS

There are no prior or related appeals.

## STATEMENT OF JURISDICTION

Jurisdiction in the district court was based on federal question jurisdiction under 28 U.S.C.A. § 1331 (West). The district court's order granting summary judgment was a final, appealable order. This court has jurisdiction under 28 U.S.C.A. § 1291 (West).

## STATEMENT OF THE ISSUES

*Introduction*

The trial court's incorrect view of the summary judgment standards highlights the need to clarify once again that district courts have a duty to submit civil rights cases to juries where, as here, there are triable issues of fact on the plaintiffs' claims. The trial court's erroneous law application is dangerous as its approach, if not corrected, would prevent majority of litigants in civil rights cases from having their day in court.

*Issues*

1. Whether the trial court can allow the defendant to block discovery of information and then grant summary judgment on the issues that were subject of discovery request by calling the evidence introduced, in

spite of the discovery block, insufficient and by impermissibly weighing evidence and engaging in credibility determination at the summary judgement stage.

2. Whether summary judgement is inappropriate where there are triable issues of fact on the plaintiffs' claims.

3. Whether the Rehabilitation Act applies to employers who receive federal assistance.

4. Whether equitable tolling should apply when employer's actions prevent employee from exhausting administrative remedies.

## STATEMENT OF THE CASE

***Krista Edmonds-Radford begins work for Southwest and notifies Southwest of her disability during her training in Dallas.***

Krista Edmonds-Radford began working as a Customer Service Agent for Southwest in September 2014.  As Southwest's records show, she passed her training in Dallas with a 93% GPA and positive feedback, including these comments:

> The Customer Service Leadership Team would like to congratulate Kris on the completion of her first 50 days as a Customer Service Agent with Southwest Airlines. . . . *Kris has been given an overall Satisfactory Rating in "Attitude".  She is exactly where we expect to see a Customer Service Agent for the first 50 day review period.*
>
> . . .

> *Kris has no problem communicating with her Peers and Leaders while on the job* . . . . Kris's smile is as infectious as her Spirit, and her kindness is appreciated by all who work with her.
>
> *During Dallas Training, Kris spoke with facilitator Carol Barnes to explain that she understands and interprets information differently. This initiative was appreciated by Carol, and she explained "Kris has a great attitude! I know that she will give 110%!" Kris graduated from Dallas training with a 93% GPA.*
>
> Throughout Kris's on the job training, her Station Trainers have also been impressed with her attitude and demeanor. Members of the Training team have stated "her personality is fantastic", "Kris is so upbeat and focused on mastering all aspects of the job", and "she has a great presence and is not afraid to ask questions for better understanding."

ROA Vol. II at 673 (emphasis added).

> With regard to areas where she needed improvement, Southwest noted:
>
> Within her first 50 days with Southwest Airlines, Kris has experienced some struggles in grasping the technical elements of the position of a Customer Service Agent. For this reason, she has received a "Needs Improvement" in Aptitude.
>
> . . .
>
> Every individual with Southwest Airlines learns differently. We are actively searching for the best way to convey information so that Kris can retain and process the knowledge gained. Due to daily observations throughout her Training period, Kris has opted to take advantage of additional training at the gate with a member of the Station Trainer Team. Kris has received "Needs Improvement" ratings in Gate Procedures, Computer Abilities, and Irregular Operations. The Station Training Team noted that she "is a little apprehensive and unsure about herself and this frustrates her." She knows the information and the tasks that need to be completed, but often her lack of confidence gets the best of her. Kris needs to establish a routine, take things slow, and work diligently at developing her computer

skills and mastering the job duties as a Customer Service Agent. We ask that Kris let us know what she needs in order to grasp the aspects of the position.

The Leadership Team would like to stress that it is entirely possible to practice and teach the job duties, CS2, and policies and procedures. It is not possible to teach the Southwest Spirit, which- as previously mentioned - Kris already exhibits. *Despite her struggles, we are so happy to have her as part of our family.* We encourage Kris to take time to practice, ask for help when needed, and know that we are here to support her every step of her Southwest Airlines journey. We look forward to Kris's adventure with us here in Denver, and can't wait to see how she develops in the upcoming months.

ROA Vol. II at 675 (emphasis added). With reasonable accommodations, Edmonds-Radford graduated from training in Dallas with a 93% GPA and many glowing comments.

In Denver, however, she did not receive accommodations.

***Despite knowing of her disability and request for training, Southwest fails to provide appropriate training in Denver and terminated Edmonds-Radford without engaging in interactive process.***

Southwest admits it could have provided Edmonds-Radford with reasonable accommodations in Denver. *See* ROA Vol. II at 708 (depo 33-35). She informed all her trainers and supervisors about her disabilities and request for training. ROA Vol. II at 684 (depo 112-13); 686-87 (depo 120-21), 691-92 (depo 143-47). Southwest's policy required them to inform the ACT team. They failed to do so, however. ROA Vol. II at 723 (depo 141-42); 706-08 (depo 28-33); 713-14 (depo 61-65).

Although Southwest claimed it provided reasonable accommodations in the form of additional training, in reality it provided training only for the counter—the area Edmonds-Radford had already done well and received good reviews. Southwest failed to provide the requested training at the gate, where she actually needed it. ROA Vol. II at 682-86 (depo 91-96, 112-18); 697 (depo 177-78); *see also* ROA Vol. II at 467 (email to CEO Kelly, noting "I felt had received support in Dallas however once being hired in Denver I didn't receive the same support. I requested additional training at the gates. I was assured to have 3 weeks training however I was not provided that training request.").

Moreover, Southwest had not prepared any of the Denver trainers to provide reasonable accommodations to Edmonds-Radford. The 30(b)(6) deposition describes what went wrong and Southwest could have (and should have) done, but did not do, before it fired Edmonds-Radford. ROA Vol. II at 712-722 (depo 60-62, 65-82, 85-96; 97-100) (describing the reasonable accommodations Southwest could provide after reinstatement—accommodations not provided before her January 2015 termination. Southwest trained new employees in a controlled environment by qualified trainers in Dallas before sending them to the busy, hectic, and fast-paced airport environment. ROA Vol. II at 732-33 (depo 225-31). In the Dallas performance evaluations, Southwest

expressed its commitment to follow the federal laws and provide assistance to people with disabilities.

In Denver, however, Southwest used Ms. Edmonds-Radford's untrained co-workers to provide "training" during their own work shifts. ROA Vol. II at 692-94 (depo 148-53); 696 (depo 173-74); 716 (depo 73-76); 732-33 (depo 225-31); 800 (table showing training mostly at counter not at gate). Southwest had not trained any of these Denver "trainers" to train people with a learning disability. In fact, Southwest had not even informed any of them of her disability or need for accommodation. ROA Vol. II at 712-16 (depo 60-62, 65-76). Not surprisingly, any training provided was neither adequate nor reasonable. To the extent she continued to have "issues" at the gate, it was because of the lack of appropriate training—training she had requested. ROA Vol. II at 682-86 (depo 91-96, 112-13, 115-18); 697 (depo 177-78); 800; 712-21 (depo 60-62, 65-82, 85-96).

### *Southwest continuously praised Edmonds-Radford for how she interacted with people.*

Southwest agrees that Edmond-Radford is disabled. ROA Vol. III at 52. She has a learning disability and suffers from anxiety and posttraumatic stress disorders (due to the death of her only son). But with reasonable accommodations, she can interact with people. Her treating physician averred that "despite some impairment of her abilities, with reasonable accommodations for her psychiatric

conditions she would be able to interact sufficiently well with people to perform her job duties." ROA Vol. II at 801-02 (Affidavit of Dr. Lewis). Dr. Lewis continued, "she was able to function well if given the required accommodations as requested by her psychiatric team." *Id.* During her time working at Southwest, Edmonds-Radford was constantly praised for her ability to interact with people by Southwest leadership, her peers, and Southwest customers. *See* ROA Vol. II at 673-75; ROA Vol. V (RESTRICTED) at 28-37 ("Kick Tails").

In January 2015, however, Southwest terminated her. ROA Vol. III at 37. In March 2015, Edmonds-Radford emailed Southwest's CEO Gary Kelly asserting that Southwest had discriminated against her based on race, age, gender, and her learning disability. ROA Vol. II at 467. Southwest offered "reinstatement" in July 2015. ROA Vol. III at 37. But Southwest interfered with her ability to get reinstated by not permitting her to get her required security badge.

### Southwest does not permit Ms. Edmonds-Radford to acquire her SIDA Badge.

A SIDA badge is a security badge obtained from DIA security, necessary for employees working at the airport. ROA Vol. II at 492-93. Edmonds-Radford notified Southwest that as a result of her January 2015 termination she and her service dog went homeless and she lost her vital documents. ROA Vol. II at 678-81 (depo 61, 65-66, 70, 73); 691 (depo 141); 698 (depo 229-30); 699 (depo 255); 700 (depo 265); 703 (depo 330-32); 712 (depo 58); 739 (depo 265-66). She

specifically informed Southwest that she needed her backpay so she could get back on her feet and obtain the documents she lost and needed to get her SIDA badge. ROA Vol. II at 803-04. Southwest refused to pay her back pay but agreed to pay her some of her salary while she was waiting for her documents.

Edmonds-Radford contacted the EEOC in July 2015 and filed an EEOC charge of discrimination on August 25, 2015. ROA Vol. I at 490; ROA Vol. II at 817. But unbeknownst to her or the EEOC, Southwest terminated her a second time. ROA Vol. II at 815-16; 701-02 (depo at 271-73); 724-26 (depo 150-55, 162-64); 745 (depo 354).

After Edmonds-Radford notified Southwest that she had obtained the documents necessary for her SIDA badge, Southwest cut off communications with her and did not renew the authorization required by the airport in order to issue her SIDA badge. Southwest thereby prevented her getting her badge. ROA Vol. II 740-43 (depo at 269-76, 281-86); 690-91 (depo 140, 142); 727-30 (depo 168-72, 213-18); 736-38 (depo 253-64).

Mr. Watkins, the 30(b)(6) deponent, admitted that Southwest's authorization had expired at the end of August 2015 (shortly after Edmonds-Radford filed her EEOC charge) and that Southwest did not issue a new authorization to allow Ms. Edmonds-Radford to obtain her SIDA badge after she received the documents lost when she became homeless as a result of Southwest's initial termination. *Id.*

***Southwest retaliates against Edmonds-Radford but does not inform her that it terminated her.***

Southwest did not inform Edmonds-Radford or the EEOC that it had fired her a second time.  Exhibit 4 at 271-73; Exhibit 5 at 150-51.  It was only during a November 2018 30(b)(6) deposition that Southwest affirmatively acknowledged it had indeed fired her again, ostensibly at the end of August 2015.

Southwest's intentional acts in hiding this material fact prevented Ms. Edmonds-Radford and the EEOC from addressing it during the administrative proceedings.  Southwest later asserted in the district court that it terminated her "sometime after Thanksgiving 2015, retroactive to August 21, 2015."  ROA Vol. II at 327.  Southwest's position at the 30(b)(6) deposition was that it could not recall the exact date of her second termination.  *See* ROA Vol. II. at 744 (depo 289-90).  Southwest's records, though, indicate that it terminated her in August 2015.  ROA Vol. II at 815-16 (listing the second termination date as 8/21/15).

Edmonds-Radford had obtained her documents by September 3, 2015.  ROA Vol. II at 689 (depo 134).  She informed Southwest.  Southwest, however, did not reissue the authorization to allow her to obtain the SIDA badge.  Neither did it inform her (or the EEOC) that it had terminated her again at the end of August.  ROA Vol. II at 701-02 (depo 271-73); 724-26 (depo 150-55, 162-64); 745 (depo 354).  Instead, Southwest continued its pretense of being "committed" to reinstate

Edmonds-Radford in its negotiations with the EEOC.  *See* ROA Vol. V (SEALED) at 43-46.  Only when forced to respond to Edmonds-Radford's discovery requests and during the 30(b)(6) deposition did Southwest acknowledge it had fired her a second time, without notifying either her or the EEOC.

In November 2016, Ms. Edmonds-Radford filed a *pro se* complaint.  ROA Vol. I at 9-16.  She filed another complaint *pro se* a few months later.  ROA Vol. I at 87-95.  Pro bono counsel was appointed, *id.* at 167-68, and an amended complaint was filed.  *Id.* at 169-80.  The amended complaint asserted claims of failure to accommodate, disability discrimination, and retaliation under the Americans with Disabilities Act 42 U.S.C.A. § 12203(a) (West), the ADA Amendments Act of 2008 ("ADAAA," § 504), ADA AMENDMENTS ACT OF 2008, PL 110–325, September 25, 2008, 122 Stat 3553, and the Rehabilitation Act of 1973, 29 U.S.C.A. § 701 (West), et seq.  *Id.*

Southwest moved for summary judgment, which the district court granted.  *See* ROA Vol. II at 314-49 (motion); ROA Vol. III at 35-67 (order); 68-69 (judgment).  Edmonds-Radford timely appealed.  ROA Vol. III at 88-89.

## SUMMARY OF THE ARGUMENT

The Rehabilitation Act applies because Southwest received financial assistance—not compensation—from the federal government.  As a result,

Edmonds Radford was not required to exhaust administrative remedies.

Further, summary judgment is inappropriate. The trial court abused its discretion when:

- it allowed Southwest to block Edmonds-Radford's efforts to conduct discovery, and

- called the evidence obtained in spite of the discovery hurdles "self-serving" and "speculation," in violation of the established law that prevents it from weighing the evidence and making credibility determinations but instead requires sending the case to the jury where, as here, there are triable issues of fact on the plaintiffs' claims.

Viewing the evidence in the light most favorable to Edmonds-Radford, her claims should have been submitted to the jury.

Where, as here, an employer conceals crucial facts from employee and the EEOC, preventing the employee from amending her EEOC charge or filing a new charge and preventing the EEOC from addressing employees claims, failure to exhaust the administrative remedies is a direct result of employers conduct and should not prevent the employee from pursuing her claim.

