No. 20-1132

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

**KRISTA EDMONDS-RADFORD**, Plaintiff-Appellee,

v.

**SOUTHWEST AIRLINES CO.,** Defendant-Appellant

_____

On Appeal from the United States District Court
For the District of Colorado
The Honorable Lewis T. Babcock, Senior District Judge
D.C. No. 1:16−cv−02860−LTB−STV

_____

## APPELLANT'S REPLY BRIEF

_____

Katayoun A. Donnelly
*Azizpour Donnelly LLC*
2373 Central Park Blvd., Suite 100
Denver, CO 80238
720-675-8584
katy@kdonnellylaw.com

Blain Myhre
*Blain Myhre LLC*
PO Box 3600
Englewood, CO 80155
(303) 250-3932
blainmyhre@gmail.com

Attorneys for Plaintiff-Appellant

**ORAL ARGUMENT IS REQUESTED**

# **TABLE OF CONTENTS**

THE EVIDENCE IS OVERWHELMING ............................................................. 6

Krista Edmonds-Radford notified Southwest of her disability and requested accommodations from the very beginning, during her training in Dallas. ........................... 7

Southwest provided Ms. Edmonds-Radford reasonable accommodations during her training and as a result she graduated from Dallas training with a 93% GPA ........................................ 7

After the report of her disability and request for accommodations, the professional trainers in Dallas identified the reasonable accommodations Ms. Edmonds-Radford needed in Denver in order to be to perform the essential functions of her job ........................................................ 8

Southwest failed to provide the very accommodations its Dallas team had recommended and instead terminated Edmonds-Radford without engaging in interactive process. ........................ 9

The additional training in Denver was not the reasonable accommodations she needed, as identified by Dallas .................................................................................................................. 9

Southwest admits it could have provided, but did not provide, reasonable accommodations to Ms. Edmonds-Radford in Denver. ............................................................................................ 11

Southwest did not permit Ms. Edmonds-Radford to acquire her SIDA Badge. ....................... 12

Southwest retaliated against Edmonds-Radford and did not even inform her that it had terminated her. ............................................................................................................................ 14

FAILURE TO ACCOMMODATE CLAIM ............................................................ 15

DISCRIMINATION CLAIM ................................................................................. 17

RETALIATION FOR REQUESTING AN ACCOMMODATION ......................... 21

EQUITABLE TOLLING AND EXHAUSTION .................................................... 23

SOUTHWEST RECEIVES FEDERAL FINANCIAL ASSISTANCE.

THEREFORE THE DISTRICT COURT ERRED IN CONCLUDING THAT THE

REHABILITATION ACT DOES NOT APPLY ....................................................24

    Activities and Programs .......................................................................................... 24

    Federal financial assistance...................................................................................... 25

    Withheld Evidence .................................................................................................. 30

CONCLUSION ....................................................................................................32

ADDITIONAL STATEMENT REGARDING ORAL ARGUMENT ...................32

CERTIFICATIONS..............................................................................................34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby*, Inc.,
477 U.S. 242 (1986) ........................................................................6

*Aubrey v. Koppes*,
975 F.3d 995 (10th Cir. 2020) ................................................ Passim

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ...................................................................6, 10

*Consol. Rail Corp. v. Darrone*,
465 U.S. 624 ....................................................................................24

*Curtis v. Commissioner*,
623 F.2d 1047 (10th Cir. 1980) .................................................30, 31

*DeVargas v. Mason & Hanger-Silas Mason Co.*,
911 F.2d 1377 (10th Cir. 1990) .................................................25, 26

*Doe v. Salvation Army in the United States*,
685 F.3d 564 (6th Cir. 2012) ..........................................................25

*Foster v. Mountain Coal Co.*, LLC,
830 F.3d 1178 (10th Cir. 2016) ......................................................22

*Friedel v. City of Madison*,
832 F.2d 965 (7th Cir. 1987) ............................................................6

*Grove City Coll. v. Bell*,
465 U.S. 555 ....................................................................................24

*Jarno v. Lewis*,
256 F. Supp. 2d 499 (E.D. Va. 2003) ...........................................25

*Lantec, Inc. v. Novell, Inc.*,
306 F.3d 1003 (10th Cir. 2002) ........................................................6

*Martz v. Union Labor Life Ins. Co.*,
757 F.2d 135 (7th Cir. 1985) ............................................................6

*Mathews v. Denver Newspaper Agency LLP*,
649 F.3d 1199 (10th Cir. 2011) ........................................................7

*Prairie Band of Potawatomi Indians v. Pierce*,
253 F.3d 1234 (10th Cir. 2001) ......................................................29

*Shotz v. American Airlines, Inc.*,
420 F.3d 1332 (11th Cir. 2005) .................................................26, 27

*Smith v. Midland Brake, Inc.*,

4

180 F.3d 1154 (10th Cir. 1999)..........................................................17

*Thomas v. IBM*,
48 F.3d 478 (10th Cir. 1995)................................................... Passim

*United States DOT v. Paralyzed Veterans of Am.*,
477 U.S. 597 (1986) ...............................................................24

**Statutes**

20 U.S.C. § 1681(a).......................................................................24
29 U.S.C. § 794(a) .......................................................................25
29 U.S.C. § 794(b), (b)(3)(A)(i)-(ii).................................................25
42 U.S.C. § 12111(9)(B) ..............................................................17
42 U.S.C. § 12112(b)(5)(A) ..........................................................18
Pub. L. No. 100-259, 102 Stat. 28 (1988) ......................................25
Pub. L. No. 107-42, 115 Stat. 230 (2001) .......................................26