## ARGUMENT

***The district court reversibly erred in concluding the Rehabilitation Act did not apply.***

***Preservation and Standard of Review***

In its summary judgment motion, Southwest argued the Rehabilitation Act did not apply. ROA Vol. II at 343-44. Edmonds-Radford argued it did. ROA Vol. II at 657-65. The court ruled it did not apply. ROA Vol. III at 41. The issue is preserved. Whether the Rehabilitation Act applies or not is a question of law, reviewed *de novo*. *See Toomer v. City Cab,* 443 F.3d 1191, 1194 (10th Cir. 2006) (construction and applicability of a statute is a legal question reviewed *de novo*). The district court reversibly erred in concluding it did not apply.

***Southwest receives federal financial assistance, and therefore the district court erred in concluding the Rehabilitation Act did not apply.***

As Southwest admits, there is no requirement for exhausting administrative remedies for Edmonds-Radford's Rehabilitation Act claims. ROA Vol. II. at 341 n.3; ROA Vol. 1 at 171.78.

Section 504 of the Rehabilitation Act provides that "No otherwise qualified handicapped individual . . . shall solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C.A. § 794(a) (West). "Federal assistance" means

> any grant, cooperative agreement, loan, contract (other than a direct Federal procurement contract or a contract of insurance or guaranty), subgrant, contract under a grant or any other arrangement by which the Department provides or otherwise makes available assistance in

the form of: (1) Funds; (2) Services of Federal personnel; (3) Real and personal property or any interest in or use of such property . . . .

28 C.F.R. § 42.540(f).

An entity that receives federal financial assistance, whether directly or through an intermediary, is a recipient subject to liability under the Rehabilitation Act. *United States DOT v. Paralyzed Veterans of Am.*, 477 U.S. 597, 604 (1986). "Federal financial assistance" in the Rehabilitation Act § 504 (29 U.S.C. § 794(a)) means "subsidy," and therefore an entity receives federal financial assistance when it receives a "subsidy." *DeVargas v. Mason & Hanger-Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir. 1990). Indirect receipt of federal funds through a conduit source is sufficient to trigger the Act. *See, e.g., Grove City College v. Bell*, 465 U.S. 555 (1986); *Bentley v. Cleveland County Bd. of County Comm'rs*, 41 F.3d 600 (10th Cir. 1994); *Frazier v. Board of Trustees of Northwest Mississippi Regional Medical*, 765 F.2d 1278, *modified*, 777 F.2d 329 (5th Cir. 1985).

Plaintiff identified two sources of federal financial assistance: loan guarantees to AirTran, which was acquired by Southwest, and FAA (and TSA) grants for the Love Field modernization project. ROA Vol. II at 657-664, 658, 663, 1111,1112, 1114 (Plaintiff's Response and Sur-reply to Defendant's Motion for Summary Judgment).

The district court rejected as "speculation" the evidence on the AirTran, which Southwest acquired after it received almost $72 million in federal financial

assistance.  *See* ROA Vol. II at 841-1091 (AirTran Acquisition Documents).

Acquisition.  *See* Order at 10 (ROA Vol. III at 45).

Southwest employee Kenneth Guckian, who was deposed principally in connection with the Love Field project, indicated that although unaware of the details, he believed that that debt had been fully discharged no later than the fourth quarter of 2016.  ROA Vol. II at 757-58 (depo 33-37).  He also indicated that the details could be determined through examining Southwest's tax returns.  *Id*.

Southwest, however, refused to produce its tax returns.  Ms. Edmonds-Radford requested that the court to order Southwest to produce the tax returns, but the Court denied this request.[1]  The trial court's characterization of well-developed documentation of the Rehabilitation Act issue as "speculation" is particularly

---

1 Ms. Edmonds-Radford requested:

> All documents relevant to Southwest's acquisition of AirTran, as it relates to the $71,823,648 AirTran received in federal financial assistance (in the form of loans or loan guarantees) before the acquisition, including
>
> o Copies of the AirTran loan guarantee documents and any documents reflecting the satisfaction of the loans and release and termination of the loan guarantees. (Mr. Guckian testified that he believes the $71,823,648 was retired from Southwest's books "by 2016 or so." Ex. E [Guckian Deposition, pp. 34-35].

*See,* ROA Vol. II at 8-19, Ms. Edmonds-Radford's forthwith motion for modification of the scheduling order, listing the documents related to the Rehabilitation Act claim that she needed; Doc. # 118 (denying the motion). Ms. Edmonds-Radford filed a timely objection, which was also denied by the Court.

interesting considering that it took Edmonds-Radford's counsel many hours to obtain this information through public records because the district court allowed Southwest to block all efforts to obtain information relevant to the Rehabilitation Claim. ROA Vol. II at 8-19 (motion), 193-201 (reply), 282-287 (objection), 313 (summary denial). Considering the importance of the information sought to determination of application of the Rehabilitation Act, ROA Vol. II 16-17, and considering that the trial court had vacated the trial date and granted Southwest's motion for extension to file summary judgment motion, summary denial of Edmonds-Radford's request to compel discovery, without any explanation, was abuse of discretion. *Health Grades, Inc. v. Decatur Mem'l Hosp.*, 190 F. App'x 586, 589 (10th Cir. 2006) ("The district court gave no explanation for its refusal to allow jurisdictional discovery, and based on the evidence before it, we can only conclude that the district court abused its discretion."). As such, even if Edmonds-Radford had not proved that the Rehabilitation Act applies—she has— or had not provided enough information to create a genuine issue of material fact regarding its applicability—which she has—the case should be remanded to allow Edmonds-Radford to complete discovery on this issue.

Further, at the very least, the district court failed to view the evidence in the light most favorable to Edmonds-Radford. With respect to the Love Field project, the court relied on a self-serving affidavit of Southwest-employee Guckian, which

asserted that Southwest did not receive federal financial assistance. Order at 8, ROA Vol. III at 42. And the court got the analysis wrong in concluding Southwest did not receive funds, erroneously treating Southwest as a mere beneficiary of the aid, not an intended recipient. *See* Order at 9, ROA Vol. III at 43.

The FAA, through its Airport Improvement Program, made twenty grants to Love Field (numbers 32-53) from 2008 through 2017, totaling nearly $87 million (this includes grants 46-53, from 2014 through 2017, totaling almost $37 million.) ROA Vol. II at 824. Of these grants, five (numbers 38, 41, 43, 46, 48) totaling more than $40 million, were for apron improvements (which were not ordinary airport maintenance but required by the demolition and reconstruction of the terminal, as anticipated in the initial budget of the project2 and as identified in Southwest's 2014 Annual Report3). ROA Vol. II at 822. See also ROA Vol. II at 799 (list of FAA AIP Grants, from FAA Grant History Lookup Tool https://www.faa.gov/airports/aip/grant_histories/lookup/).4 In addition, the TSA made a grant of $19.5 million in 2010. (https://www.tsa.gov/news/releases/2010/08/17/tsa-announces-195-million-new-checked-baggage-screening-system-dallas-love).

2 ROA Vol. II at 1208, 768 (Exhibit 27, Radford 438. Cf. Exhibit 7, Radford 425).
3ROA Vol. II at 1220-1221 (Exhibit 27, Radford 1391-1392).
4 Search parameters: Start date 2008; End Date: 2017; All Service Levels; State TX; View data for a particular airport Airport Name Dallas Love Field. Search performed 11/2/2018.

These grants were subsidies intended to financially assist in the modernization of Love Field – which is inseparably linked with Southwest. The company's headquarters is located on the grounds of Love Field. Its New York Stock Exchange ticker symbol is LUV. And Southwest, which before construction began had acquired the right to use eighty percent of the gates in the new terminal, was the principal intended beneficiary of the modernization project. On this record, if there is not sufficient evidence that Southwest received federal financial assistance and is thus subject to the Rehabilitation Act § 504, there is at least a material issue of fact to be resolved by a jury. It therefore was reversible error to conclude the Act did not apply.

Guckian inaccurately described the relationship between Southwest and the Love Field Modernization Program ("LFMP") and the Love Field Airport Modernization Corporation ("LFAMC"). He claimed Southwest was simply the "building contractor" for the City of Dallas. ROA Vol. II at 757 (depo 10-12).

Setting aside the question of why anyone would hire a low-cost airline with no prior construction experience as a building contractor, the webpage for the LFAMC—bearing the logos of both Southwest and the City of Dallas—states: "The Love Field Airport Modernization Corporation (LFAMC) is comprised of the City of Dallas *and Southwest Airlines*. *The partnership*, *which began prior to the start of the Love Field Modernization Program (LFMP), is dedicated to expanding*

*and transforming Dallas Love Field Airport* into a convenient, modern airport for travelers and visitors in Dallas." ROA Vol. II at 805 (emphasis added). LFAMC is a public-private partnership, created by the City of Dallas as a "Local Government Corporation." ROA Vol. II at 764. Southwest provides the Program Manager and has equal representation on the Steering Committee. ROA Vol. II at 767-72. And in its annual reports to its shareholders, Southwest repeatedly acknowledged its active management role in a project designed to be used principally by Southwest. "In conjunction with the Company's significant presence at Dallas Love Field, its rights to occupy 16 of the available gates upon completion of the facility, and other factors, the Company agreed to manage the majority of the LFMP project." ROA Vol. II at 783 (excerpt of 12/31/2013 Southwest annual report).

*Paralyzed Veterans* restricts coverage of the Rehabilitation Act to "those entities that are intended recipients of federal financial assistance." 477 U.S. 597, 604 (1986). Although federal financial assistance for the new terminal at Love Field was disbursed to the City of Dallas, that money went to, and was intended for the use of, LFAMC, a public-private corporation composed of the City and SWA. And the City and Southwest formed LFAMC because they were the two principal beneficiaries of the project—Southwest directly, in the form of dramatically increased operations and thus profits (as it bragged in its annual reports [e.g., ROA

24

Vol II at 782, 788, 792]); the City more diffusely, principally in terms of increased economic activity through improved transportation links.

Guckian denied Southwest used its corporate credit to back the Love Field bonds. ROA Vol. II at 751 (depo 11). The plan approved by the Dallas City Council, however, indicated "LFAMC issues bonds on behalf of City, *using SWA corporate credit*, to finance LFMP improvements." ROA Vol. II at 767 (emphasis added).

Guckian denied Southwest guaranteed the bonds. ROA Vol. II at 751 (depo at 12). But according to Southwest's Annual Report, "For the rebuilding of the facilities at Dallas Love Field, the Company *has guaranteed principal, premium, and interest on $456 million in bonds* issued by the Love Field Airport Modernization Corporation ("LFAMC") that have been utilized to fund the majority of the project." ROA Vol. II at 830; *see also id.* at 825-40.

Guckian denied that Southwest paid debt service on the bonds. Southwest's annual report states that "the Company is obligated to make debt service payments on the principal and interest amounts associated with the LFMP Bonds (Facilities Payments)." ROA Vol. II at 828; *see also id.* at 827, 830, 832, 834, 837.

Guckian denied Southwest invested any substantial amount of its own funds. ROA Vol. II at 751 (depo 12) ("Southwest invested none of its funds in Love Field."). But according to Southwest's Annual Report, "As of December 31, 2009,

the Company had spent a total of $31 million *of its own funds* on a portion of the LFMP project." ROA Vol. II at 826 (emphasis added).

Furthermore, in submissions to the Fifth Circuit Court of Appeals, Southwest argued that it

> paid an enormous cost, over almost fifty years, to keep Love Field open and secure its current preferential lease rights. Indeed, Love Field exists today because of Southwest's dogged determination to keep it operating in the 1970s and 1980s in the face of great opposition.
>  . . .
> More recently, **Southwest invested hundreds of millions of dollars to rebuild and reinvigorate Love Field** to better serve North Texas travelers.

*Dallas v. Delta v. Southwest*, Case. No. 16-10051, Brief of Appellant Southwest Airlines, Document: 00513477354, pp. 1, 2 9 (emphasis added) available at https://www.scribd.com/document/310383686/Southwest-Appeals-Delta-Ruling (last visited August 14, 2020).

Guckian claimed that Southwest did not depreciate the LFMP assets on its books, ROA Vol. II at 753. Once again, the Annual Reports say otherwise. "The Company has placed the associated assets in service and has begun depreciating the assets over their estimated useful lives. The amount of depreciation recorded for the year ended December 31, 2014, associated with the LFMP assets in service was $20 million." *Id.* at 833; *see also id.* at 835 (noting $36 million depreciation for 2015).

Addressing depreciation, Guckian indicated that only the asset owner could depreciate it. ROA Vol. II at 753 (depo 17-18). By his own analysis, then, Southwest owns the assets. And this is indeed how Southwest has presented the situation to its stockholders. "The project assets *did not meet the qualifications for sale and leaseback accounting due to the Company's continuing involvement with the facility*, as defined; therefore, for financial reporting purposes, *these assets will remain on the Company's books* until the bonds issued by the City of Dallas are repaid," ROA Vol. II at 838–that is, for more than another twenty years!

The project was built by Southwest, for Southwest's use, using both Southwest's corporate credit and some of its own funds. And for the entire useful life of the terminal,[5] Southwest has been and will be both the owner and the near-monopoly user of the terminal, which was built with federal financial assistance. There can be no doubt that the FAA grants disbursed to the City of Dallas were received by and intended to benefit SWA.

The district court's full reliance on Guckian's self-serving and repeatedly inaccurate testimony is clearly erroneous and misapplies the summary judgment standard by failing to view the record evidence in the light most favorable to the

---

[5] "[I]ts associated projects are estimated to have a weighted average useful life of 27 years and a residual value of 17%." ROA. Vol. II at 833, 1161 (Exhibit 24, Radford 1454. Cf. 1896).

nonmoving party.  Therefore, it was reversible error to conclude the Rehabilitation Act did not apply.