**Rules**

Fed. R. App. P. 32(a)(5) ...............................................................34
Fed. R. App. P. 32(a)(6) ...............................................................34
Fed. R. App. P. 32(a)(7)(B)...........................................................34
Fed. R. App. P. 32(f) ...................................................................34

**Regulations**

28 C.F.R. § 42.540(f) ...................................................................25

## THE EVIDENCE IS OVERWHELMING

Ms. Edmonds-Radford's response to the motion for summary judgment provided the district court with more than sufficient evidence for a reasonable jury to return a verdict for her. *See Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986); *Aubrey v. Koppes*, 975 F.3d 995, 1004 (10th Cir. 2020). The district court, however, failed to view the evidence and draw "all reasonable inferences therefrom in the light most favorable to" Ms. Edmonds-Radford. *Mathews v. Denver Newspaper Agency LLP*, 649 F.3d 1199, 1204 (10th Cir. 2011). Therefore, granting summary judgment was a reversible error.

"Supporting materials designed to establish issues of fact in a summary judgment proceeding 'must be established through one of the vehicles designed to ensure reliability and veracity—**depositions**, answers to interrogatories, admissions and affidavits. When a party seeks to offer evidence through other exhibits, they must be identified by affidavit or otherwise made admissible in evidence.'" *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987) (quoting *Martz v. Union Labor Life Ins. Co.*, 757 F.2d 135, 139 (7th Cir. 1985)) (emphasis added); *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1011 (10th Cir. 2002). "The nonmovant is not required to produce evidence 'in a form that is admissible at trial,' *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), but the content or

substance of the evidence must be admissible." *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995).

In its Response, Southwest does not merely disregards the evidence included in Ms. Edmonds-Radford's briefs but repeatedly denies that such evidence was presented. In particular, Southwest flouts the clearly established law that statements made in depositions based on personal knowledge are admissible evidence.

Here is just some of the evidence presented that creates genuine disputes over material facts in this case.

***Krista Edmonds-Radford notified Southwest of her disability and requested accommodations from the very beginning, during her training in Dallas.***

> **During Dallas Training, Kris spoke with facilitator Carol Barnes to explain that she understands and interprets information differently**. *This initiative was appreciated by Carol, and she explained "Kris has a great attitude! I know that she will give 110%!"*

Vol. II at 673 (emphasis added).

Southwest still claims that she did not. Resp. Br. 9.

***Southwest provided Ms. Edmonds-Radford reasonable accommodations during her training and as a result she graduated from Dallas training with a 93% GPA***

> *She is exactly where we expect to see a Customer Service Agent for the first 50 day review period.*
>
> *. . .*
>
> *Kris graduated from Dallas training with a 93% GPA.*

*Id.* at 673 (emphasis added).

Southwest, however, still claims that she was not able to perform the duties

of her job during the probationary period. Resp. Br. 6.

***After the report of her disability and request for accommodations, the***
***professional trainers in Dallas identified the reasonable accommodations Ms.***
***Edmonds-Radford needed in Denver in order to be to perform the essential***
***functions of her job***

Southwest not only was able to provide Ms. Edmonds-Radford reasonable

accommodations but had identified these accommodations and promised to provide

them in Denver.

> Every individual with Southwest Airlines learns differently. We are
> actively searching for the best way to convey information so that Kris
> can retain and process the knowledge gained. Due to daily
> observations throughout her Training period, Kris has opted to take
> advantage of additional ***training at the <u>gate</u> with <u>a member of the</u>***
> ***<u>Station Trainer Team</u>.*** Kris has received "Needs Improvement"
> ratings in ***Gate Procedures, Computer Abilities, and Irregular***
> ***Operations***. The Station Training Team noted that she "is a little
> apprehensive and unsure about herself and this frustrates her." She
> knows the information and the tasks that need to be completed, but
> often her lack of confidence gets the best of her. ***Kris needs to***
> ***<u>establish a routine</u>, <u>take things slow</u>, and work <u>diligently at</u>***
> ***<u>developing her computer skills and mastering the job duties as</u> a***
> ***Customer Service Agent***. We ask that Kris let us know what she
> needs in order to grasp the aspects of the position.
> …

*Id.* at 675 (emphasis added). In Denver, however, Southwest did not follow

Dallas' specific instructions on how to accommodate Ms. Edmonds-Radford. And

despite these specific instructions, Southwest claims that Ms. Edmonds-Radford

did not even notify it of her disability. Resp. Br. 9.

***Southwest failed to provide the very accommodations its Dallas team had recommended and instead terminated Edmonds-Radford without engaging in interactive process.***

Even though Dallas had already informed Denver that it needed to provide Ms. Edmonds-Radford reasonable accommodations, she informed all her trainers and supervisors in Denver about her disabilities and request for training as well. *Id.* at 684 (Depo. 112-13); 686-87 (Depo. 120-21), 691-92 (Depo. 143-47). Southwest's policy required the supervisor and trainers to inform the ACT team. *Id*. at 723 (Depo. 141-42); 706-08 (Depo. 28-33); 713-14 (Depo. 61-65). Nonetheless, Southwest claims that she did not notify it of her disability. Resp. Br. 9.

***The additional training in Denver was not the reasonable accommodations she needed, as identified by Dallas***

In Denver, rather than provide the specific training at the gate identified by Dallas, Southwest provided training only for the counter (where Ms. Edmonds-Radford had done well and received good reviews).[1] Neither did it follow the

---

[1] 19 Q. You mentioned just the gate. So she was
20 fine up front?
21 A. Based on her -- the feedback from the
22 trainer, she didn't have as much problem at the ticket
23 counter or in the baggage service office.