But even if there were any question whether Southwest received federal funding, it would be a disputed question of material fact for the jury to decide. *Duffy v. Riveland*, 98 F.3d 447, 454 (9th Cir. 1996).  The court could not weigh the evidence or access its credibility.  *Plotke*, 405 F.3d at 1094.  This court should therefore reverse the district court's conclusion that the Rehabilitation Act did not apply.

### The district court erred in granting summary judgment on Edmonds-Radford's disparate treatment claim.

#### Preservation and Standard of Review

Following full briefing, ROA Vol. II at 314-49, 627-1091, ROA Vol. V at 28-101, the district court granted summary judgment on Edmonds-Radford disparate treatment claim.  ROA Vol. III at 51-57.  The issue is preserved.

This court reviews a grant of summary judgment *de novo*.  *Plotke v. White*, 405 F.3d 1092, 1093 (10th Cir. 2005).  Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.*  All evidence must be viewed in the light most favorable to the party opposing

summary judgment. *Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Services*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 120 S. Ct. 53 (1999). In applying this standard, all inferences arising from the record "must be drawn and indulged in favor of" the nonmoving party. *Plotke*, 405 F.3d at 1093-94, quoting *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003). The court does not weigh the evidence or make credibility determinations at the summary judgment stage as those are "jury functions, not those of a judge." *Id.* at 1094. Rather, the court's role "is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim." *Stinnett*, 337 F.3d at 1216.

Simply put, if there are triable issues of fact on the plaintiffs' claims, summary judgment is inappropriate. *See, e.g.*, *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1139-40, 1144 (10th Cir. 2008) (reversing summary judgment where record showed triable issues of fact).

### On this record, triable issues of fact existed precluding summary judgment on Edmonds-Radford's ADA disparate treatment claim.

#### a. Ms. Edmonds Radford established a prima facia case of discrimination.

To establish a *prima case* of disparate treatment disability discrimination, a plaintiff must demonstrate she (1) is a disabled person as defined by the ADA, (2) is qualified, with or without reasonable accommodation, to perform the essential

functions of the job, and (3) suffered discrimination by an employer because of that disability. *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037-38 (10th Cir. 2011). In granting summary judgment, the district court erroneously concluded Edmonds-Radford failed to show the second and third elements of her prima facie case.6 The court failed to view the evidence in the light most favorable to Edmonds-Radford.

Concluding Edmonds-Radford failed to show that was qualified, the district court determined that she was provided all the additional training she requested. ROA Vol. III at 54. But the record, including Southwest's contemporaneous documentation of Ms. Edmonds-Radford's performance, shows she was qualified.

Southwest's performance appraisal of Edmonds-Radford shows that in Dallas, where she was provided reasonable accommodation, in 15 of 18 categories her performance was "Satisfactory." ROA Vol. II at 673-75. In the other three categories, she was rated as "Needs Improvement," which Southwest defines as "does not meet all expected results. Supervision needed." But she did not receive a single "Unacceptable Rating" in any appraisal category. *See id.*

The comments from the Southwest personnel rating her include many positive remarks contradicting Southwest's argument that she could not "interact

---

6 There was no dispute that Edmonds-Radford was a person with a disability under the ADA. ROA Vol. III at 52.

with people":

- Kris has been given an overall Satisfactory Rating in 'Attitude'. *She is exactly where we expect to see a Customer Service Agent for the first 50 day review period.*"

- "*Kris has no problem communicating with her Peers and Leaders while on the job*, and genuinely appears to be having fun getting to know her Denver Co-Hearts. Kris's smile is as infectious as her Spirit, and her kindness is appreciated by all who work with her."

- "During Dallas Training, Kris spoke with facilitator Carol Barnes to explain that she understands and interprets information differently. *This initiative was appreciated by Carol, and she explained 'Kris has a great attitude! I know she will give 110%!'* Kris graduated from Dallas training with a 93% GPA."

- "Throughout Kris's on the job training, her Station Trainers have also been impressed with her attitude and demeanor. Members of the Training team have stated *'her personality is fantastic', 'Kris is so upbeat and focused on mastering all aspects of the job', and 'she has great presence and is not afraid to ask questions for better understanding.'*"

- "*Kris handles her internal and external Customers with grace and benevolence, and has a way of making sure that people feel cared for and important. She actively listens to Customer concerns and addresses them to the best of her abilities at a one-on-one level. **This was exemplified in a commendation letter that Kris received that stated 'I fly SWA once or twice a week. I won't fly anyone else because of people like Krista.'**"*

ROA Vol. II at 673-75 (emphasis added).

As recently as the day before her initial January 2015 termination, Edmonds-Radford had received several commendations for her work from Southwest's CEO and others, in the form of written "Kick Tails." ROA Vol. V at 28-37. Further, Edmonds-Radford's treating physician explained that while her conditions affected

her ability to interact with people, she was able to function well if given the requested accommodations. *See* ROA Vol. II at 801-02.

The district court concluded, however, that she was not qualified because she was provided all the additional training she requested and "was unable to adequately master the duties of the job." ROA Vol. III at 54. That conclusion is clearly erroneous and cannot be squared with the record evidence, noted above, showing her ability to perform her job duties. Nor can it be squared with the evidence showing Southwest did *not* provide all the requested training.

As noted above, Southwest failed to provide the requested training where Edmonds-Radford actually needed it, at the gate. ROA Vol. II at 682-86 (depo 91-96, 112-18); 697 (depo 177-78); ROA Vol. II at 467.

Moreover, Southwest didn't prepare any trainers in Denver to provide her reasonable accommodations. Instead, the trainers in Denver—unlike the professional trainers in Dallas—were simply her co-workers, some of whom were just working with her at the same time. ROA Vol. II at 692-94 (depo 148-53); 696 (depo 173-74); 716 (depo 73-76). Southwest did not train them to train people with a learning disability. In fact, it did not even inform them of Edmonds-Radford's disability or need for accommodation. ROA Vol. II at 712-16 (depo 60-62, 65-76).

In Denver, Southwest used Ms. Edmonds-Radford's co-workers—not professional trainers— to provide "training" during their own work shifts. ROA Vol. II at 692-94 (depo 148-53); 696 (depo 173-74); 716 (depo 73-76); 732-33 (depo 225-31); 800 (table showing training mostly at counter not at gate). To the extent she continued to have "issues" at the gate – as opposed to the counter—it was because of the lack of the appropriate training—training she had requested. ROA Vol. II at 682-86 (depo 91-96, 112-13, 115-18); 697 (depo 177-78); 800; 712-21 (depo 60-62, 65-82, 85-96).

During the 30(b)(6) deposition, Mr. Watkins in no uncertain terms admitted that Southwest decided to reinstate Ms. Edmonds-Radford because it believed that with appropriate and reasonable accommodations she could perform the essential duties of her position. Mr. Watkins specifically described the reasonable accommodations Southwest was planning to provide after her reinstatement— which it had not provided before. R. Vol. at 638 (Watkin Depo. at 77-82; 85-96; 97-100 (Rule 30(b)(6) designee describing the reasonable accommodations Southwest could provide *after* reinstatement—accommodations that Southwest did not provide to Ms. Edmonds-Radford before terminating her in January 2015 without engaging in interactive process).

It is undisputed that Southwest never provided those reasonable accommodations before it cut off all communications with Ms. Edmonds-Radford

in September 2015.  Because it cannot be disputed that Ms. Edmonds-Radford was not able to start her job after the reinstatement decision, it is also undisputed that Southwest's own admittedly reasonable—but missing—accommodations were never implemented before Southwest terminated Ms. Edmonds-Radford for the second time. R. Vol. at 638 (Watkin Depo. at 77-82; 85-96; 97-100. Therefore, it not clear how Southwest, in good faith, could claim that Ms. Edmonds-Radford was not able to perform the duties of her job with reasonable accommodations when it is undisputed that she never got the opportunity to perform her job duties with the accommodations described by Mr. Watkins as reasonable and necessary. Accordingly, based on Mr. Watkin's/Southwest's own admissions alone, the trial court could not conclude that as a matter of law Ms. Edmonds-Radford was not able to perform her job functions with reasonable accommodations.

The trial court also ignored Southwest's legal duty to engage in interactive process, that "an employer must take reasonable steps to reassign a qualified individual to a vacant position or a position the employer reasonably anticipates will become vacant in the fairly immediate future . . . the employer and employee must engage in an interactive process to determine what position would be appropriate." *Albert v. Smith's Food & Drug Ctrs., Inc*., 356 F.3d 1242, 1252 (10th Cir. 2004) (emphasis added) (internal citations omitted); *Koessel v. Sublette County Sheriff's Dep't,* 717 F.3d 736, 745 (10th Cir. 2013).  It is undisputed that

Southwest fired Edmonds-Radford for the second time before even providing her the accommodations described by Watkins to see if it would enable her to perform her duties. It is also undisputed that Southwest did not follow its own policy to notify Edmonds-Radford in a written letter that it had fired her. Therefore, it cannot be disputed that Southwest did not engage in interactive process to explore other avenues to accommodate her before firing her.

Based on the foregoing, the trial court's finding that Southwest had provided all reasonable accommodations to Edmonds-Radford *before* firing her is in direct contradiction to the record and Southwest's admission and therefore clearly erroneous. The record that with proper accommodations she was qualified to perform her job functions.

### b. *Ms. Edmonds-Radford's disability was a determining factor in Southwest's decision to terminate her*

The district court also concluded that Edmonds-Radford was unable to demonstrate the third element of her prima facie case that she was terminated because of her disability. The court concluded that there was not affirmative evidence her disability was a determining factor in the decision to terminate her in January 2015. The court did not apply the correct legal standard. Its conclusion of law is erroneous and cannot be supported by the record.

To establish the third element, the causal connection, Ms. Edmonds-Radford had to "provide some evidence that her disability was a determining factor in [Southwest's] decision to terminate her." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 878 (10th Cir. 2004).

It is true that "[a]n employee cannot state a cause of action for disability discrimination when her employer terminated her for reasons unrelated to a disability." *Id.* (*citing Foster* v. Arthur Andersen, LLP, 168 F.3d 1029, 1033 (7th Cir.1999)). Here, however, the reasons offered by Southwest are all related to Ms. Edmonds-Radford's ability/disability to perform. And it should be emphasized that all Ms. Edmonds-Radford had to show was that her disability was a determining factor. That she has done.

The evidence showed (1) her performance was satisfactory with reasonable accommodations; (2) she did not receive the accommodations (the additional training) in Denver; and (3) she was terminated despite her Southwest's admission that upon reinstatement, with proper accommodations, she would be able to perform the functions of her job. *See supra,* Statement of the Case. A reasonable inference of discrimination can be drawn from (1) the failure to provide reasonable accommodations (as described by Mr. Watkins) and (2) the termination soon after her return to Denver. And it is noteworthy that after raising the issue with the CEO

after her termination, Edmonds-Radford was reinstated quickly and provided a plan to receive proper accommodations (as described by Mr. Watkins).

That evidence alone shows, and a reasonable jury certainly could find, that her disability was a determining factor in terminating her.

### c. *Southwest's explanation for its employment action was unworthy of belief—pretextual.*

As to the first discriminatory termination and failure to accommodate, Southwest argued that it articulated a legitimate reason for her termination (poor performance and failure to pass probation). But, as explained above, this record demonstrates that Edmonds-Radford *could* perform her job duties with the appropriate accommodations. Furthermore, Southwest admitted that when it decided to reinstate her, it expected her to be able to perform her job with the new accommodations it had not provided her. Based on this evidence, as well as the fact that Southwest reinstated her, recognizing its mistake in terminating her in the first place, a reasonable jury could find Southwest's stated reasons were pretexts for discrimination.

This is all that is required to get past summary judgment. *See Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir. 2010) ("A plaintiff produces sufficient evidence of pretext when she shows 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could

rationally find them unworthy of credence and hence infer that the employer did

not act for the asserted non-discriminatory reasons.' *Jaramillo v. Colo. Judicial

Dep't,* 427 F.3d 1303, 1308 (10th Cir. 2005)"). Here, there is a genuine issue of

material fact as to whether Southwest's explanation for its employment action was

pretextual or unworthy of belief. It was therefore reversible error to grant

summary judgment.

Because the trial court failed to apply equitable tolling, *see infra*, it did not

address the discrimination claim related to Edmonds-Radford's second termination

in late 2015. The evidence of discrimination there also precluded summary

judgment.

Southwest claimed Edmonds-Radford could not perform her essential job

duties because she could not obtain a SIDA badge after her reinstatement. ROA

Vol. II at 331-32. But the record shows Southwest actively prevented her from

obtaining the badge.

Edmonds-Radford obtained her documents necessary for the SIDA badge by

September 3, 2015. ROA Vol. II at 689 (depo 134). But after she told Southwest

she obtained the documents, Southwest cut off communications with her and did

not renew the authorization required by the airport in order to issue the SIDA

badge. ROA Vol. II at 740-43 (depo 269-76, 281-86); 690-91 (depo 140, 142),

727-30, 736-38 (depo 168-72, 213-18, 253-64).

Further, as explained above, Southwest continued the pretense of good faith settlement negotiations with the EEOC without notifying the EEOC or Edmonds-Radford that it had terminated her for the second time. *See, Supra,* Statement of the Case.

From this evidence the, a reasonable jury could infer and find that Southwest intentionally prevented her from obtaining her SIDA badge, despite her then being able to perform her job duties and resume working for Southwest. The jury could conclude that Southwest engaged in discrimination (and retaliation) by preventing her from obtaining her badge. This claim should proceed to trial.

Finally, Southwest refused to produce the most crucial pieces of evidence regarding the issues of causation and pretext, the information from its investigation of the discrimination and retaliation claims and the letter from its legal department left with employees waiting for Edmonds-Radford to pick it up.