Vol. II 638 (Watkins Depo. 99:19-23).

specific instructions by Dallas to provide what Ms. Edmonds-Radford needed "in order to grasp the aspects of the position," e.g.:

- "Training **at the gate** with a member of the Station Trainer Team",

- Training "to work on **Gate** Procedures, Computer Abilities, and Irregular Operations," or

- Training to meet "Kris['s] **needs to establish a routine, take things slow, and work diligently at developing her computer skills and mastering the job duties as a Customer Service Agent**."

*Id.* at 675 (emphasis added), *id.* at 800. [2]

_____

[2] 19 A. I had the counter. I did not get the
20 additional training I needed on the gate. I only got
21 three days because of -- one of my employees -- from
22 what I'm looking on here, they were across from me at
23 the other counter, so I'm actually there by myself.
24 So I really needed more help on the gates.

*Id.* at 420 (Edmonds-Radford Depo.).

17 A. I wanted to work in a controlled
18 environment, if I could, just so I can get the grasp
19 of the job that I was doing.
20 And once I get acclimated to it, like with
21 my other job at the counter, at the baggage, I would
22 be fine. Like I said before, I don't think I was
23 perfect in doing my job, as far as knowing everything,
24 but I was fairly comfortable with the counter and with
25 the baggage.
1 If I would have had more time with one
2 trainer and not being rushed to learn in that
3 particular time and actually being able to take my
4 time to write these notes and to actually get the job

In Denver, Southwest used Ms. Edmonds-Radford's untrained co-workers to provide "training" during their own work shifts. *Id.* at 692-94 (Depo. 148-53); 696 (Depo. 173-74); 716 (Depo. 73-76); 732-33 (Depo. 225-31); 800 (table showing training mostly at counter). Southwest not only had not trained these Denver "trainers" to train people with a learning disability, it did not even inform them of her disability or need for accommodation. *Id.* at 712-16 (depo 60-62, 65-76). Nonetheless, Southwest claims it provided her appropriate training, Resp. Br. 7— while also claiming that the additional training was not accommodation.

### *Southwest admits it could have provided, but did not provide, reasonable accommodations to Ms. Edmonds-Radford in Denver.*

During the 30(b)(6) deposition, Mr. Watkins not only admitted that Southwest decided to reinstate Ms. Edmonds-Radford because it believed that with appropriate and reasonable accommodations she could perform the essential duties of her position, *id.* at 708 (depo 33-35), he also described in detail the reasonable accommodations (that had not previously been provided) that Southwest was planning to provide after her reinstatement. Vol. I at 638 (Watkin Depo. 97-100).[3]

_____

5 down pat, I think I would have been very -- I know I
6 would have been successful at it, successful at my
7 job, like I was at the counter.

*Id.* 699 (Depo. 254-55).

[3] 21 A. No. We were going to give her the
22 additional time for training and put her with a fewer
23 number of trainers, two with one backup

Nonetheless, here Southwest claims that Ms. Edmonds-Radford was not able to perform the duties of her job with reasonable accommodations. Resp. Br. 34-5.

**_Southwest did not permit Ms. Edmonds-Radford to acquire her SIDA Badge._**

     After Edmonds-Radford notified Southwest that she had obtained the

---

…
10 A. We were accommodating her by limiting the
11 number of trainers she had --
12 Q. Okay.
13 A. -- and putting her in the environment
14 that she had requested.
15 Q. Which was?
16 A. A slower environment where she had more
17 time without as much pressure.
18 Q. And how would that work at a -- for
19 someone who is a customer service agent? Can you
20 explain to me how you would produce that environment,
21 create that environment?
22 A. In her particular situation, when she was
23 working at the gates, we would have her off to the
24 side with one of her trainers where she wouldn't be
25 required to run the gate. We would have another agent
1 that is running the gate, and she would be able to
2 handle situations as they came up on a one-on-one
3 basis rather than handling an entire flight.
4 Q. And this is something that she hadn't
5 received before?
6 A. No, she had not.
…
12 Q. But giving her enough time to do that
13 would be the first step to get her to the comfort
14 zone?
15 A. To be able to learn the job.
16 Q. What else?
17 A. That was the accommodations that we were
18 providing.
Vol. I at 638 (Depo. 97-100).

documents necessary for her SIDA badge,[4] Southwest cut off communications with her and did not renew the authorization required by the airport in order to issue her SIDA badge,[5] thereby preventing her getting her badge. Vol. II 740-43.

---

[4]You did not return to work at Southwest
3 Airlines; is that correct?
4 A. Because I didn't have my SIDA badge, nobody
5 would -- I was getting the runaround, trying to give
6 you guys my documents, so I could get the DIA
7 application dated again, for an eligible date.
8 Q. Because you didn't get -- provide the
9 documents necessary --
10 A. I provided them.
…
15 You didn't provide the documents necessary to
16 get your SIDA badge until after the SIDA application
17 had expired; is that correct?
18 A. After the first application had expired,
19 because I had to give my documentation. And when I
20 got it, I did go to the DIA Southwest -- to the front
21 desk and then to the back administrative office. I
22 kept getting the runaround.

Vol. II at 691 (Depo. 142).