> d. ***The trial court allowed Southwest to withhold evidence of causation and pretext[7]***

A party asserting the attorney-client privilege has the burden of establishing the relationship and the privileged nature of the communication. *Ralls v. United States*, 52 F.3d 223, 225 (9th Cir. 1995). Appellate courts review the question whether the party has met these requirements *de novo*. *Id.* The Court also reviews

---

[7] This argument equally applies to the failure to accommodate claim and is incorporated *infra*.

district court's rulings on the scope of the attorney-client privilege *de novo*. *United States v. Blackman*, 72 F.3d 1418, 1423 (9th Cir. 1995).

The Court reviews the district court's law application and conclusion as to whether attorney-client privilege applies as "a mixed question of law and fact which this court reviews independently and without deference to the district court." *United States v. Bauer*, 132 F.3d 504, 507 (9th Cir. 1997).

These issues were fully briefed and ruled upon. ROA Vol. II at 8-19 (motion), 193-201 (reply), 282-287 (objection), 313 (summary denial).

Edmonds-Radford requested that Southwest produce all emails related to the investigation of her claims after she send the letter to the CEO. Southwest simultaneously claimed that it had a right to destroy Edmonds-Radford's emails while assert attorney-work-product privilege and refusing to produce the correspondence regarding the investigation; the information related to the same matters produced in the same period of time. The trial court allowed Southwest to withhold the information and denied Edmonds-Radford's request for an adverse inference.

Considering the importance of the correspondence regarding the investigation of Edmonds-Radford claims and the correspondence among the parties in that time period—which are most relevant to the causation and pretext issues—considering that the person in charge of the investigation was not a lawyer,

ROA Vol. II at 195, 196, and considering that Southwest could not carry its burden to prove that the communications were privileged—Southwest asserted that it did not have a duty to preserve the information because it did not anticipate any legal claims—the trial court erred by allowing Southwest to withhold the documents and denying Edmonds-Radford's request for an adverse inference in its analysis of the causation and pretext issues on Edmonds-Radford's claims.

Similarly, Southwest withheld the letter it had left for Edmonds-Radford to pick up during one of the most critical periods in this case; when Edmonds-Radford notified Southwest that she obtained her documents and was ready to obtain her SIDA badge. Southwest withheld that letter, asserting privilege. Southwest did not meet its burden to prove how a finalized letter from Southwest's legal department to Edmonds-Radford which was left with a non-lawyer employee at DIA to be delivered to Edmonds-Radford could be privileged. *See, e.g., Hardy v. New York News, Inc.*, 114 F.R.D. 633, 643-44 (S.D. N.Y. 1987) ("When the ultimate corporate decision is based on both a business policy and a legal evaluation, the business aspects of the decision are not protected simply because legal considerations are also involved."); *see also* ROA Vol. II at 1078-81, 1272. Edmonds-Radford requested that trial court include the letter in the record. The letter is a part of the sealed record on appeal. Edmonds-Radford requests that this honorable Court review the letter. *See* Supplement to Unopposed Motion to

Complete the Record, filed July 27, 2020); Order granting the motion, issued July 28, 2020.

***On this record, a reasonable jury could find in favor of Edmonds-Radford on her failure to accommodate claim.***

### Preservation and Standard of Review.

After full briefing, the district court granted summary judgment on the failure to accommodate claim.  ROA Vol. III at 57-62.  The issue is preserved. This court reviews the grant of summary judgment de novo. *Plotke*, 405 F.3d at 1093.

### The McDonnell Douglas test is inapplicable.[8]

In a reasonable accommodation case, the "discrimination" is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations.  The ADA compels employers to modify their work requirements to enable disabled individuals to have the same opportunities as their non-disabled counterparts. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999); 29 C.F.R. § 1630, app. (2003) ("The reasonable accommodation requirement is best understood as a means by which barriers to the equal employment opportunity of an individual with a disability are removed or

---

[8] Edmonds-Radford recognizes that Tenth Circuit precedent applies the *McDonnell Douglas* test.  But this issue is raised to preserve it for en banc or Supreme Court hearings, as other circuits have adopted the contrary position.

alleviated."); *see also Peebles v. Potter*, 354 F.3d 761, 766-67 (8th Cir. 2004)

("Reasonable accommodation claims are not evaluated under the McDonnell

Douglas burden-shifting analysis."); *cf. Feist v. La., Dep't of Justice, Office of the*

*Att'y Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (discussing elements of failure-to-

accommodate claim); *Brumley v. UPS*, 909 F.3d 834, 839 (6th Cir. 2018); *see also*

*Hollis v. Chestnut Bend Homeowners Ass'n*, 760 F.3d 531, 540 (6th Cir. 2014)

(addressing this issue in Fair Housing Act reasonable accommodation context)

(citing *Astralis Condo. Ass'n v. Sec'y of U.S. Dep't of Hous. & Urban Dev.*, 620

F.3d 62, 67 (1st Cir. 2010); *Schwarz v. City of Treasure Island*, 544 F.3d 1201,

1218-19 (11th Cir. 2008); *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d

737, 749 (7th Cir. 2006); *Giebeler v. M&B Assocs.*, 343 F.3d 1143, 1147-49 (9th

Cir. 2003); *Bryant Woods Inn, Inc. v. Howard Cnty.*, 124 F.3d 597, 603-04 (4th

Cir. 1997); *Hovsons, Inc. v. Twp. of Brick*, 89 F.3d 1096, 1103-06 (3d Cir. 1996)).

But even if the prima facie case requirement of *McDonnell-Douglas* were to

apply in reasonable accommodation cases, Ms. Edmonds-Radford has met it.

### *A reasonable jury could find in favor of Edmonds-Radford on her failure to accommodate claim.*

The Tenth Circuit's formulation of the *McDonnell Douglas* test for failure-

to-accommodate claims requires Edmonds-Radford to initially show "(1) she is

disabled; (2) she is 'otherwise qualified'; and (3) she requested a plausibly

reasonable accommodation." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017). Upon making that showing, the burden of production shifts to Southwest to "present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." *Punt*, 862 F.3d at 1050. "If the employer does either of the above, summary judgment will be appropriate for the employer unless the employee then presents evidence establishing a genuine dispute regarding the affirmative defenses and/or rehabilitates any challenged elements of . . . her prima face case sufficiently to establish at least a genuine dispute of material fact as to such challenged elements." *Id.* On this record, viewed in the light most favorable to Edmonds-Radford as the nonmoving party, summary judgment was inappropriate, and the claim should proceed to trial.

First, as explained above, the district court erred in concluding Edmonds-Radford was not an otherwise qualified individual. It repeated that error in addressing this claim. *See* ROA Vol. III at 59.

Second, the court also erred in concluding Southwest was not made aware of her disability, again failing to view the evidence in the light most favorable to Edmonds-Radford. The court acknowledged "there is evidence that she informed her trainer in Dallas that she required accommodation," but said her deposition

testimony "does not support her self-serving claim that she informed all her trainers and supervisors at DIA." ROA Vol. III at 60-61.

Here the court erred by weighing the evidence and making credibility determination when it rejected Ms. Edmonds-Radford's statement under oath during the deposition calling them "self-serving." *Plotke*, 405 F.3d at 1094; *E.E.O.C. v. LHC Grp., Inc.,* 773 F.3d 688, 701 (5th Cir. 2014) (same). It's the function of the jury, not the trial court, to decide which party they believe. *Id.* Viewing the evidence in the light most favorable to Edmonds-Radford, she has satisfied the second element.

In addition, the record contradicts the court's conclusion. Edmonds-Radford testified that she informed *all* her trainers and supervisors about her disabilities and request for training. ROA Vol. II at 684-87, 691-92 (depo 112-13; 120-21; 143-47). Southwest's own policy and training requires anyone so informed to contact the ACT team (which is what happened after she wrote to Southwest's CEO after her termination). ROA Vol. II at 723 (depo 141-142). But the trainers and supervisors who had a duty to inform the ACT team failed to do so. ROA Vol. II at 706-08, 713-14 (depo 28-33, 61-62, 64-65). The district court simply ignored Edmonds-Radford's testimony that she informed her trainers and Southwest's testimony that the trainers had a duty to inform the ACT team.

Therefore, its factual findings are clearly erroneous. They impermissibly

weigh evidence and engage in credibility assessment, *Plotke*, 405 F.3d at 1094, and fail to view the evidence in the light most favorable to her. Edmonds-Radford presented sufficient evidence to establish her prima facie case for her failure-to-accommodate claim and it was reversible error for the court to grant summary judgment on that basis.

Because the district court granted summary judgment on the basis of the prima facie case, it did not analyze the failure-to-accommodate claim any further. But on this record, even if Southwest could meet its burden to "present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer," *Punt*, 862 F.3d at 1050, the claim should have gone to a jury because Edmonds-Radford, as demonstrated above, presented "evidence establishing a genuine dispute regarding the affirmative defenses and/or rehabilitates any challenged elements of ... her prima face case sufficiently to establish at least a genuine dispute of material fact as to such challenged elements." *Id*.

The genuine issue of material fact remains as to whether Southwest's explanation for its employment action—that as the trial court put it, Southwest "terminated Plaintiff in January 2015 due to her inability to successfully master the job duties of a Southwest Customer Service Agent during her probationary

period"—was pretextual or unworthy of belief. *See also* supra (incorporated here).

Edmonds-Radford testified she was not provided reasonable accommodations in Denver. *See* ROA Vol. II at 682-85, 693-94, 697 (depo 91-92, 94-96, 112-13, 150-53, 178-79). Southwest admitted it had no trainers trained to address the needs of individuals with mental disabilities and that it did not even inform its trainers that their trainee had a disability that required accommodation. ROA Vol. II at 692-94, 696 (depo 148-53, 173-74); 712-13, 716 (depo 60-62, 73-76). Southwest admitted it could have provided her reasonable accommodations that it had not offered before firing her in January 2015. ROA Vol. II at 712-23 (depo 60-62, 65-82, 85-100). Southwest did not provide such accommodation and in fact retaliated against Edmonds-Radford after she requested back-pay for her January 2015 wrongful termination. If such accommodation was not adequate, Southwest had an obligation to continue to engage with her. Southwest did neither. Instead, it cut off all communications with Edmonds-Radford and did not respond to her inquiries about other accommodations and potential reassignment. ROA Vol. II at 736-39 (depo 253-65); 809; ROA Vol. V at 101 (7.10.15 entry: "EE asked about transferring to ATL").

Based on these facts, a reasonable jury could find that Ms. Edmonds-Radford notified Southwest of her disability and requested reasonable accommodations, but Southwest refused to provide her reasonable accommodations in violation of

federal law. Accordingly, it was reversible error to grant summary judgment on the failure-to-accommodate claim.

Furthermore, as noted in the case of her other claim, the trial court also ignores Southwest's legal duty to engage in interactive process, that "an employer must take reasonable steps to reassign a qualified individual to a vacant position or a position the employer reasonably anticipates will become vacant in the fairly immediate future . . . the employer and employee must engage in an interactive process to determine what position would be appropriate." *Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1252 (10th Cir. 2004) (emphasis added) (internal citations omitted); *Koessel v. Sublette County Sheriff's Dep't,* 717 F.3d 736, 745 (10th Cir. 2013).

The trial court found that Ms. Edmonds-Radford is disabled. It is undisputed that before terminating Ms. Edmonds-Radford, Southwest did not engage in interactive process. Considering that the question whether Ms. Edmonds-Radford is an otherwise qualified individual cannot be answered without fist engaging in an interactive process to determine what reasonable accommodations could enable her to perform her duties and considering that it is undisputed that Southwest did not engage in an interactive process to make such determination before terminating Ms. Edmonds-Radford, the trial court's conclusion is clearly erroneous and against the weight of the record.

In fact, a reasonable jury could see through Southwest's allegations and conclude that it reinstated Ms. Edmonds-Radford precisely because it recognized that it had violated federal laws in failing to provide reasonable accommodations, and in terminating Ms. Edmonds-Radford, without even starting to engage in interactive process.

***On this record, a reasonable jury could find in favor of Edmonds-Radford on her retaliation claim.***

### *Preservation and Standard of Review.*

The district court granted summary judgment on the retaliation claim. ROA Vol. III at 62-66. The issue is preserved. This court reviews the grant of summary judgment de novo. *Plotke*, 405 F.3d at 1093.

### *Triable issues exist on the retaliation claim; therefore, the district court reversibly erred in granting summary judgment.*

"The ADA's retaliation statute provides that '[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'" *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018), quoting *Foster v. Mountain Coal Co., LLC,* 830 F.3d 1178, 1186 (10th Cir. 2016) (quoting 42 U.S.C. § 12203(a)).

To make out a prima facie case of retaliation, Edmonds-Radford must show (1) she engaged in protected opposition to discrimination; (2) a reasonable employee would have found Southwest's subsequent action to be materially adverse; and (3) a causal connection exists between her protected activity and the employer's action. *Lincoln*, 900 F.3d at 1209. She met this standard.

In granting summary judgment on the retaliation claims, the district court based its conclusion first on its erroneous determination that Edmonds-Radford had not engaged in the protected activity of informing Southwest of her disability before her first termination. *See* ROA Vol. III at 64. As explained above, however, the district court failed to view the evidence in the light most favorable to Edmonds-Radford.

That evidence showed that she was not provided reasonable accommodations in Denver, despite informing all her trainers and supervisors of her disabilities and requesting accommodations: additional appropriate training. *See* ROA Vol. II at 682-85, 693-94, 697 (depo 91-92, 94-96, 112-13, 150-53, 178-79); ROA Vol. II at 684 (depo 112-13); 686-87 (depo 120-21), 691-92 (depo 143-47). "An employee's request that his employer provide him an accommodation for a disability constitutes a protected activity for purposes of advancing an ADA retaliation claim." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018). Therefore, the trial court's conclusion that Edmonds-Radford did not engage in

protected activity is clearly erroneous.