[5]
14 A. I'm not aware of any communication with
15 Ms. Edmonds-Radford after she told us she received her
16 documents.
. . .
4 A. From Mary Hollender. "Hello, I received
5 a phone call from Krista and she stated that **she now
6 does have the required documentation to get her SIDA
7 badge. Do we start paying again**? She also stated she
8 needs to go part time because she had to get another
9 job. Are we accommodating this? She is also going to
10 be applying for the catastrophic aid that the company
11 offers and wants me to provide her with the correct
12 forms. Just wanted to touch base and see where we are
13 at with this and get some direction regarding her

Southwest admitted that its authorization had expired at the end of August 2015 (shortly after Edmonds-Radford filed her EEOC charge) and that it did not issue a new authorization to allow Ms. Edmonds-Radford to obtain her SIDA badge after she received the documents lost when she became homeless as a result of Southwest's initial termination.  *Id.*

Southwest's claim, however, that Ms. Edmonds-Radford did not get her SIDA badge to return to work fails to acknowledge that it prevented her from doing so.

**Southwest retaliated against Edmonds-Radford and did not even inform her that it had terminated her.**

Southwest then terminated Ms. Edmonds-Radford for the second time, without informing either her or the EEOC.[6]

---

14 situation."
15 Q. **So Southwest stopped communicating with**
16 **Ms. Edmonds-Radford after receiving this communication**
17 **from her, correct**?
18 MR. CARROLL: Object to the form of the
19 question.
20 A. **As far as I'm aware, yes**.

Vol. II at 740 (W Depo. 271-72) (emphasis added); Vol. I at 433 (the Sep 3, 2015 email).

[6] 5 "So what did you review
7 to determine that she was notified?"
8 A. So I was misspeaking. It appears that
9 she was not notified, from what we have about her
10 second termination, that she would not be coming back.

Vol. II 725 (Watkins Depo. 155).

# FAILURE TO ACCOMMODATE CLAIM

Under the ADA, to establish a prima facie failure-to-accommodate claim

Ms. Edmonds-Radford had to show:

1) she was disabled, 2) she was otherwise qualified, 3) she requested a plausibly reasonable accommodation, and 4) the County refused to accommodate her disability. Establishing a prima facie claim is not onerous. If Aubrey established a prima facie claim—as we conclude she did—the burden then shifted to the County to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer.

If the employer does either of the above, summary judgment will be appropriate for the employer unless the employee then presents evidence establishing a genuine dispute regarding the affirmative defenses and/or rehabilitates any challenged elements of her prima face case sufficiently to establish at least a genuine dispute of material fact as to such challenged elements.

This general analytical framework is useful in the context of a failure-to-accommodate claim, not to probe the subjective intent of the employer, which is not at issue, but instead to determine whether the various parties have advanced sufficient evidence to meet their respective traditional burdens to prove or disprove the reasonableness of the accommodations offered or not offered.

---

14 Q. When did you notify the EEOC that you had
15 terminated her again?
16 MR. CARROLL: Objection. Foundation.
17 A. The answer that Southwest gave to the
18 EEOC to her complaint ended up with letting them know
19 what our offer was for her to return, and I do not
20 have the documents that would say that we told the
21 EEOC that she would not be returning.

*Id.* 724 (Watkins Depo. 150).

*Aubrey*, at 1005-1006 (internal citations and quotation marks omitted).

Here, like *Aubrey*, based on Southwest Dallas' acknowledgement of Ms. Edmonds-Radford disability and recommendations of reasonable accommodations alone, Vol. II 675, she established a prima facie failure-to-accommodate claim.

Similarly, Ms. Edmonds-Radford established that she is an otherwise qualified candidate based on Southwest's admission that it reinstated her because it thought reasonable accommodations would have enabled her to perform the essential functions of her job, Vol. II at 675, Vol. I at 638 (Depo. 97-100)—as she had in fact done with reasonable accommodations in Dallas, graduating with a 93% GPA.

Southwest cannot dispute that Dallas' recommendations also establish that the accommodations requested and recommended were plausibly reasonable accommodations.

In addition, like in *Aubrey*, a jury could find that before terminating Ms. Edmonds-Radford Southwest failed to engage in an interactive process with her to determine if there were any reasonable accommodations that would have enabled her to perform the essential functions of her job or if it could reassign her. *Aubrey,* at 1007 ("The obligation to participate in this interactive process is inherent in the statutory requirement that the employer offer a disabled, but otherwise qualified employee a reasonable accommodation."); 42 U.S.C. § 12111(9)(B) (the ADA

itself expressly recognizes reassignment as a reasonable accommodation). Here, Southwest made no attempt to engage in any sort of interactive process before it terminated Ms. Edmonds-Radford's employment. Only after she wrote to its CEO did Southwest reinstate her and promise to provide the reasonable accommodations it had not provided in Denver. Vol. II at 467; Vol. III at 37. But just a few months later it terminated her again, not only without interactive process but without even notifying her or the EEOC (to which it continued to represent that it was committed to reinstating her).

As this court recently reiterated in *Aubrey*, the mere fact of Southwest's assertion of counter-evidence challenging Ms. Edmonds-Radford prima facie claim proves that a trial is required to allow the jury to resolve the disputed material issues of fact. *Aubrey*, 975 F.3d at 1013 ("After considering the submissions by both sides on summary judgment, if there remains genuine evidence supporting each element of the employee's prima facie case and, if need be, disputing the employer's affirmative defenses, summary judgment for the employer should be denied and the matter must proceed to trial." (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1179 (10th Cir. 1999) (en banc))).