It is also undisputed that the trainers and supervisors Edmonds-Radford informed had, according to Southwest policy, a duty to inform the ACT team. ROA Vol. II at 706-08 (depo 28-33); 713-14 (depo 61-65). She, therefore, did what she needed to do to inform the ACT team. Edmonds-Radford was, however, fired soon after without being provided the appropriate accommodations that could actually enable her to perform the essential duties of her job. Thus, a jury could reasonably infer that she was terminated for requesting the additional and appropriate training and other accommodations. This inference is bolstered by the fact that once Edmonds-Radford brought this to CEO Kelly's attention, Southwest reversed course and initially agreed to reinstate her. On this record, she satisfied her prima facie case as to Southwest's initial retaliation.

Because the district court did not apply equitable tolling and because it found the Rehabilitation Act does not apply, it did not address Edmonds-Radford's retaliation claim as to her second termination in late 2015. As explained above, both those conclusions are in error. On that claim, the record also shows Southwest engaged in retaliation.

As noted, Southwest actively and intentionally prevented Edmonds-Radford from obtaining her SIDA badge and thereby made it impossible for Edmonds-Radford to return to work. *See supra* Statement of the Case. Edmonds-Radford

was ready, willing and able to return to work, but Southwest interfered with her ability to get the SIDA badge. A reasonable jury could conclude that Southwest engaged in retaliation against her for her contacting the EEOC in July 2015 and filing her EEOC charge in August 2015. *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1187 (10th Cir. 2016) ("Certain employee actions, such as filing an EEOC complaint, are **indisputably protected activities under the ADA**.").

The timing of Southwest's interference coincides remarkably with the filing of the EEOC charges. She had her documents by September 3, 2015, less than 2 weeks after she filed her EEOC charge. Southwest cut off communication with her and interfered with her getting her badge, thereby rendering her unable to return to work. A jury could find in favor of Edmonds-Radford on this retaliation claim, and therefore it was reversible error to grant summary judgment.

## Equitable tolling applies
### Preservation and standards of review.

The district court permitted amendment of the complaint and ordered the parties to address whether plaintiff had exhausted her administrative remedies on her amended claim (the Third Claim). *See* ROA Vol. II at 1245, 1304-11; 1311. Southwest argued she had not. *See* ROA Vol. II at 1325-34. Edmonds-Radford argued that equitable tolling applied. ROA Vol. III at 18-22. The court declined to apply equitable tolling and concluded that Edmonds-Radford had failed to exhaust her administrative remedies as to her allegations "that Southwest engaged in

unlawful employment practices in August/September 2015, and when it thereafter

terminated her employment in the Fall of 2015." Order at 13-17; ROA Vol. III at

47-51. The issue is preserved.

This court reviews a district court's denial of equitable tolling for abuse of

discretion. *Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002) (Title VII); *Al-*

*Yousif v. Trani*, 779 F.3d 1173, 1177 (10th Cir. 2015) (AEDPA). Under *Hulsey v.*

*Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994), equitable tolling is appropriate

where there is active deception by the defendant-employer. Such active deception

occurred here and is reflected in the record. The trial court abused its discretion by

misconstruing the record and concluding there was not active deception by

Southwest.

### *The district court erred in requiring Ms. Edmonds-Radford to exhaust administrative remedies where the failure to exhaust was a result of Southwest's actions.*

In granting Edmonds-Radford's motion to amend over Southwest's

objection she had not timely moved to amend, the district court noted

> Plaintiff has sufficient reason for the delay – specifically, that she was not made aware, until discovery, of Southwest's specific act to end their employment relationship after she attempted reinstatement. Southwest does not deny that it failed to notify her at that time; rather, it contends that she should have known of the termination and that, at the least, she should have been aware of it in April of 2018 (not October 2018) when the documentation of the second termination was initially provided in discovery.

> Southwest's assertion that it is simply not plausible that

Plaintiff spent three years believing that she was still a Southwest employee is misplaced. Rather, its Plaintiff's contention that she was not made aware of Southwest's specific act of termination after her reinstatement was unsuccessful until discovery in this case. I agree with Plaintiff that Southwest's failure to notify her of her second termination provides adequate explanation and good cause for her delay which, in turn, justifies allowing amendment . . . .

I further conclude that, under the circumstances, Plaintiff's failure to seek amendment does not constitute undue delay, bad faith or dilatory motive; nor does it amount to undue prejudice to the opposing party supporting a denial of a request for leave to amend under Rule 15(a). To the extent Southwest argues that I should deny Plaintiff's request for leave to amend on the grounds that such amendment would be futile – in that the evidence is undisputed that it did not actually employ Plaintiff after its unconditional offer of reinstatement because she was unable to obtain a SIDA badge – such argument will be addressed in my ruling on Southwest's pending motion for summary judgement [sic].

ROA Vol. II at 1310.

But in declining to apply equitable tolling in granting summary judgment, the district court concluded that its ruling on the motion to amend did not "dictate a finding that Plaintiff has shown active or intentional concealment for purposes of equitable tolling." ROA Vol. III at 49. That conclusion ignores the evidence viewed in the light most favorable to Edmonds-Radford.

The record shows the delay was caused by Southwest concealing information that it had terminated Edmonds-Radford a second time. The purpose of exhaustion of administrative remedies is to provide the employer the opportunity to address the claims before the administrative body. *Foster v.*

*Ruhrpumpen, Inc.*, 365 F.3d 1191, 1195 (10th Cir. 2004). It is not to reward an employer who hides vital employment information from a plaintiff, her counsel, or the EEOC. The EEOC and Ms. Edmonds-Radford were provided identical information regarding Southwest's actions from January 2015 until issuance of the first Notice of Right to Sue on August 24, 2016. As Southwest admitted, in late summer and fall of 2015 it was actively engaged in settlement negotiations with the EEOC to reinstate Ms. Edmonds-Radford. ROA Vol. II at 1327. Yet, during those negotiations, Southwest did not inform the EEOC or Edmonds-Radford that it was terminating Ms. Edmonds-Radford for the second time.

Filing a timely charge with the EEOC is not a jurisdictional prerequisite to suit in federal court, but instead a requirement that, like a statute of limitations, is subject to waiver, estoppel and equitable tolling. *Granger v. Aaron's, Inc*., 636 F.3d 708, 711 (5th Cir. 2011) (affirming equitable tolling). Under the doctrines of waiver and estoppel, an employer who intentionally conceals further acts of retaliation should not be able to claim that the plaintiff has failed to exhaust administrative remedies. Contrary to the district court's summary judgment ruling, the record shows Southwest intentionally concealed its second termination of Edmonds-Radford from both her and the EEOC. Southwest should not be rewarded for its concealment.

Bases for equitable tolling include a plaintiff's "unawareness of the facts

giving rise to the claim because of the defendant's intentional concealment of them." *Granger*, 636 F.3d at 712. Such tolling should apply here because Southwest continued to deliberately conceal the fact of the second termination during and after its negotiations with the EEOC and Ms. Edmonds-Radford, and even after this action was filed.

The district court failed to view the evidence in the light most favorable to Edmonds-Radford by relying on a cryptic document provided in discovery in April 2018. The court erroneously referred to the document as "unambiguously" revealing that her employment was terminated on August 21, 2015. ROA Vol. III at 50. Not only is the document anything but unambiguous, but the record shows that Southwest inconsistently stated what the date of the second termination was.

The document at issue was this screen capture printout of some electronic Southwest personnel record for Edmonds-Radford:

| Pers.No. | 109662 | | | | | | |
|---|---|---|---|---|---|---|---|
| Name | Krista Levenus Edmonds Radford | | | | | | |
| EE group | D Regular | | Personnel ar | DEN | CO-Denver-DEN | | |
| EE subgroup | 03 Union Hourly FT | | | | | | |
| Choose | 01/01/1800 | to | 12/31/9999 | | | | |

| Start Date | End Date | Act. | Action type | AttR | Reason for action | Cu... | L... |
|---|---|---|---|---|---|---|---|
| 08/21/2015 | 12/31/9999 | ZJ | Termination | 37 | Invol-Unsatisfactory Perform | T | 0 |
| 07/10/2015 | 08/20/2015 | ZM | Reinstatement | 01 | Grievance Settlement | A | 3 |
| 01/21/2015 | 07/09/2015 | ZJ | Termination | 37 | Invol-Unsatisfactory Perform | T | 0 |
| 09/29/2014 | 01/20/2015 | ZD | New Hire | 01 | New Hire | A | 3 |
| 09/19/2014 | 09/28/2014 | ZA | Prehire | 01 | New Hire | P | 1 |

ROA Vol. II at 1287. This document does not clearly indicate that she was terminated in August 2015, especially since Southwest asserted the termination

decision was "sometime after Thanksgiving 2015, *retroactive to August 21, 2015.*" ROA Vol. II at 327 (emphasis added). It is undisputed that in late 2015—*after* August 21, 2015—Southwest was still negotiating with the EEOC but failed to inform the EEOC or Edmonds-Radford that it had, supposedly, terminated her August 21, 2015. The 30(b)(6) deposition testimony further demonstrated the lack of clarity over when and how Southwest made the second termination decision. *See* ROA Vol. II at 724, 734-37 (depo 149-50, 246-60). The record contradicts the court's conclusion that the screen capture unambiguously showed the second termination was in August 2015. Even during the October 2018 deposition of Mr. Watkins, Southwest could not confirm when it actually fired Edmonds-Radford for the second time. *See* ROA Vol. II. at 744 (depo 289-90).

The record shows that during the negotiations with the EEOC, Southwest continued to pretend that it intended to reinstate Ms. Edmonds-Radford. Given Southwest's active, and blatant, concealment, it was not until October 2018 that plaintiff and her counsel knew, with certainty, that Southwest had terminated her at some point in 2015.

The district court abused its discretion by misconstruing the record in determining equitable tolling does not apply.

## CONCLUSION

The court should reverse the summary judgment and remand for a trial on

the merits on the Rehabilitation Act, ADA, and Retaliation claims.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested in this case. Oral argument will assist the panel in navigating the summary judgment record and the evidence that supports both Edmonds-Radford's discrimination claims and retaliation claims. Oral argument is necessary to address the nuances in the applicable case law as well as to address the factual record and how the district court reversibly erred in granting summary judgment.

Respectfully submitted this 8th day of September 2020.

*/s/ Katayoun A. Donnelly*
Katayoun A. Donnelly
*Azizpour Donnelly LLC*
2373 Central Park Blvd., Suite 100
Denver, CO 80238
Phone: (720) 675-8584
Email: katy@kdonnellylaw.com

Blain Myhre
*Blain Myhre LLC*
PO Box 3600
Englewood, CO 80155
(303) 250-3932
blainmyhre@gmail.com

Attorneys for Plaintiff-Appellant

## CERTIFICATIONS

I certify that the following is true and correct to the best of my knowledge and belief, formed after a reasonable inquiry:

(1) This pleading is proportionally spaced and complies with the applicable type-volume limitations.

(2) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,760 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

(3) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 pt. Times New Roman.

(4) Any required privacy redactions have been made.

(5) If required to file additional hard copies, the ECF submission is, except for any redactions, an exact copy of those hard copies.

(6) The ECF submission was scanned for viruses with the most recent version of a commercial virus-scanning program Avast Security Mac (Version 14.3), which is continuously updated, and, according to the program is free of viruses.

(7) On September 8, 2020, I electronically filed the foregoing using the

CM/ECF system, which will send notification of this filing to opposing counsel.

Margaret Parnell Hogan
Thomas W. Carroll
LITTLER MENDELSON, P.C.
1900 16th Street, Suite 800
Denver, CO 80202
mphogan@littler.com, tcarroll@littler.com
*Attorneys for Appellee*

/s/ *Katayoun A. Donnelly*
Katayoun A Donnelly

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, JUDGE

Civil Case No.  16-cv-02860-LTB-STV

KRISTA EDMONDS-RADFORD,

     Plaintiff,

v.

SOUTHWEST AIRLINES CO.,

     Defendant.

---

## ORDER

---

This matter is before me on a Motion for Summary Judgment filed by

Defendant Southwest Airlines Co. ("Southwest") seeking dismissal of the disability

discrimination claims raised against it by Plaintiff Krista Edmonds-Radford. [**Doc**

**#125**]  The motion has been fully briefed. [Docs #141 & #146]  Oral arguments

would not materially assist me in my determination.  After consideration of the

parties' arguments, briefs and extensive attachments, and for the reasons stated, I

GRANT Southwest's motion and, as a result, I DISMISS this case.

## I.  UNDERLYING FACTS

Southwest hired Plaintiff as a full-time Customer Service Agent at Denver

International Airport ("DIA") on September 29, 2014. [Doc #125-5]

Southwest Customer Service Agents receive both classroom training in

Dallas, Texas and on-site training. [Doc #125-5]  Approximately two weeks after the

beginning of her employment, Plaintiff went to her training in Dallas, where it is

undisputed that she struggled to understand the information and topics being covered. [Doc #125-13, #141-4]  During her training, Plaintiff told her classroom trainer that she had learning disabilities and that she hears/sees things differently than most people. [Doc #125-13, #141-4 pg. 144]  Plaintiff requested to sit at the front of the classroom and talk through each test question presented to her.  In addition, she was permitted to have lessons repeated and/or re-worded to aid in her comprehension. [Doc # 125-13, #141-4]  With these adjustments, Plaintiff graduated from her Dallas training with a "93% GPA." [Doc #125-13, 141-2]

After completing her training in Dallas, Plaintiff returned to DIA.  Plaintiff contends that she informed her trainers and supervisors at DIA about her disabilities, and she requested additional training.  Southwest disagrees that she informed her DIA supervisors of her disabilities, but agrees that Plaintiff requested and received training in addition to what would normally be provided to probationary Customer Service Agents.  It is Southwest's position that even with extra training and assistance, Plaintiff was unable to perform critical aspects of her position as a Customer Service Agent.  At her 50-day performance appraisal on December 10, 2014, Plaintiff was assessed with needing improvement in three of eight subcategories – Gate Procedures, Computer Abilities, and Irregular Operations. [Doc #125-14]

Thereafter, in early January 2015, Southwest provided Plaintiff with another ten days of additional training.  Managers of the Customer Service Agents then received written feedback from several of Plaintiff's trainers indicating that she was

still not meeting expectations. [Doc #125-2]  As a result, on January 20, 2015,

Southwest terminated Plaintiff's employment. [Doc #125-15]  Southwest maintains

that the reason for the termination was her ongoing performance deficiencies and

inability to perform essential job functions, resulting in a failure to pass probation.