## DISCRIMINATION CLAIM

Where, as here, there is no direct evidence of discriminatory animus, the Court applies the *McDonnell-Douglas* burden-shifting analysis. *See Aubrey*, 975

F.3d at 1014. "Again, establishing a prima facie claim is not onerous." *Id.* Based on the same evidence referenced above, Ms. Edmonds-Radford established a prima facie case of discrimination by showing (1) that she is disabled within the meaning of the ADA; (2) that (with reasonable accommodations) she is qualified for the job held or desired; and (3) that she was discriminated against because of her disability. *See id.*

The first two elements are addressed above. It is undisputed that Ms. Edmonds-Radford is disabled within the meaning of ADA, Vol. III at 52, and, as explained above, she presented sufficient evidence that she was otherwise qualified.

As to the third element, "the ADA defines 'discrimination' to include 'not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual.'" *Id.* (quoting 42 U.S.C. § 12112(b)(5)(A)). As explained above, Ms. Edmonds-Radford has satisfied that element as well.

As to Southwest's alleged legitimate, non-discriminatory reason for terminating Ms. Edmonds-Radford, in spite of its own admissions and offer of reinstatement, Southwest continues to assert that Ms. Edmonds-Radford was unable to perform the essential duties of her job. Res. Br. 32.

As explained above, though, Ms. Edmonds-Radford has shown that Southwest's justification for terminating her, because factually false, is a pretext

for disability discrimination.

> A plaintiff may show pretext by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision. This is often accomplished by revealing weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.

*Aubrey*, at 1015 (citations omitted).

Here, based on Southwest Dallas' acknowledgements and recommendations of reasonable accommodations and Southwest's statements in the 30(b)(6) that it reinstated Ms. Edmonds-Radford because it thought with reasonable accommodations she could perform the duties of her job, a jury could find that the reason Southwest gave for terminating Ms. Edmonds-Radford was unworthy of belief because it was inaccurate or false. *See id*.

A jury could further infer that Southwest had acted with a discriminatory animus from the fact that before terminating Ms. Edmonds-Radford it did not engage in interactive process to identify and provide her reasonable accommodations that could enable perform her duties—in the areas that she actually needed help due to her disability, not those where she could already perform the duties of her job, as Southwest did in Denver— or to reassign her to another job, considering that "Denver International Airport ("DEN") is Southwest's fourth-busiest airport, with 25 gates, up to 220 daily departures to 65

cities, and more than 4,000 Southwest employees." Resp. Br. at 4.

Instead of engaging in an interactive process, however, Southwest terminated her. When it offered to reinstate her, it did not pay her back-pay for the period she had been unjustly terminated. And then, after she filed an EEOC charge, Southwest not only prevented her from coming back and terminated her again but hid that fact from the EEOC.

As of November 4, 2015, Southwest was continuing to represent to the EEOC and Ms. Edmonds-Radford that it was "committed" to reinstating her. Vol. II at 806-10. Yet, as it revealed for the first time during discovery in this case in 2018, Southwest had terminated Ms. Edmonds-Radford for the second time on August 21, 2105. *Id.* at 815-16. And if this obfuscation were not sufficient evidence of bad faith, pretext, and continued retaliation, Southwest changed its story again, representing to the district court in the motion for summary judgment that it terminated Ms. Edmonds-Radford sometime (but no one seems to know exactly when) after Thanksgiving 2015 ("retroactive to August 21, 2015"). *Id.* at 327.

Ms. Edmonds-Radford has presented more than sufficient evidence to create a triable question as to pretext. *See Aubrey*, at 1015.

In addition, Southwest refused to produce a letter from its legal department that was supposed to be delivered to Ms. Edmonds-Radford at the end of August

2015.  Vol. II at 736-37.  Because the content of that letter could provide information regarding the position of Southwest' executives on Ms. Edmonds-Radford's second termination, Ms. Edmonds-Radford requested disclosure of this critical document, along with all other documents related to this business decision, and the process through which Southwest arrived at it—all of which Southwest withheld and the Magistrate Judge reviewed *in camera*. Vol. I at 548-553, 1271-72, 399.  The magistrate judge denied disclosure. Ms. Edmonds-Radford filed an objection. The district court summarily denied her request.

She then explained the importance of the letter in the context of the motion for summary judgment and renewed her motion for production of the letter, Vol. II 647-48 (MSJ response); Vol. I at 1078-81 (Krista Edmonds-Radford's Objection to Magistrate Judge's November 15, 2018).  The district court denied that as well.

Ms. Edmonds-Radford respectfully requests that the Court review *de novo* the documents the Magistrate Judge reviewed *in camera*.

## RETALIATION FOR REQUESTING AN ACCOMMODATION

Protected activity includes requesting an accommodation. *Aubrey*, at 1015-1016.  Ms. Edmonds-Radford established a prima facie retaliation claim by showing 1) she engaged in activity protected under the ADA; 2) Southwest took action against her that an objectively reasonable employee would have found adverse; and 3) a causal connection between her protected conduct and the

Southwest's adverse action to justify inferring that it took that action because of her protected conduct.  *See id.*

Ms. Edmonds-Radford filed an EEOC charge when Southwest denied her request for back-pay for her January 2015 wrongful termination so she could get out of homelessness and obtain the documents she lost when she became homeless as a result of the termination.  Vol. II at 803-04, 817.  After that filing, Southwest actively and intentionally prevented Edmonds-Radford from obtaining her SIDA badge and thereby made it impossible for Edmonds-Radford to return to work.