[Doc #125-5]

 A month and a half after her termination, Plaintiff emailed various people at

Southwest, including its CEO.  In that email, dated March 2, 2015, Plaintiff

asserted that Southwest discriminated against her based on her race, age, gender,

and her learning disability. [Doc #125-16]  During Southwest's investigation of

Plaintiff's claims, Plaintiff provided Southwest's Accommodation & Career

Transition ("ACT") Team – which was responsible for determining whether a

reasonable workplace accommodation could be made for an employee's disability –

an ADA Medical Information Form ("ADA Form") on April 29, 2015, in which she

indicated that she has an Anxiety Disorder and PTSD.  She also requested specific

accommodations, including that:  job procedures be written down; she be shown how

to perform her duties at a slow pace; and she work with one person during training.

[Doc #141-4]   In a subsequent conversation with an ACT Team representative,

Plaintiff indicated that in order to be successful she would also like: up to one

month of training at gates; to be able to use her notes and not feel rushed; and to

work with the same trainer when possible. [Doc #141-4]

 Thereafter, on July 8, 2015, Southwest offered Plaintiff reinstatement to her

position as a full-time Customer Service Agent. [Docs #125-22, #141-3]  That

3

reinstatement offer included credit for all seniority purposes and probationary time, an unaffected attendance record, and reinstatement of sick-time accrual and benefits from the date of her January 2015 termination. [Doc #125-5]  The reinstatement offer did not include back-pay.  On July 27, 2015, Southwest's ACT Team sent Plaintiff a letter responding to her requests for accommodation as stated on her ADA Form.  Southwest agreed to provide Plaintiff additional time to complete tasks during training and/or to take and use notes while in training, and provided her with three dedicated trainers. [Doc #125-5]

As a condition of returning to work, Plaintiff was required to obtain a new Secure Identification Display Area ("SIDA") badge. [Docs #125-5, #141-4]  The Federal Transportation Security Administration and DIA authorities require SIDA badges so that employees can access certain secure parts of DIA.  The SIDA badges are issued through the DIA security office.  In order to receive a SIDA badge, Plaintiff was required to submit paperwork directly to DIA security, including a signed authorization from Southwest and her marriage and birth certificates.  Southwest provided Plaintiff a SIDA authorization on July 23, 2015. [Doc #141-40]  However, Plaintiff was unable to provide her required paperwork to DIA security before the SIDA authorization expired at the end of August 2015.  Plaintiff contends that the reason she was unable to obtain a SIDA badge – which was known to Southwest – is that she had misplaced her personal documents when she became homeless after she lost her job in January of 2015.  It is undisputed that without a SIDA badge, Plaintiff could not work as a Customer Service Agent for Southwest.

4

Plaintiff contends that she eventually obtained the necessary documents by September 3, 2015.  After she informed Southwest that she had found her documents, Plaintiff contends that Southwest "cut off communications with her" and failed to renew its authorization for her SIDA badge.  Plaintiff did not return to work at Southwest.

Plaintiff subsequently filed this lawsuit, on November 22, 2016, claiming disability discrimination. [Doc #1]  Plaintiff's First Amended Complaint alleges claims of:  1) failure to accommodate; 2) disability discrimination; and 3) retaliation. [Doc #40]  Southwest filed this motion seeking judgment in its favor, as a matter of law, on all of Plaintiff's claims against it. [Doc #125]  Thereafter, I granted Plaintiff leave to amend her complaint. [Doc #167]  In her Second Amended Complaint, Plaintiff asserts the same claims against Southwest, but alleges additional factual grounds in support of her discrimination and retaliation claims. [Doc #168]

## II.  STANDARD OF REVIEW

The purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

Rule 56(c) provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  The non-moving party has the burden of showing that there are issues of material fact to be determined.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex v. Catrett, supra*, 477 U.S. at 323; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992). Once a properly supported summary judgment motion is made, the opposing party must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980); Fed.R.Civ.P. 56(e). A dispute is "genuine" if the issue could be resolved in favor of either party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994).

## III. APPLICABLE LAW

Plaintiff asserts her discrimination claims against Southwest for violation of the Americans with Disabilities Act, as amended, 42 U.S.C. §12101, *et seq.* (the "ADA") and the Rehabilitation Act of 1973, 29 U.S.C. §701, *et seq.* (the "Rehabilitation Act"). Under the ADA "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. §12112(a). Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely

6

by reason of her or his disability, be excluded from the participation in, be denied

the benefits of, or be subjected to discrimination under any program or activity

receiving Federal financial assistance . . . .". 29 U.S.C. §794(a).

As an initial matter, I address Southwest's assertion that the Rehabilitation

Act does not apply to Plaintiff's claims because Southwest does not receive financial

assistance, subsidies, or financial aid from the federal government.  Southwest

argues that Plaintiff has put forth no evidence that Southwest was an actual,

intended recipient of federal financial assistance.  I agree.

Application of §504 of the Rehabilitation Act "is limited to entities that

actually receive federal financial assistance because Congress sought to impose the

act's coverage as a form of contractual cost of the recipient's agreement to accept the

federal funds." *Shepherd v. United States Olympic Comm.*, 94 F. Supp. 2d 1136,

1146 (D. Colo. 2000)(quoting *United States Dep't of Transp. v. Paralyzed Veterans

of America*, 477 U.S. 597, 605, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986)).   The Tenth

Circuit has defined "financial assistance" as the receipt of a "government subsidy."

*DeVargas v. Mason & Hanger–Silas Mason Co., Inc.*, 911 F.2d 1377, 1381 (10th Cir.

1990)(*citing Jacobson v. Delta Airlines, Inc.,* 742 F.2d 1202, 1208–09 (9th Cir.

1984)).   "The test to determine whether a government transfer of money to an entity

is a subsidy is whether Congress or the federal agency administering the program

intended to subsidize the entity.  Absent such intent, the fact that the entity has

received a benefit from a transaction or transfer will not cause the transaction to be

considered federal financial assistance." *Shepherd v. U.S. Olympic Comm., supra,*

7

94 F. Supp.2d at 1146 (quoting *DeVargas v. Mason, supra,* 911 F.2d at 1381).  The

question of which programs are subject to the Rehabilitation Act is a question of

law.  *Jacobson v. Delta Airlines, supra,* 742 F.2d at 1210.

Southwest's Managing Director of Tax and Controller Operations avers, in

his affidavit filed in support of its motion for summary judgment, that "Southwest

did not receive financial assistance, subsidies, or financial aid from the federal

government at any time between September 29, 2014 and the present." [Doc #125-4]

Plaintiff asserts, in response, that publicly-available documents reveal a

partnership between Southwest and the Love Field Moderation Corporation (a

public-private partnership created by the City of Dallas as a "local Government

Corporation").  Plaintiff notes that Southwest has a significant presence at Dallas

Love Field and, as such, it agreed to manage most of the Love Field Modernization

project (a construction project to update and expand the Love Field airport), as well

as record the project on its books as both an asset and obligation, in exchange for

substantial benefits such as preferential lease rights and access to expansion at

that airport.  Southwest's annual report indicates that the project assets will stay

on its books until the bonds to pay for the construction issued by the City of Dallas

are repaid.  Because the project received federal "subsidies" in the form of grants

from 2011 through 2017, Plaintiff contends that Southwest received federal

financial assistance.  Plaintiff also asserts that Southwest received federal

assistance when it acquired AirTran Airways in 1991, which had previously

received federal financial assistance in the form of loan or loan guarantees.  Finally,

because Southwest did not provide its tax returns in discovery, Plaintiff contends that a disputed issue of fact remains as to whether it received federal assistance.

In *United States Department of Transportation v. Paralyzed Veterans of America*, the Supreme Court rejected a disabled veterans group's argument that commercial air carriers were governed by the Rehabilitation Act based on the federal government's extensive financial assistance to airports, because the funds were used to construct runways that, in turn, uniquely benefitted air carriers.  477 U.S. at 606.  The Court found that "coverage extends to Congress' intended recipient, whether receiving the aid directly or indirectly," but coverage does not "follow[ ] the aid past the recipient to those who merely benefit from the aid." *Id.* at 607; *see also National Collegiate Athletic Association v. Smith*, 525 U.S. 459, 468, 119 S.Ct. 924, 142 L.Ed.2d 929 (1999)(ruling that "[e]ntities that receive federal assistance, whether directly or through an intermediary, are recipients . . . entities that only benefit economically from federal assistance are not").

I conclude that even if Southwest received financial benefit related to construction/remodeling at Love Field, such benefit does not constitute, as a matter of law, federal financial assistance sufficient to bring Southwest with in the ambient of the Rehabilitation Act.  While Plaintiff has alleged that Southwest economically benefitted from such assistance in various ways, it clearly was not the intended recipient of the funds, nor were the disbursement of the funds intended to subsidize Southwest. *See DeVargas v. Mason, supra,* 911 F.2d at 1381 (ruling that "courts should focus not on market value but on the intention of the government to

9

give a subsidy, as opposed to government intent to provide compensation")(citing

*Jacobson v. Delta Airlines, supra,* 742 F.2d at 1210).

Furthermore, to the extent that Plaintiff alleges that Southwest was provided

with subsidies in the form of loans/loan guarantees to AirTran Airways, I agree

with Southwest that Plaintiff has failed to provide any evidence in support of this

claim.  And, again, there is no evidence or allegation that Southwest was the

intended beneficiary or recipient of any subsidies related to AirTran Airway loans.

Finally, Plaintiff's claim that she has met her burden of raising a disputed issue of

fact as to whether Southwest received federal assistance, based on the fact that

Southwest's tax returns might reveal such assistance, such argument is grounded

in pure speculation.  As such, I conclude that the Rehabilitation Act does not govern

Southwest in this case, and Plaintiff's claims of discrimination by Southwest are

brought under the ADA only.

## IV.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

I next address Southwest's contention that I should limit the scope of

Plaintiff's claims because she failed to exhaust her administrative remedies under

the ADA as to the allegations raised in her Second Amended Complaint. [Doc #168]

Pursuant to my order [Doc #167], the parties have filed additional briefing

addressing this issue.  [Docs #169, #171 & #172]

I first note that to the extent Plaintiff argues that her new allegations

survive under the Rehabilitation Act – which does not require exhaustion of her

administrative remedies – I have determined that Plaintiff's discrimination claims

10

are not governed by the Rehabilitation Act, as discussed *supra,* but rather by the ADA only. The ADA "requires a plaintiff to exhaust her administrative remedies before filing suit." *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007)(citing *MacKenzie v. City & County of Denver,* 414 F.3d 1266, 1274 (10th Cir. 2005)). The first step to exhaustion is the filing of a charge of discrimination with the EEOC. *Jones v. U.P.S.*, *supra*, 502 F.3d at 1183 (citing *Jones v. Runyon*, 91 F.3d 1398, 1399 FN. 1 (10th Cir. 1996)). "A plaintiff's claim in federal court is generally limited by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination submitted to the EEOC." *MacKenzie v. Denver, supra,* 414 F.3d at 1274; *see also West v. New Mexico Taxation & Revenue Dep't*, 757 F. Supp. 2d 1065, 1089 (D.N.M. 2010). As a result, "each discrete incident" of discrimination must be exhausted. *Jones v. U.P.S., supra*, 502 F.3d at 1186 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). Where discrete acts of alleged discrimination happen after the initial charge of discrimination, the employee must file an additional or amended charge of discrimination in order to satisfy the exhaustion requirement as to those post-charge acts. *Lincoln v. BNSF Ry. Co.,* 900 F.3d 1166, 1181 (10th Cir. 2018).

Plaintiff filed an initial Charge of Discrimination with the EEOC (the "First Charge") on August 25, 2015. [Doc #125-23] The First Charge related to Southwest's discriminatory acts of: failing to provide her with accommodation; terminating her employment in January of 2015; and failing to compensate her for

back-pay from her January 2015 termination through her reinstatement in July 2015.  After filing her First Charge, Southwest contends that the parties engaged in informal negotiations with the EEOC, which ended or "stalled" when Southwest informed the EEOC that it was unwilling to pay the settlement amount sought by Plaintiff.  The First Charge proceeded to investigation and, thereafter, the EEOC issued Plaintiff a right to sue letter and she filed this lawsuit on November 22, 2016. [Doc #1]

Plaintiff filed a subsequent Charge of Discrimination (the "Second Charge") on June 11, 2019, alleging that Southwest's actions after her attempted reinstatement – starting with its refusal to re-issue her SIDA badge authorization and culminating in Southwest's decision sometime after Thanksgiving of 2015, to terminate her employment retroactive to August 21, 2015 – constituted additional discrimination based on her disability, and retaliation for engaging in the protected activity of filing the First Charge.  [Doc #169-2]

## A.  Timeliness

In order to bring an ADA action in federal court in Colorado, a plaintiff first must exhaust his or her administrative remedies by filing a charge of discrimination with the EEOC within 300 days of the allegedly unlawful employment practice.  *Castaldo v. Denver Pub. Schs.*, 276 Fed. App'x 839, 841 (10th Cir. 2008)(unpublished)(citing *Proctor v. United Parcel Serv., Inc.*, 502 F.3d 1200, 1206 & FN.3 (10th Cir. 2007)); *see also* 42 U.S.C. §2000e-5(e)(1), (f)(1).