A reasonable jury could conclude that Southwest engaged in retaliation against her for her contacting the EEOC in July 2015 and filing her EEOC charge in August 2015. *See Foster v. Mountain Coal Co.*, LLC, 830 F.3d 1178, 1187 (10th Cir. 2016) ("Certain employee actions, such as filing an EEOC complaint, are indisputably protected activities under the ADA.").  Although Ms. Edmonds-Radford was able to obtain her replacement documents by September 3, 2015, less than 2 weeks after she filed her EEOC charge, Southwest cut off communication with her and interfered with her getting her badge, thereby rendering her unable to return to work.  Southwest then terminated her without notifying her or the EEOC. A jury could find in favor of Edmonds-Radford on this retaliation claim. Therefore it was reversible error to grant summary judgment.

## EQUITABLE TOLLING AND EXHAUSTION

For all the reasons stated above and in Ms. Edmonds-Radford's opening brief, Op. Br. 52-7, the district court abused its discretion by misconstruing the record in determining that equitable tolling does not apply and that Ms. Edmonds-Radford has not exhausted her administrative remedies.  To this date Ms. Edmonds-Radford does not know when Southwest actually fired her for the second time.  Perhaps some light could also be shed in this issue by the Court's *in camera* review of the letter that Southwest admits was meant for Ms. Edmonds-Radford to pick up in 2015[7] but has withheld.  Regardless, defendants cannot be rewarded for deceiving the EEOC and plaintiff and preventing them from conducting a full assessment, for imposing the additional burden of filing new claims years after the initial claim was processed because defendants waited for years before they inadvertently (or otherwise) disclosed additional adverse actions taken against plaintiffs, and for multiplying the burden and cost of litigating these issues by forcing often-indigent *pro se* plaintiffs to file multiple charges and law suits.

---

[7] 22 A. I have reviewed that letter prior to this
23 deposition.
24 Q. And **the letter was supposed to be given**
**25 to Ms. Edmonds-Radford**?
1 A. **Yes**.

Vol. II at 736 (Depo. 255-56).

## SOUTHWEST RECEIVES FEDERAL FINANCIAL ASSISTANCE. THEREFORE THE DISTRICT COURT ERRED IN CONCLUDING THAT THE REHABILITATION ACT DOES NOT APPLY

"An entity that receives federal financial assistance, *whether directly or through an intermediary*, is a recipient subject to liability under the Rehabilitation Act. *United States DOT v. Paralyzed Veterans of Am.*, 477 U.S. 597, 604 (1986).

Southwest claims that the Rehabilitation Act does not apply because its activities have not received federal financial assistance.

### *Activities and Programs*

In its Response Southwest tries to avoid liability by providing an outdated narrow definition of "activity" and "program." As the Sixth Circuit has explained, however, Southwest's definition is wrong.

> The term "program or activity" appears in four of the federal discrimination statutes, but was initially not defined by Congress with any more specificity. In 1984, the Supreme Court considered the meaning of the phrase as it related to a claim under § 901(a) of Title IX of the Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 373, 20 U.S.C. § 1681(a), and held that the plaintiff must show that the accused program or activity itself received federal financial assistance, not just that the discriminatory program was part of a larger organization that received federal assistance. *Grove City Coll. v. Bell*, 465 U.S. 555, 573-74 [](1984); *Consol. Rail Corp. v. Darrone*, 465 U.S. 624, 635-36 [] (1984) (holding same for then-version of § 504 of the Rehabilitation Act).

> In response, Congress passed the Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28 (1988), which amended the Rehabilitation Act of 1973 and the other three statutes to define explicitly "program or activity." Section 504, as amended by the Restoration Act, now defines a program or activity as including "*all of*

> *the operations of . . . an entire corporation*, partnership, or other
> private organization" if either (1) federal financial "assistance is
> extended to such corporation, partnership, private organization, or
> sole proprietorship as a whole," or (2) the organization "is principally
> engaged in the business of providing education, health care, housing,
> social services, or parks and recreation," and any part of the
> organization receives federal financial assistance. 29 U.S.C. § 794(b),
> (b)(3)(A)(i)-(ii), as amended by Civil Rights Restoration Act of 1987,
> Pub. L. No. 100-259, 102 Stat. 28, § 4 (1988).

*Doe v. Salvation Army in the United States*, 685 F.3d 564, 567-568 (6th Cir. 2012)

(emphasis added).  As such, here, federal financial assistance for a program or

activity includes all of the operations Southwest as a whole.

### Federal financial assistance

> "Federal assistance" means

> any grant, cooperative agreement, loan, contract (other than a direct
> Federal procurement contract or a contract of insurance or guaranty),
> subgrant, contract under a grant or any other arrangement by which
> the Department provides or otherwise makes available assistance in
> the form of: (1) Funds; (2) Services of Federal personnel; (3) Real and
> personal property or any interest in or use of such property . . . .

28 C.F.R. § 42.540(f).  "Federal financial assistance" in the Rehabilitation Act §

504 (29 U.S.C. § 794(a)) means "subsidy," and therefore an entity receives federal

financial assistance when it receives a "subsidy."  *DeVargas v. Mason & Hanger-*

*Silas Mason Co.*, 911 F.2d 1377, 1382 (10th Cir. 1990*); Jarno v. Lewis*, 256 F.

Supp. 2d 499, 504-05 (E.D. Va. 2003) ("[T]he term 'federal financial assistance'

should be given its plain and ordinary meaning, that is, aid provided to assist rather

than to compensate for services rendered.").