Plaintiff's Second Charge, dated June 11, 2019, was filed substantially later

12

than 300 days following the allegedly unlawful employment practices – specifically, Southwest's failure to renew or reissue Plaintiff's SIDA authorization in August/September of 2015, and its decision to terminate her employment as late as November of 2015. The Second Charge itself indicates that the latest date the discrimination took place was November 30, 2015. [Doc #169-2] As such, the Second Charge, filed over three and one-half years later in June of 2019, was filed well outside of the 300-day period, and results in a failure to exhaust administrative remedies as to the allegations raised therein.

## B. Equitable Tolling

However, a plaintiff's failure to exhaust his or her administrative remedies is an affirmative defense that is "subject to waiver, estoppel, and equitable tolling." *Lincoln v. BNSF, supra,* 900 F.3d at 1183; *see also Dumas v. Proctor & Gamble Mfg. Co.,* 453 F. App'x 819, 820 (10th Cir. 2011)(unpublished)(ruling that the failure to file a timely EEOC charge is fatal to a complaint unless the circumstances warrant equitable tolling).

The parties, in their additional briefing filed on this issue, agree that the equitable tolling standard in this case requires intentional or deliberate concealment of the facts by the employer. [Docs #169, #171 & #172] Southwest relies on *Hulsey v. Kmart, Inc.,* 43 F.3d 555 (10th Cir. 1994), in which the Tenth Circuit found that equitable tolling of the Age Discrimination in Employment Act statute of limitations "is appropriate only where the circumstances of the case rise to the level of active deception . . . where a plaintiff has been lulled into inaction by

13

her past employer, state or federal agencies, or the courts." *Id.* at 557 (quoting *Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 615 (10th Cir. 1988) and *Martinez v. Orr*, 738 F.2d 1107, 1110 (10th Cir. 1984)).  Plaintiff refers me to *Granger v. Aaron's, Inc.*, 636 F.3d 708, 712 (5th Cir. 2011), in which the Court reviewed the expiration of the 300-day period for filing an EEOC charge, and indicated that a "plaintiff's unawareness of the facts giving rise to the claim because of the defendant's intentional concealment of them" was a basis for equitable tolling. *Id.* at 712 (*quoting Wilson v. Sec'y, Dep't of Veterans Affairs*, 65 F.3d 402, 404 (5th Cir. 1995)(per curiam)).

Plaintiff argues that equitable tolling applies in this case, but I disagree. First, I reject Plaintiff's assertion that she was not aware of her second termination from her employment at Southwest, following her attempted reinstatement, because Southwest actively or intentionally concealed it from her.  Plaintiff knew that Southwest was refusing to renew her expired SIDA authorization – and that a SIDA badge was required for her to be employed at Southwest as a Customer Service Agent — in August or September of 2015.  It is undisputed that Plaintiff did not go to work or receive a paycheck from Southwest at any time after her failed reinstatement in July/August of 2015.  Plaintiff does not dispute that the informal negotiations on her First Charge were unsuccessful in October of 2015. Furthermore, it is clear that Plaintiff was aware that she was no longer employed at Southwest when she sought reinstatement as a remedy in her original Complaint (dated November of 2016) [Doc #1], as well as in her First Amended Complaint

(dated November of 2017) when she added an allegation that Southwest's "refusal to reinstate/rehire" her after she filed her First Charge was an adverse employment action. [Doc #40]  Based on these facts, it is clear that Plaintiff was aware that Southwest had terminated her employment or ended her attempt at reinstatement after it refused to re-issue a SIDA authorization sometime in the Fall of 2015. *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1187 (10th Cir. 2003)(ruling that "knowledge of the adverse employment decision itself . . .  triggers the running of the statute of limitations")(*quoting Hulsey v. Kmart, supra*, 43 F.3d at 558-59).

I reject Plaintiff's argument that I have already determined that Southwest concealed its act of terminating her employment after her unsuccessful reinstatement, when I granted Plaintiff's request to amend her complaint on December 31, 2019. [Doc #167]  My conclusion that  "Southwest's failure to notify Plaintiff of her second termination provides adequate explanation and good cause for her delay which, in turn, justifies allowing amendment" pursuant to Federal Rules of Civil Procedure 15 and 16, does not dictate a finding that Plaintiff has shown active or intentional concealment for purposes of equitable tolling. *See Hulsey v. Kmart, supra*, 43 F.3d at 558-59 (ruling that equitable tolling for active concealment by an employer does not apply "unless an employee's failure to timely file results from either a deliberate design by the employer or actions that the employer should unmistakably have understood would cause the employee to delay filing").

Furthermore, even if it could be said that Southwest actively concealed its

decision to terminate Plaintiff's employment (either in August of 2015, or as late as November of 2015 retroactive to August of 2015) to equitably toll the 300-day period, Plaintiff' Second Charge was still untimely filed. On April 19, 2018, during the litigation of this case, Southwest provided Plaintiff what appears to be a screen shot of a computer print-out revealing her employment history. [Doc #163-1] With regard to her initial termination and reinstatement, the print-out shows: 1) an Action Type of "New Hire" with a start date of: 09/29/2014 and an end date of: 1/20/2015; 2) an Action Type of "Termination" with a start date of 1/21/2015 and an end date of 07/09/205 (when she was reinstated); and 3) an Action Type of "Reinstatement" with a start date of: 07/10/2015 and an end date of: 08/20/2015. The last entry, which is relevant here, is an Action Type of "Termination" with a start date of 8/21/2015. As such, even if Plaintiff was not aware that her employment with Southwest had ended in the Fall of 2015, this document – provided in discovery on April 19, 2018 – unambiguously reveals that her employment with Southwest was terminated on August 21, 2015. Plaintiff's Second Charge dated June 11, 2019, was therefore filed out of time by 118 days (418 days after the print-out was provided to her on April 19, 2018). Plaintiff also contends that she "brought this issue to the attention of the EEOC" by providing it with a copy of her Response to Southwest's Motion for Summary Judgment on March 19, 2019 [Doc #168 ¶15]. But even if I were to conclude that such act would fulfill the requirement of filing a Charge of Discrimination, this submission to the EEOC was likewise filed out of time by 34 days (334 days after April 19, 2018).

## C.  Conclusion

Therefore, it cannot be genuinely disputed that Plaintiff failed to exhaust her administrative remedies by filing a timely Charge of Discrimination with regard to her allegations that Southwest engaged in unlawful employment practices when it failed to renew or reissue Plaintiff's SIDA authorization in August/September of 2015, and when it thereafter terminated her employment in the Fall of  2015.  *See Duncan v. Manager, Dep't of Safety, City & Cty. of Denver*, 397 F.3d 1300, 1314 (10th Cir. 2005)(affirming dismissal for failure to exhaust because the plaintiff had not filed additional EEOC charge alleging retaliation based on her original charge).

## V.  DISPARATE TREATMENT DISCRIMINATION CLAIM

As to Plaintiff's substantive claims, I first address her argument that Southwest discriminated against her, when terminating her employment in January 2015 after she was unsuccessful in completing her period of probation, under the ADA on a theory of disparate treatment.

A plaintiff makes a disparate treatment claim of discrimination when she contends that the defendant intentionally treated her differently because of her disability.  *Sorenson v. Campbell Cty. Sch. Dist.*, 2019 WL 1768150 (10th Cir. Apr. 19, 2019)(unpublished)(citing *Davidson v. Am. Online, supra,* 337 F.3d at 1188); *see also Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1306 (10th Cir. 2005).  To prevail on an ADA discrimination claim for disparate treatment, the plaintiff must have evidence to establish a *prima facie* case that:  (1) she is disabled; (2) she was qualified, with or without reasonable accommodation, to perform the essential

17

functions of the job; and (3) her employer discriminated against her because of her disability. *MacKenzie v. Denver, supra*, 414 F.3d at 1274.

If the plaintiff makes out her *prima facie* case, but there is no direct evidence of discrimination, the court on summary judgment review applies the burden-shifting framework outlined in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). Under this framework, if the plaintiff meets her initial burden of establishing a *prima facie* case by a preponderance of the evidence, a rebuttable presumption of unlawful discrimination arises. *Butler v. City of Prairie Vill., Kan.*, 172 F.3d 736, 747 (10th Cir. 1999)(citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). The defendant then bears the burden of producing a legitimate, nondiscriminatory reason for the adverse employment decision. *McDonnell Douglas v. Green, supra,* 411 U.S. at 802. If the defendant is able to articulate a valid reason, the plaintiff has the opportunity to prove that the defendant's stated reason "was in fact pretext." *Id.* at 804. At all times, the plaintiff bears the ultimate burden of proving discrimination. *See St. Mary's v. Hicks, supra,* 509 U.S. at 515.

## A. Plaintiff's *Prima Facie* Case

In its motion, Southwest does not challenge Plaintiff's ability to demonstrate that she was disabled. Instead, Southwest contends that Plaintiff is unable to make out the second element of her *prima facie* case because she cannot show that she was qualified, with or without accommodation, to perform the essential functions of

18

a Southwest Customer Service Agent.  Specifically, Southwest argues Plaintiff was not qualified because the evidence is undisputed that she could not satisfactorily master the functions of the job during her probationary period.

A qualified person with a disability is someone who "satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position."  29 C.F.R. §1630.2(m); *see also* 42 U.S.C. §12111(8).  The Tenth Circuit has endorsed a two-part analysis to determine whether a person is qualified under the ADA. *Davidson v. Am. Online, supra,* 337 F.3d at 1190 (citing *Aldrich v. Boeing Co.,* 146 F.3d 1265, 1271 (10th Cir. 1998)).  First, the court determines whether the individual can perform the essential functions of the job.  Second, if (but only if) the court concludes that the individual is unable to perform the essential functions of the job, the court determines whether any reasonable accommodation by the employer would enable her to perform those functions.  *Davidson v. Am. Online, supra,* 337 F.3d at 1190 (citations omitted).

In assessing whether Plaintiff was otherwise qualified, I first reject Southwest's claim that Plaintiff could not perform the essential functions of the job because her treating physician previously certified  – on a Family Medical Leave Act application in 2014 and again in 2015 – that she was unable to interact with others.  Plaintiff has provided an affidavit from her doctor that clarifies that it is his opinion that "despite some impairment of her abilities, with reasonable

19

accommodations for her psychiatric conditions she would be able to interact sufficiently well with people to perform her job duties for Southwest Airlines, as I understand those job duties to be." [Doc #141-13]  In addition, Plaintiff has provided evidence that she was commended for her interaction with customers during her probationary period. [Doc #141-2]

However, it is undisputed that Plaintiff was unable to otherwise adequately meet the expectations of the Customer Service Agent job at Southwest by the end of her probation. [Doc #125-2]  As a result, at issue is whether Plaintiff can demonstrate that reasonable accommodation by Southwest would have enabled her to perform those essential functions.  Plaintiff argues that accommodation in the form of additional training on-site at DIA would have enabled her to master those functions.  It is undisputed, however, that Southwest provided her with all the additional training she asked for during her probationary period and, despite this, she was unable to adequately master the duties of the job.  *See Gonzagowski v. Widnall*, 115 F.3d 744, 748 (10th Cir. 1997)(noting that the Rehabilitation Act does not grant relief to one who is incapable of doing a job even with additional training); *see also Provstgaard v. IHC Health Servs., Inc.*,  2016 WL 6108545 (D. Utah 2016) (unpublished)(ruling that the plaintiff failed make out a reasonable accommodation claim where he provided "no evidence that more training would have enabled him to perform the essential functions of his position – he instead offers speculation and hope that one day he would have been able to do so").  Therefore, I agree with Southwest that Plaintiff is unable to show that she was qualified, with or without

accommodation, for the position of Customer Service Agent with Southwest at the time she was terminated.

In addition, I agree with Southwest that Plaintiff is unable to demonstrate the third element of her *prima facie* case that Southwest discriminated against her when it terminated her employment "because of" her disability. The determination of whether Plaintiff was subjected to discrimination because of her disability "focuses on whether the circumstances surrounding the adverse employment action give rise to an inference that the [action] was based on [the plaintiff's] disability." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014). Without "some affirmative evidence that disability was a determining factor in the employer's decision," a disparate-treatment claim under the ADA fails. *Sorenson v. Campbell Cty., supra,* 769 F. App'x at 585 (quoting *Lincoln v. BNSF, supra,* 900 F.3d at 1193 and *Morgan v. Hilti, supra,* 108 F.3d at 1323).

But Plaintiff asserts, without specific support, that "the only question is whether she has produced sufficient evidence that she suffered an adverse employment action because of her disability. She has." [Doc #141 pg. 24] Plaintiff, however, has failed to identify any affirmative evidence that her disability was a determining factor in the decision to terminate her employment at Southwest in January of 2015. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 52, 124 S. Ct. 513, 157 L. Ed. 2d 357 (2003)(noting that liability in a disparate- treatment case "depends on whether the protected trait . . . actually motivated the employer's decision")(quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701,

21

123 L.Ed.2d 338 (1993)).

So Plaintiff has failed to met her burden to establish the second and third elements of her *prima facie* case of ADA disparate treatment discrimination. *See MacKenzie v. Denver, supra*, 414 F.3d at 1274 (indicating that in the summary judgment context, "a plaintiff initially must raise a genuine issue of material fact on each element of the prima facie case").

## B. Defendant's Pretext

Even if Plaintiff was able to make out her *prima facie* case, Southwest has offered a legitimate, non-discriminatory reason for its employment action – namely that it terminated Plaintiff in January 2015 due to her inability to successfully master the job duties of a Southwest Customer Service Agent during her probationary period.