Southwest relies on *Shotz v. American Airlines, Inc.*, 420 F.3d 1332, 1337 (11th Cir. 2005), which is readily distinguishable. *Shotz* rejected a claim that the Rehabilitation Act applied to airlines who received funds as part of the post-9/11 Air Transportation Safety and System Stabilization Act, Pub. L. No. 107-42, 115 Stat. 230 (2001). The Stabilization Act, however, expressly provided that the funds disbursed to the airlines were *compensation* not *subsidies*. *Shotz*, 420 F.3d at 1335-36 ("Plainly, the express language found in the Stabilization Act unambiguously shows Congress intended for the funds and financial benefits at issue to compensate, not subsidize, airline carriers"). Thus Congressional intent in *Shotz* was not to subsidize. The court in *Shotz* rejected the plaintiffs' reliance on the defendants' descriptions of the funds and financial benefits they received through the Stabilization Act found in SEC filings or 10-Ks as "grants" or "assistance," given the clear Congressional intent expressed in the Stabilization Act. 420 F.3d at 1337. *Shotz* is inapposite here.

Citing *DeVargas,* Southwest seems to imply that the FAA was acting as a market participant when it awarded the AIP grants at issue here, and therefore the grants could not be a subsidy. Resp. Br. at 25. But the issue, as *DeVargas* notes, is one of Congressional intent. Here, the FAA grants are subsidies, intended to

support airport improvements.  The FAA was not acting as a "market participant" but as the regulatory agency overseeing the aviation industry.

In any case, market participants, *as market participants*, don't make grants. (They buy and sell things in a market.)  And there was no market for AIP grants. Rather, there was a grant-making process.

Further, as noted in the Opening Brief, Southwest was not simply a beneficiary, it was an *intended recipient* of the aid.  Op. Br. 21-24. Ms. Edmonds-Radford identified two sources of federal financial assistance:  loan guarantees to AirTran, which was acquired by Southwest, and FAA (and TSA) grants for the Love Field modernization project.  Vol. II at 657-664, 658, 663, 1111,1112, 1114.

With respect to Love Field, Edmonds-Radford provided evidence of nearly $87 million in FAA grants (explicitly named as such), with more than $40 million for apron improvements necessitated by the redesign. Op. Br. 22.  These grants were made to the City of Dallas for use by LFMAC, a joint enterprise of Southwest and the City of Dallas. *Id.* 21.  Southwest, which managed the project, *id.* 22, leased eighty percent of the gates in the terminal before construction began, *id* 21, 22, used its own credit to support the project, *id* 23, guaranteed and has paid debt service on the bonds, *id.*, has depreciated the terminal as an asset, *id* 24-25, and will continue to carry the terminal as an asset on its books for the next two decades. *Id*. 25.  Furthermore, Southwest, in another legal action, asserts that it has

"invested hundreds of millions of dollars to rebuild and reinvigorate Love Field",
*id*. 26[8]—which is the project for which these federal grants were received.

The Love Field Modernization Program was built by Southwest, in partnership with the City of Dallas, and the FAA funds disbursed to the City were *received by and intended to benefit* Southwest (as well as Dallas). It is beyond question that the grants were for a project undertaken both by and for Southwest (and the City of Dallas); that Southwest was a recipient of federal financial assistance through an intermediary.

Southwest uses the absurd example of airport concessionaires Breugger's Bagels and Baskin Robbins to argue Southwest does not receive federal financial assistance. Resp. Br. 25. These concessionaires, however, simply entered into contracts to use tiny pieces of the space of the (already built) terminal to sell food and drinks, an ancillary activity in an airport. Southwest, by contrast, leased eighty percent of the gates in the terminal, before *it* built that terminal *for its own use*—

---

[8] In its submissions to the Fifth Circuit Court of Appeals, Southwest argued that

> More recently, **Southwest invested hundreds of millions of dollars to rebuild and reinvigorate Love Field to better serve North Texas travelers**.

*Dallas v. Delta v. Southwest*, Case. No. 16-10051, Brief of Appellant Southwest Airlines, Document: 00513477354, pp. 1, 2 9 (emphasis added), available at https://www.scribd.com/document/310383686/Southwest-Appeals-Delta-Ruling (last visited Dec. 10, 2020).

and, through LFAMC, received tens of millions of dollars of FAA AIP grant for apron improvements required by the rebuilding.

In addition, Ms. Edmonds-Radford provided evidence that AirTran received loans of $72 million, which became Southwest's when it required Air Tran. She also identified, through the testimony of Mr. Guckian, the mechanism to determine what happened to them, namely, examination of the relevant parts of Southwest's tax returns. But the district court refused to allow access to these documents. And then it characterized her claim as "speculation" when in fact it is undisputed that AirTran (and thus Southwest) in fact received those loans.

In both instances, the court ignored, rather than considered in the light most favorable to Edmonds-Radford, the *undisputed* evidence of federal funding. (Southwest did not challenge a single particular adduced by Edmonds-Radford concerning the facts of federal funding.)