Because Southwest is able to produce a legitimate reason for its act, the burden shifts back to Plaintiff to demonstrate that there is a genuine issue of material fact as to whether Southwest's reasons are genuine or pretextual.  The court's inquiry of a pretext argument "does not review the wisdom or fairness of the employer's proffered reasons," but rather determines if the evidence of the plaintiff's misconduct presented "was so weak that a rational factfinder could infer that [the] expressed reason for terminating [the] plaintiff must have been pretextual." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1220 (10th Cir. 2007)(quoting *Rivera v. City & County of Denver*, 365 F.3d 912, 925 (10th Cir. 2004)).

Plaintiff has again failed to assert any basis or present evidence in support of

a determination that Southwest's reason for terminating her employment after her unsuccessful probationary period was pretextual.  Plaintiff merely speculates that a "jury could find Southwest's stated reasons were pretexts for discrimination" when the evidence is viewed in her favor. [Doc #141 pg. 24]  *See Melton v. Farmers Ins. Grp.,* 619 F. Supp. 2d 1131, 1139-40 (W.D. Okla. 2008)(ruling that the plaintiff failed to offer evidence raising the necessary inference of discriminatory motive or show there is a genuine issue of material fact as to whether the defendant's explanation for its employment action was pretextual or unworthy of belief).

## C.  Conclusion

Because I have ruled that Plaintiff is unable to met her burden of production to make out a *prima facie* case, and she failed to assert evidence in support of a determination that Southwest's legitimate reason for it act of terminating her after she was unable to successfully complete her probation was pretextual, Plaintiff's claim of disparate treatment under the ADA fails as a matter of law.

## VI.  FAILURE TO ACCOMMODATE CLAIM

I next address Plaintiff's claim that Southwest violated the ADA when it failed to accommodate her disabilities.

The ADA provides for a cause of action based on an employer's failure to reasonably accommodate the disability of an otherwise qualified individual pursuant to 42 U.S.C. §12112(b)(5)(A)(indicating that the term 'discriminate against a qualified individual on the basis of disability' includes . . . not making reasonable accommodations to the known physical or mental limitations of an

23

otherwise qualified individual with a disability"). As a result, "any failure to provide reasonable accommodations for a disability is necessarily 'because of a disability' – the accommodations are only deemed reasonable (and, thus, required) if they are needed because of the disability – and no proof of a particularized discriminatory animus is exigible." *Punt v. Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017)(quoting *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252 (1st Cir. 1999)). "[A]ssuming the employee has provided notice to the employer of her disability, any limitations which result therefrom, and the accommodation she wishes to receive, then the employer's failure to provide a reasonable accommodation for the disability establishes the required nexus between the disability and the alleged discrimination without the need to delve into the employer's subjective motivations [and t]hus, the employee need present no evidence, whether direct or circumstantial, of discriminatory intent in order to succeed on a failure-to-accommodate claim." *Punt v. Kelly, supra,* 862 F.3d at 1048.

The Tenth Circuit has adopted a modified burden-shifting framework to assess reasonable accommodation claims and to "provide a useful structure by which the district court, when considering a motion for summary judgment, can determine whether the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered." *Punt v. Kelly, supra,* 862 F.3d at 1050 (quoting *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1178 FN.12 (10th Cir. 1999)(en banc)). Under the modified framework, the employee

24

must make an initial *prima facie* showing that: (1) she is disabled; (2) she is "otherwise qualified;" and (3) she requested a plausibly reasonable accommodation. *Punt v. Kelly, supra*, 862 F.3d at 1050 (quoting *Sanchez v. Vilsack*, 695 F.3d 1174, 1177 (10th Cir. 2012)). Once an employee makes out a *prima facie* case, the burden of production shifts to the employer to present evidence either (1) conclusively rebutting one or more elements of plaintiff's *prima facie* case, or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer. *Punt v. Kelly, supra*, 862 F.3d at 1050 (quoting *Smith v. Midland Brake, supra,* 180 F.3d at 1177). If the employer does either, summary judgment will be appropriate for the employer "unless the employee then presents evidence establishing a genuine dispute regarding the affirmative defenses and/or rehabilitates any challenged elements of [her] *prima facie* case sufficiently to establish at least a genuine dispute of material fact as to such challenged elements." *Punt v. Kelly, supra*, 862 F.3d at 1050.

## A. Plaintiff's *Prima Facie* Case

As an initial matter, my conclusion that Plaintiff is unable to demonstrate that she was an otherwise qualified individual forecloses Plaintiff's ability to demonstrate the second element of her *prima facie* case for failure to accommodate.

Plaintiff is also unable to establish the third element of her *prima facie* case that she requested reasonable accommodation. First, Plaintiff is unable to point to sufficient evidence that she told Southwest of her disability and the resulting limitations. "[T]he employer must know of both the disability and the employee's

desire for accommodations for that disability." *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011)(quoting *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 313 (3d Cir. 1999)); *see also Punt v. Kelly, supra,* 862 F.3d at 1048 (noting that "[t]he employer must of course know of the employee's disability and of the accommodation the employee wishes to receive in order to have any responsibility for providing such an accommodation")(citing *Smith v. Midland Brake, supra,* 180 F.3d at 1171-72). Simply put, in order to fail to provide a reasonable accommodation, the employer must be aware of the disability. *Allen v. SouthCrest Hosp.*, 455 F. App'x 827, 836 FN.4 (10th Cir. 2011)(unpublished) (citations omitted).

In support of its position that Plaintiff did not inform it of her learning disability, Southwest notes that although Plaintiff admits she was aware that Southwest's procedures required that she request disability accommodations through its ACT team, it is undisputed that Plaintiff did not do so prior to her termination in January 2015. The nature of Plaintiff's disability does not render it obvious to an employer. *See Robertson v. Las Animas County Sheriff's Dep't*, 500 F.3d 1185, 1196 (10th Cir. 2007)(ruling that "when an individual's disability is not obvious, the individual must inform its employer of the disability before the employer can be held liable under the ADA for failing to provide a reasonable accommodation"); *see also Nguyen v. City & Cty. of Denver*, 286 F. Supp. 3d 1168, 1184 (D. Colo. 2017). And while there is evidence that she informed her trainer in Dallas that she required accommodation, her deposition testimony does not support her self-serving claim that she informed all her trainers and supervisors at DIA of

26

her disability. [*See* Doc # 141-4 pp 112-23, 120-24]  *See EEOC v. C.R. England, supra,* 644 F.3d at 1049 (citing *Zivkovic v. S. Cal. Edison Co.,* 302 F.3d 1080, 1089 (9th Cir. 2002)(ruling that "[a]n employee is not required to use any particular language when requesting an accommodation but need only inform the employer of the need for an adjustment due to a medical condition"))

Additionally, Plaintiff's request for additional training while on-site at DIA, prior to her termination in January 2015, failed to convey her desire for accommodations *for* her learning disability.  To the extent that Plaintiff sought more training, there is no evidence that the training she sought constituted help or assistance to address deficiencies that arose out of her disability.  Although the notice or request "does not have to be in writing, be made by the employee, or formally invoke the magic words "reasonable accommodation,"' it "nonetheless must make clear that the employee wants assistance *for his or her disability*." *EEOC v. C.R. England, supra*, 644 F.3d at 1049 (emphasis in original).

Furthermore, the evidence is undisputed that Southwest provided Plaintiff with all the accommodation – in the form of assistance at her training in Dallas, extra on-site training hours at DIA and the ability to take notes – she requested prior to her termination at the end of her probationary period.  And, when Plaintiff contacted Southwest after she was terminated, it offered her reinstatement and provided her with all the accommodations she sought in order for her to learn the functions of the job – including additional time to complete tasks during training

and/or to take and use notes while in training, and three dedicated trainers.

Therefore, I conclude that Plaintiff is unable to establish either the second or third element of her *prima facie* case for reasonable accommodation. *See e.g. White v. Town of Hurley*, 2019 WL 1411135 (D.N.M. 2019)(unpublished)(granting summary judgment in favor of employer when the plaintiff failed to establish a *prima facie* case for his failure-to-accommodate claim, because he was not a qualified individual and did not request a reasonable accommodation).

## VII.  RETALIATION CLAIMS

Finally, I address Plaintiff's claim alleging  that Southwest retaliated against her in violation of the ADA.

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. §12203(a).  Plaintiff must show the following in order to establish a *prima facie* case of retaliation:  (1) that she engaged in an activity protected by the statute; (2) that she was subjected to an adverse employment action subsequent to or contemporaneous with the protected activity; and (3) that there was a causal connection between the protected activity and the adverse action. *Martin v. AT&T Corp.*, 331 F. Supp. 2d 1274, 1301 (D. Colo. 2004)(quoting *Selenke v. Med. Imaging of Colorado*, 248 F.3d 1249, 1264 (10th Cir. 2001)); *see also EEOC v. Picture People, Inc.,* 684 F.3d 981, 988 (10th Cir. 2012).

If a plaintiff establishes a *prima facie* case of retaliation, the burden of

production shifts to the employer to show it had a legitimate, nondiscriminatory reason for the adverse action. *EEOC v. Picture People, supra,* 684 F.3d at 988 (citing *Hennagir v. Utah Dep't of Corr.,* 587 F.3d 1255, 1265 (10th Cir. 2009)).  If the employer can do so, the burden shifts back to the plaintiff to prove pretext, which requires a showing that the proffered non-discriminatory reason is "unworthy of belief." *EEOC v. Picture People, supra,* 684 F.3d at 988 (quoting *Johnson v. Weld Cnty., Colo.,* 594 F.3d 1202, 1211 (10th Cir. 2010)).

## A. Plaintiff's *Prima Facie* Case

In order to make out the first element of her *prima facie* case of retaliation, Plaintiff must demonstrate that she engaged in an activity protected by the ADA. Plaintiff alleges that she engaged in the following protected activities: 1) she reported her disability and requested accommodation; and 2) she requested that Southwest pay her back-pay when they offered reinstatement.  With regard to the second element of her *prima facie* case, Plaintiff must demonstrate that she was subjected to an adverse employment action.  Plaintiff alleges that Southwest retaliated against her via the following employment actions: 1) terminating her employment; and 2) refusing to pay her back-pay.

Southwest asserts that Plaintiff cannot make out her *prima facie* case for retaliation on her claims related to her initial termination and Southwest's refusal to pay her back-pay upon her reinstatement because she is unable to demonstrate a causal connection between the protected activity and the adverse action.  The third

element of a *prima facie* case for retaliation requires that the plaintiff establish "a causal connection" between the protected activity and the adverse employment action. To do so, a plaintiff must present "evidence of circumstances that justify an inference of retaliatory motive." *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014)(quoting *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007)). The Supreme Court "has likened this burden to showing a 'but-for causation.' " *Id.* (citing *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360-61, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)). The evidence of but-for causation "must be based on more than mere speculation, conjecture, or surmise." *Id.* (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)).

Southwest argues that Plaintiff has failed to establish that she engaged in the protected activity of informing Southwest of her disability prior to its determination to terminate her employment for failure to successfully pass probation. As discussed *supra*, it is undisputed that Plaintiff did not inform Southwest's ACT team of her disability before her termination and Plaintiff has not provided evidence in support of her claim that she informed her DIA supervisors of her disabilities. Rather, Plaintiff relies on her deposition testimony which indicates only that she informed a Dallas trainer about her learning disability. [See Doc #141-4 pp. 112-13, pp. 120-21, pp. 143-48] In addition, Southwest's evidence that her DIA supervisors responsible for the decision to terminate her were not aware of her learning disability is unchallenged. [Docs #125-1, #125-3, and #125-6] Here, there is no causal connection that she was terminated because of her disability since it is

30

undisputed that the decision makers were not aware that she was disabled. *See Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002)(ruling that "an employer's action against an employee cannot be *because of* that employee's protected conduct unless the employer knows the employee has engaged in protected opposition")(emphasis in original).  And while Southwest concedes that Plaintiff asked for and was provided additional training at DIA during her probationary period, Plaintiff is unable to refer me to any evidence that her request for more training was known by her supervisors as necessary in order to accommodate any disability.

As to her claim that Southwest's decision to deny her request for back-pay (from the time of her termination in January of 2015 to the time she accepted Southwest's offer of restatement in July of 2105) was retaliatory, I disagree that her request constituted a protected activity under the ADA.  Protected activity consists of exercising the rights afforded by the ADA; such as filing a complaint of discrimination, filing a charge with the EEOC, or requesting accommodation for a disability. *See Foster v. Mountain Coal Co., LLC,* 830 F.3d 1178, 1190 (10th Cir. 2016); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir. 1997)(finding that, by its own terms, the ADA retaliation provision protects any individual "who has opposed any act or practice made unlawful by the ADA")(quoting 42 U.S.C. § 12203(a)).  Plaintiff's request for back-pay under the circumstances here was, in essence, a negotiation tactic, not conduct opposing an act made unlawful by the ADA or seeking vindication of right protected by the ADA.  As such, it was not

protected activity.  *See Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1136 (10th Cir. 2005)(describing protected activity as ranging from the "filing formal charges to complaining informally to supervisors)(citing. *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004)).

And, again, Plaintiff has provided no evidence to support a determination that Southwest's decision to decline her request for back-pay was because of any conduct to  protect her ADA rights.  *See Selenke v. Med. Imaging, supra,* 248 F.3d at 1266 (the failure to offer sufficient evidence of a casual connection between the adverse employment action and the plaintiff's request for accommodation resulted in summary judgment in favor of the employer).

Plaintiff is therefore unable to make out a *prima facie* case for relation under the ADA for either the adverse action of terminating her employment, or refusing her request for back-pay related to its offer of reinstatement.

## VIII.  CONCLUSION

Because I have dismissed all of Plaintiff's claims as a matter of law, for the reasons stated, I GRANT the Motion for Summary Judgment filed by Defendant. [Doc #125]  As a result, I DISMISS with prejudice this case.  Costs and fees are AWARDED to Defendant.

Dated: March _6_, 2020 in Denver, Colorado.

BY THE COURT:

s/Lewis T. Babcock
LEWIS T. BABCOCK, JUDGE