Therefore, it was reversible error to conclude the Rehabilitation Act did not apply—especially, where, as here, the district court allowed Southwest to block Ms. Edmonds-Radford's efforts to obtain the information and then granted summary judgment without analyzing the "financial assistance" requirement.[9]

---

[9] As such, the district court's findings were not adequate for purposes of appellate review. *See. e.g., Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1245 (10th Cir. 2001) (noting that "without adequate findings of fact and conclusions of law, appellate review is in general not possible"); *Curtis v. Commissioner*, 623 F.2d 1047, 1051 (10th Cir. 1980) (noting that a trial court's findings of fact "may be challenged as inadequate to

*Withheld Evidence*

Finally, Southwest argues that the court should not consider the fact that it blocked Ms. Edmonds-Radford's efforts to obtain needed information. Southwest, taking advantage of the court's practice standards regarding discovery disputes, for eight months blocked Ms. Edmonds-Radford's efforts to obtain this information and depose the people who could testify about these issues. Vol. I at 566-72. Only just before the close of discovery did the Magistrate Judge order Southwest to respond to Ms. Edmonds-Radford's interrogatories so that she could determine who to depose. Vol. I 574-75.

During the depositions (which the Magistrate Judge without any explanation limited to three), Ms. Edmonds-Radford was finally able to identify the essential documents Southwest had not yet produced, including its tax returns, as identified by Mr. Guckian, the highest-ranking official in Southwest's tax department. Vol II. at 750. Southwest, however, refused to produce its tax returns. Ms. Edmonds-Radford requested the court to order Southwest to produce the necessary information for the financial assistance analysis, but the Court denied this request.[10]

---

give a clear understanding of the process by which the court's ultimate conclusions were reached and thus inadequate to permit appellate review").

[10] *See,* Vol. II at 8-19 (listing the documents related to the Rehabilitation Act claim that she needed); *id.* 204 (denying the motion).

Ms. Edmonds-Radford did everything she could to highlight the importance of this information for the district court and preserve the issues.[11]  The district court, however, denied all objections to the Magistrate Judge's rulings without any analysis.[12]

Ms. Edmonds-Radford then incorporated these arguments in her response to the motion for summary judgment, explaining their importance to the analysis in the summary judgment context and renewed her motions for production, Vol. II at 664 fn. 11, 663, 1208-23.  The district court denied her request.  Therefore, this issue remains a genuine disputed question of material fact.

When Ms. Edmonds-Radford brought these issues to the district court's attention in her objections to the Magistrate Judge's rulings, Southwest asked the district court to sanction Ms. Edmonds-Radford and her pro bono counsel.  Vol. II at 144-45.  When Ms. Edmonds-Radford explained to the district court why her motions were necessary to preserve the issues, *id.* 503-512, Southwest further accused her: "Edmonds-Radford continues to needlessly expand the litigation with

---

[11] Vol. I 393-405 (Discovery Matters); *id.* at 400-401, 403, 413 (Rehabilitation Act); *id.* 410-415 (Written Discovery); 566-573 (Objection to October 19 and November 2, 2018 Orders); Vol II. 282-311 (Objection to December 27, 2018 Rulings); *id.* 285 (Federal Financial Assistance.); *id.* 8-19 (Forthwith Motion for Modification of Scheduling Order and to Compel Discovery); *id.* 193-202 (Reply in Support of the Forthwith Motion); *id.* 204-05 (denying Plaintiff's motion); 313 (denied objection Dec. 27th denial).

[12] Vol. III 104 (denying Objection to October 19 and November 2, 2018 Discovery Orders.); *id.* (denying Objection to November 15, 2018 Rulings); *id.* at 105 (Objection (Doc 123) Denied).

irrelevant arguments." *id.* 564.

It is therefore ironic, at best, that now on appeal Southwest, having attempted to prevent Ms. Edmonds-Radford from making her arguments in the district court under threat of sanctions, claims not only that she should have taken still one more step (which Southwest in its request for sanctions portrayed as needless expansion of litigation) but that in the absence of that extra step the Court should simply disregard the fact that Ms. Edmonds-Radford did everything she could, under threat of sanctions, to properly preserve these issues and bring them to this Court's attention.

## CONCLUSION

The court should reverse the summary judgment and remand for a trial on the merits on the Rehabilitation Act, ADA, and Retaliation claims.

## ADDITIONAL STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested in this case in order to address a question of first impression regarding the Rehabilitation Act and the nuances in the applicable case law, as well as to address the factual record and how the district court reversibly erred in granting summary judgment.

Respectfully submitted this 10th day of December 2020.

/s/ Katayoun A. Donnelly
Katayoun A. Donnelly
*Azizpour Donnelly LLC*
2373 Central Park Blvd., Suite 100
Denver, CO  80238
Phone: (720) 675-8584
Email: katy@kdonnellylaw.com

Blain Myhre
*Blain Myhre LLC*
PO Box 3600
Englewood, CO 80155
(303) 250-3932
blainmyhre@gmail.com

Attorneys for Plaintiff-Appellant

## CERTIFICATIONS

I certify that the following is true and correct to the best of my knowledge and belief, formed after a reasonable inquiry:

(1) This pleading is proportionally spaced and complies with the applicable type-volume limitations.

(2) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,438 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

(3) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 pt. Times New Roman.

(4) Any required privacy redactions have been made.

(5) If required to file additional hard copies, the ECF submission is, except for any redactions, an exact copy of those hard copies.

(6) The ECF submission was scanned for viruses with the most recent version of a commercial virus-scanning program Avast Security Mac (Version 14.3), which is continuously updated, and, according to the program is free of viruses.

(7) On December 10, 2020, I electronically filed the foregoing using the

CM/ECF system, which will send notification of this filing to opposing counsel.

Margaret Parnell Hogan
Thomas W. Carroll
LITTLER MENDELSON, P.C.
1900 16th Street, Suite 800
Denver, CO 80202
mphogan@littler.com, tcarroll@littler.com
*Attorneys for Appellee*

/s/ *Katayoun A. Donnelly*
Katayoun A Donnelly