**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 8, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

———————————————

KRISTA EDMONDS-RADFORD,

     Plaintiff - Appellant,

v.

SOUTHWEST AIRLINES CO.,

     Defendant - Appellee.

No. 20-1132
(D.C. No. 1:16-CV-02860-LTB-STV)
(D. Colo.)

———————————————

**ORDER**

———————————————

Before **MATHESON**, **EBEL**, and **MORITZ**, Circuit Judges.

———————————————

     This matter is before the court on the *Petition for Panel Rehearing* filed by Appellant. Pursuant to Fed. R. App. P. 40, Appellant's request for panel rehearing is granted to the extent of the modifications in the attached revised opinion. The court's September 16, 2021 opinion is withdrawn and replaced by the attached revised opinion, which shall be filed as of today's date.

Entered for the Court,

CHRISTOPHER M. WOLPERT, Clerk

FILED
United States Court of Appeals
Tenth Circuit

November 8, 2021

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

KRISTA EDMONDS-RADFORD,

     Plaintiff - Appellant,

v.

SOUTHWEST AIRLINES CO.,

     Defendant - Appellee.

No. 20-1132

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:16-CV-02860-LTB-STV)**

_____

Katayoun A. Donnelly, Azizpour Donnelly LLC, Denver, Colorado (Blain Myhre, Blain Myhre LLC, Englewood, Colorado, with her on the briefs), for Plaintiff-Appellant.

Thomas W. Carroll (Margaret Parnell Hogan and Stephen E. Baumann II with him on the brief), Littler Mendelson, P.C., Denver, Colorado, for Defendant-Appellee.

_____

Before **MATHESON**, **EBEL**, and **MORITZ**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

     Defendant-Appellee Southwest Airlines grades its new hires based on two overarching categories of criteria: Attitude and Aptitude.  By all accounts, Plaintiff-Appellant Krista Edmonds-Radford had the necessary Attitude in spades for her position as a Southwest Customer Service Agent.  Unfortunately, however, she failed to exhibit

the necessary Aptitude, and Southwest terminated her for failing to meet expectations. That termination led to this disability-based lawsuit, in which Edmonds-Radford sued Southwest for disparate treatment, failure to accommodate, and retaliation under the Americans with Disabilities Act (ADA) and the Rehabilitation Act. The district court granted summary judgment in favor of Southwest on all claims, and Edmonds-Radford now appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.      Background

### A.      Factual History[1]

In September 2014, Southwest hired Edmonds-Radford as a full-time Customer Service Agent at Denver International Airport (DIA). That job encompassed operations at both the check-in counter and at the terminal gates, including handling ticketing, check-in, baggage service, reservations, boarding, re-booking, complaints, fares, and more. All Customer Service Agents begin their career on probation, during which they must demonstrate the ability to perform their job functions.

Customer Service Agents are required to complete a training program, starting with classroom training in Dallas, Texas. During that training, Edmonds-Radford "struggled each day to understand the information being covered in class and pass each test." (R., vol. II at 462 (assessment of Southwest instructor).) Edmonds-Radford informed her Dallas trainers that she had a learning disability, specifically that "she

---

[1] We view the evidence in the light most favorable to Edmonds-Radford and draw all reasonable inferences from those facts in her favor. Aubrey v. Koppes, 975 F.3d 995, 1000 (10th Cir. 2020).

hears/sees things different than most people" and thus "understands and interprets information differently."  (Id. at 462, 673.)

After explaining this disability to her trainer, Edmonds-Radford asked to "sit up front and talk through each test question."  (Id. at 462.)  The trainer granted that request, and additionally "repeated and/or reworded what was covered in class" each day for Edmonds-Radford.  (Id.)  Despite this extra assistance, Edmonds-Radford was still "confused" and "still needed help completing each task."  (Id.)  Nevertheless, she completed the classroom training with a "93% GPA."  (Id.)

Edmonds-Radford next began on-site training at DIA in Denver.  Unlike the controlled classroom environment in Dallas, this involved on-the-job training in the chaos that is DIA.  The on-the-job training involved working with more experienced Customer Service Agents to perform the job functions at the check-in counter and terminal gates. Edmonds-Radford struggled to master the more technical aspects of the job.

In response to her struggles, Edmonds-Radford told her supervisors and managers that she did not feel like she was getting the training that she needed.  She also told the co-workers that were training her that she had a learning disability.  Edmonds-Radford did not, however, contact Southwest's Accommodation & Career Transition ("ACT") Team, which is responsible for determining whether reasonable workplace accommodations for disabilities can be made.  Southwest's policies direct employees wishing to request such disability accommodations to contact the ACT Team.  Edmonds-Radford received and acknowledged that she understood these policies during her employment.

3

Because Edmonds-Radford was struggling, she received additional training "above and beyond what would normally be provided to probationary Customer Service Agents, both in terms of the quantity of training and the substance of the training itself." (Id. at 350–51 (affidavit of Southwest's Assistant Station Manager at DIA).)  Southwest also provided Edmonds-Radford with one-on-one training sessions and allowed her to take notes during training.  None of her co-workers, however, were specifically trained on how to instruct someone with a learning disability.

Despite the extra training and assistance, Edmonds-Radford continued to struggle, specifically with gate operations.  Her fifty-day performance appraisal graded her as "Needs Improvement" in three of eight subcategories for her Aptitude rating: Gate Procedures, Computer Abilities, and Irregular Operations.  Edmonds-Radford did not dispute the appraisal.  (Id. at 675.)

Southwest provided Edmonds-Radford with another ten days of extra training, also above and beyond what would normally be provided to probationary Customer Service Agents.  This training was split between additional check-in counter time (at which Edmonds-Radford was proficient) and gate operations time (with which Edmonds-Radford struggled).  Despite the extra training, Edmonds-Radford was still unable to demonstrate that she could perform the essential functions of her job.

In January 2015, Southwest terminated Edmonds-Radford's employment.  This decision was made by Southwest's Assistant Station Manager for Customer Service at DIA, Michele Benze; Southwest's Manager of Ramp and Operations at DIA, Gayla Sims; and Southwest's Assistant Station Manager at DIA, Tammy Knoblock.  Each individual

believed, based on the feedback they received from Edmonds-Radford's DIA trainers, that "Edmonds-Radford's ongoing performance deficiencies and inability to perform essential job functions, resulting in a failure to pass probation," warranted termination. (Id. at 322.)  There is no evidence that any of these individuals were aware at the time of termination that Edmonds-Radford had a learning disability.

After her termination, Edmonds-Radford emailed Southwest's CEO, claiming that Southwest had discriminated against her based on her race, age, gender, and disability.[2] Southwest's Employee Relations Team investigated the matter, and pursuant to the investigation, Edmonds-Radford provided Southwest an ADA Medical Information form explaining that she had anxiety and PTSD and requesting specific accommodations for her disabilities.  This was the first formal notice Edmonds-Radford gave Southwest of her disabilities and requested accommodations.  Edmonds-Radford ultimately requested her job back and accommodations in the form of: (1) up to one month of training at gate operations; (2) the ability to use her notes and not feel rushed; and (3) the ability to work with the same trainer when possible for consistency.

Southwest elected to give Edmonds-Radford another chance, offering her reinstatement to her position.  Southwest also agreed to accommodate Edmonds-Radford by providing additional time to complete tasks during training, allowing her to take and use notes while in training, and allocating three dedicated trainers to her.  Southwest

---

[2] Edmonds-Radford now pursues only disability-based claims.

denied Edmonds-Radford's request for backpay during her period of non-employment,

but it did resume paying Edmonds-Radford in anticipation of her return to work.

In order to return to work at DIA, however, Edmonds-Radford had to obtain a new

security badge, issued via the DIA security office (not operated by Southwest). To get

that badge, Edmonds-Radford had to provide certain paperwork, including her marriage

and birth certificates and an authorization form signed by Southwest. Southwest

provided the authorization, but Edmonds-Radford could not produce the other necessary

documents because she had lost them after becoming homeless following her termination

from Southwest. By the time Edmonds-Radford obtained the documents she needed, the

Southwest authorization had expired. Edmonds-Radford never obtained her security

badge and never returned to work at Southwest. Southwest later terminated Edmonds-

Radford's employment a second time, though it did not send her a formal termination

notice.

## B.    Procedural History

In between her first and second termination, Edmonds-Radford filed a

discrimination charge against Southwest with the Equal Employment Opportunity

Commission ("EEOC"). This charge related only to the events surrounding her first

termination.

Edmonds-Radford then sued Southwest, alleging claims for failure to

accommodate, disability discrimination, and retaliation under both the ADA and the

Rehabilitation Act. Southwest moved for summary judgment on all claims. While

Southwest's motion was pending before the district court, Edmonds-Radford filed a

second charge of discrimination with the EEOC.  The district court allowed Edmonds-Radford to amend her complaint based on that second charge of discrimination.

Ultimately, the district court granted summary judgment in favor of Southwest on all claims.  The court first held that the Rehabilitation Act did not apply because Southwest did not receive federal financial assistance.  The court also held that Edmonds-Radford had failed to exhaust her administrative remedies as to the second charge of discrimination because it was untimely and equitable tolling was unavailable.  Turning to the merits of Edmonds-Radford's remaining ADA-based claims, the court held that Southwest was entitled to summary judgment on each claim.  Edmonds-Radford timely appealed.

## II.    Standard of Review

We review de novo a district court's grant of summary judgment.  <u>Aubrey</u>, 975 F.3d at 1004.  Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As noted above, we view the evidence in the light most favorable to the non-moving party (here, Edmonds-Radford) and draw all reasonable inferences in her favor.  <u>Aubrey</u>, 975 F.3d at 1000.

## III.    Discussion

On appeal, Edmonds-Radford challenges the district court's grant of summary judgment in favor of Southwest, raising a host of arguments.

We first address Edmonds-Radford's threshold arguments.  Considering each in turn, we hold that: (A) Edmonds-Radford's discovery-based challenges are inadequately

presented and we thus consider her claims on the existing record; (B) the Rehabilitation Act does not apply in this case because Southwest does not receive federal financial assistance; and (C) equitable tolling does not apply to Edmonds-Radford's untimely second charge of discrimination and we thus cannot consider those claims.

Turning to the merits of Edmonds-Radford's remaining claims, we further hold that: (D) Edmonds-Radford's disparate-treatment claim fails because she did not establish that her disability was a determinative factor in her termination or that Southwest's reason for the termination was pretextual; (E) Edmonds-Radford's failure-to-accommodate claim fails because she did not establish that she requested accommodations in connection with her disability or that Southwest failed to provide any requested accommodations; and (F) Edmonds-Radford's retaliation claim fails because she did not establish that there was a causal connection between her termination and any protected activity.

Accordingly, and for the reasons described below, we affirm.

## A.    We consider Edmonds-Radford's claims based on the existing record.

We turn first to Edmonds-Radford's arguments regarding the scope of discovery below.  Edmonds-Radford asserts that the district court erred in denying her necessary discovery, and she asks that the case should be remanded to allow her to complete discovery.  We reject these arguments.

Edmonds-Radford does not raise these arguments as a separate section in her brief but instead intersperses them among her summary-judgment arguments. Specifically, Edmonds-Radford argues that the district court abused its discretion in

affirming the magistrate judge's rulings denying her motions to compel discovery as to: (1) documents relevant to Southwest's acquisition of AirTran Airway, including Southwest's tax returns; and (2) correspondence regarding Southwest's investigation of Edmonds-Radford's disability-related claims.

Southwest tries to stave off this Court's review of these arguments by asserting that Edmonds-Radford failed to appeal the district court's discovery rulings because her Notice of Appeal and Docketing Statement do not specifically mention those rulings. Southwest's arguments lack merit. Edmonds-Radford's Notice of Appeal was directed to the final judgment entered in this action, and "a notice of appeal designating the final judgment necessarily confers jurisdiction over earlier interlocutory orders that merge into the final judgment." AdvantEdge Bus. Grp., L.L.C. v. Thomas E. Mestmaker & Assocs., Inc., 552 F.3d 1233, 1236–37 (10th Cir. 2009); accord Lister v. W. Indus. Corp., -- F. App'x --, 2021 WL 3030371, at *3 & n.4 (10th Cir. July 19, 2021) (unpublished) (magistrate judge discovery order merges into final judgment for purposes of Notice of Appeal). And "[a]n issue not raised in the docketing statement may be raised in the appellant's opening brief." 10th Cir. R. 3.4(B).

We thus have appellate jurisdiction to consider Edmonds-Radford's discovery challenges. Ultimately, however, we deem her arguments waived, for two reasons. First, Edmonds-Radford inadequately presents her arguments on appeal. She asserts that the district court abused its discretion in denying, "without any explanation," her requests to compel discovery. (Aplt. Br. 21.) But it was the magistrate judge that

9

denied Edmonds-Radford's discovery requests, and the district court merely denied her objections to those rulings, concluding that the magistrate judge's orders were neither clearly erroneous nor contrary to law.  Edmonds-Radford never explains on what grounds the magistrate judge denied her motions, how those rulings were clearly erroneous or contrary to law, or how the district court abused its discretion in upholding those rulings.  Edmonds-Radford ignores these issues and instead merely asserts that the information she sought was important and relevant and thus she should have been entitled to discovery.  These vague and conclusory assertions do not adequately present this issue for our review.

The second problem with Edmonds-Radford's discovery arguments is that this Court could not review this issue even if Edmonds-Radford had adequately argued it, because the magistrate judge's relevant ruling is not included in the record.  Indeed, Edmonds-Radford does not attach any discovery-related ruling to her opening brief, in violation of Tenth Circuit Rule 28.2(A).[3]  Instead, she merely cites to one page in the record containing the district court's denial of her objections to the magistrate judge's discovery ruling.  Edmonds-Radford does not cite to the magistrate judge's ruling itself.  Then, in her reply brief, Edmonds-Radford cites a minute order from the magistrate judge that referenced the pertinent discovery ruling but did not include

---

[3] Southwest points out this issue but fails to acknowledge that it, too, violated Rule 28.2, because it had an obligation to attach the relevant rulings after Edmonds-Radford failed to do so.  10th Cir. R. 28.2(B).  We remind counsel for both parties of their obligations to follow this Court's rules.

its content.  Edmonds-Radford then cites other district court orders denying her objections to different discovery rulings by the magistrate judge.

From what little we can garner from these jumbled citations and arguments, Edmonds-Radford's challenge is focused on a discovery ruling the magistrate judge made on December 27, 2018.  But that ruling appears to have been made orally from the bench, and Edmonds-Radford does not point us to a transcript of that ruling, nor have we stumbled across one in the record.[4]  The record before us is thus inadequate to support appellate review.  "When the party asserting an issue fails to provide a record or appendix sufficient for considering that issue, the court may decline to consider it."  10th Cir. R. 10.4(B).  Because we do not have the magistrate judge's ruling before us, we cannot review whether that ruling was clearly erroneous or contrary to law, or whether the district court abused its discretion in denying Edmonds-Radford's objections to the ruling.  Edmonds-Radford has thus waived her discovery arguments by failing to establish a proper record for our review.[5]  See, e.g., Travelers Indem. Co. v. Accurate Autobody, Inc., 340 F.3d 1118, 1120–21 (10th Cir. 2003).

---

[4] It is not the role of this Court to engage in a scavenger hunt through the 3,000-page record to piece together Edmonds-Radford's arguments for her.

[5] Because Edmonds-Radford proceeded on appeal in forma pauperis, the record on appeal was prepared by the district court.  See 10th Cir. R. 10.3(A).  But Edmonds-Radford, represented by court-appointed counsel, had the ability and opportunity to supplement the record, and she exercised that ability by filing in this Court a motion to complete the record, plus a supplement to that motion.

In sum, we agree with Southwest that Edmonds-Radford failed to "present this Court with the history of the discovery orders she challenges or discrete argument that would allow this Court to properly assess" this issue.  (Aple. Br. 20.) Accordingly, Edmonds-Radford has waived her discovery-related arguments and we decline to consider them.

**B.      The Rehabilitation Act does not apply.**

Edmonds-Radford next challenges the district court's determination that the Rehabilitation Act does not apply.  This presents a question of law that we review de novo.  Toomer v. City Cab, 443 F.3d 1191, 1194 (10th Cir. 2006).  We affirm.

Although the same substantive standards apply under the Rehabilitation Act and the ADA, Nielsen v. Moroni Feed Co., 162 F.3d 604, 608 n.7 (10th Cir. 1998), the applicability of the Rehabilitation Act is significant here because it, unlike the ADA, does not require the exhaustion of administrative remedies.  Compare Jones v. U.P.S., Inc., 502 F.3d 1176, 1183 (10th Cir. 2007) (ADA), with McGeshick v. Principi, 357 F.3d 1146, 1149 (10th Cir. 2004) (Rehabilitation Act).  This is important because Edmonds-Radford did not timely exhaust her administrative remedies on all her claims, as we discuss in more detail in Part III.C infra.

The Rehabilitation Act applies only if Edmonds-Radford was "subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).  Federal financial assistance is defined as "any grant, cooperative agreement, loan, contract . . . , subgrant, contract under a grant or any other arrangement

by which the Department provides or otherwise makes available assistance in the form

of" funds, personnel, property, and more.  28 C.F.R. § 42.540(f).

Edmonds-Radford asserts two potential bases for federal financial assistance to

Southwest: (1) federal grants for the modernization of Dallas Love Field Airport; and

(2) federal loans to AirTran Airway, which was later acquired by Southwest.  We

conclude that neither constitutes federal financial assistance to Southwest.

### (1)    Federal Grants for the Modernization of Love Field

Edmonds-Radford first argues that Southwest received federal financial assistance

in the form of federal grants from the Federal Aviation Administration and the

Transportation Security Administration to the City of Dallas for the modernization of

Love Field Airport.  She asserts that this constitutes federal financial assistance to

Southwest because Southwest partnered with the City of Dallas and had an active

management role in the project, Southwest spent some of its own funds on that project,

and Southwest benefited from the project because it has the right to use 80 percent of the

gates in the new Love Field terminal.

None of that, however, establishes that Southwest was a recipient of the federal

grants.  See U.S. Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 605

(1986) ("Congress limited the scope of [the Rehabilitation Act] to those who actually

'receive' federal financial assistance . . . .").  Those grants were distributed not to

Southwest, but to the City of Dallas.  Although Southwest undoubtedly benefited from

the federal funds, the Rehabilitation Act draws a distinction between actual recipients of

federal financial assistance and mere beneficiaries of that assistance.  Id. at 607 ("[I]t is

clear that the airlines do not actually receive the aid; they only benefit from the airports' use of the aid."). The Rehabilitation Act does not extend past the recipient of federal aid to those who benefit from the use of the aid, and Edmonds-Radford's argument "confuses intended <u>beneficiaries</u> with intended <u>recipients</u>." <u>Id.</u> at 606–07.

Here, Edmonds-Radford's evidence shows merely that Southwest had great interest and involvement in the Love Field modernization project, not that it was an intended recipient of federal grants rather than a beneficiary. In trying to argue otherwise, Edmonds-Radford contends that Southwest and Love Field are "inseparably linked." (Aplt. Br. 23.) But the Supreme Court has already rejected this very argument under similar circumstances:

> The Court of Appeals found that airports and airlines are "inextricably intertwined" . . . because [airlines] make use of airports that accept federal funds, and because airports are "indispensable" to air travel.

> We find this reasoning overbroad and unpersuasive. . . . The Court of Appeals' reasoning extends [the Rehabilitation Act] beyond its bounds. Under the Court of Appeals' view various industries and institutions would become part of a federally assisted program or activity, not because they had received federal financial assistance, but because they are "inextricably intertwined" with an institution that has.

<u>Paralyzed Veterans of Am.</u> at 610. For the same reasons, we reject Edmonds-Radford's argument here.

**(2)    Federal Loans to AirTran**

Edmonds-Radford next argues that Southwest received federal financial assistance in the form of federal loan guarantees made to AirTran Airways prior to its acquisition by

Southwest.  We agree with the district court that there is "no evidence or allegation that Southwest was the intended beneficiary or recipient of any subsidies related to AirTran Airway loans."  (R., vol. III at 129.)

AirTran received approximately $72 million in federal loan guarantees in 2007, four years prior to Southwest's acquisition of AirTran in 2011.  Edmonds-Radford can point to nothing in the record establishing that these federal loan guarantees were still outstanding when Southwest acquired AirTran.  The only evidence on this point is a statement from Southwest's Managing Director of Tax and Controller Operations, Kenneth Guckian, who stated that he was not aware of the status of the loan guarantees when Southwest acquired AirTran, and that any and all debt obligations (federal or otherwise) brought over in the acquisition were retired by 2016.  (R., vol. II at 757 ("I do not specifically recall a $72 million loan guarantee or debt obligation from the U.S. government.").)

Accordingly, all Edmonds-Radford has established is that AirTran had a number of debt offerings, including loans from the federal government, several years before Southwest acquired it.  Although Guckian indicated that Southwest had debt obligations from AirTran on its books until 2016, there is no evidence that any of those involved loans from the federal government, and Guckian had no recollection of any such loans.  There is thus no evidence in the record as to the state of the federal loans when Southwest acquired AirTran.

Moreover, even if any of the federal loan guarantees were still in existence when Southwest acquired AirTran, Edmonds-Radford fails to establish that

Southwest was an "intended recipient" of those loans, rather than a mere beneficiary, as we discuss above.  See <u>Paralyzed Veterans of Am.</u>, 477 U.S. at 606–07.

Having identified no federal financial assistance received by Southwest, we conclude that the Rehabilitation Act does not apply.[6]  Accordingly, Edmonds-Radford's claims are limited to the ADA and she must satisfy the ADA's exhaustion requirement for us to consider them.  We turn next to exhaustion under the ADA.

## C.    Equitable tolling is not available for Edmonds-Radford's second charge of discrimination.

In order to bring a claim under the ADA, Edmonds-Radford must have exhausted her administrative remedies as to that claim before filing suit.  See <u>Jones</u>, 502 F.3d at 1183.  To do so, the ADA (in a "deferral state" like Colorado) requires that a putative plaintiff file a charge of discrimination with the EEOC within 300 days of the allegedly unlawful employment practice.  <u>Castaldo v. Denver Pub. Schs.</u>, 276 F. App'x 839, 841 (10th Cir. 2008) (unpublished); <u>see also</u> 42 U.S.C. § 12117(a) (incorporating 42 U.S.C. § 2000e–5(e)(1) (Title VII filing requirement)).  Here, it is undisputed that although Edmonds-Radford's first charge of discrimination was timely filed with the EEOC, her second charge of discrimination was not, because it was filed over three-and-a-half years after the alleged discrimination took place.

---

[6] Because we conclude the record does not establish that Southwest was the recipient of federal financial assistance, we need not consider Southwest's alternative arguments about the scope of the Rehabilitation's Act "program or activity" language or whether the government was acting as a market participant in making the relevant federal grants.

Below, Edmonds-Radford attempted to get around the exhaustion requirement by arguing for equitable tolling. See Lincoln v. BNSF Ry. Co., 900 F.3d 1166, 1183 (10th Cir. 2018) (failure to file a timely EEOC charge is subject to equitable tolling). The district court denied equitable tolling, and we review that decision for an abuse of discretion. Montoya v. Chao, 296 F.3d 952, 957 (10th Cir. 2002). Equitable tolling is appropriate only where the employer has committed "active deception" lulling a plaintiff into inaction. Gray v. Phillips Petrol. Co., 858 F.2d 610, 615–16 (10th Cir. 1988). This is a high bar to overcome. Hulsey v. Kmart, Inc., 43 F.3d 555, 557 (10th Cir. 1994).

Edmonds-Radford attempts to do so by arguing that her second charge of discrimination—based on her second termination by Southwest—was untimely because Southwest deliberately failed to inform her of that termination. But although Southwest indeed failed to notify Edmonds-Radford of the second termination, nothing in the record suggests that Southwest committed "active deception."

The second termination took place in November 2015, retroactive to August 2015. Edmonds-Radford did not file her second charge of discrimination with the EEOC until June 2019, more than three years later. It would not be reasonable for Edmonds-Radford to believe that she was still employed with Southwest throughout this time. She never obtained her security badge, never returned to work at Southwest, never received paychecks from Southwest after July 2015, and alleged in her First Amended Complaint in 2017 that Southwest "refus[ed] to rehire/reinstate" her. (R., vol. I at 177.) Furthermore, Edmonds-Radford does not identify any statements by Southwest that would have deceived her into believing she was still employed there, instead pointing

17

only to Southwest's <u>lack</u> of communication regarding the termination. But a lack of communication is not the same thing as "active deception," particularly when the circumstances made clear that Edmonds-Radford no longer worked for Southwest.

Moreover, even if active deception occurred and equitable tolling applied, that tolling would have ended on April 19, 2018, when Southwest provided Edmonds-Radford with a discovery document which clearly indicated that she was terminated for a second time. Even from this April 19, 2018, date, Edmonds-Radford's second charge of discrimination was filed 118 days late. And despite Edmonds-Radford's arguments to the contrary, there is nothing "cryptic," (Aplt. Br. 56), about the discovery document, as it plainly notes Edmonds-Radford's "Termination" as of "8/21/2015." (R., vol. II at 1285.)

Accordingly, the district court did not abuse its discretion in denying equitable tolling and in concluding that Edmonds-Radford failed to exhaust her administrative remedies as to the second charge of discrimination, limiting her ADA claims to the allegations in the first charge. As a result, in our following analysis of Edmonds-Radford's ADA claims, we consider only the allegations in the first charge: disparate treatment based on the first termination, failure to accommodate, and retaliation based on the first termination. We turn now to the merits of those claims.

**D.    Southwest was entitled to summary judgment on Edmonds-Radford's disparate-treatment claim.**

Edmonds-Radford's first substantive claim is a disparate-treatment claim asserting that Southwest discriminated against her by treating her less favorably because of her

disability, specifically, by terminating her employment.  We agree with the district court that Southwest is entitled to summary judgment on this claim because Edmonds-Radford failed to establish her prima facie case or that Southwest's proffered reason for her termination was pretextual.

This claim is subject to the familiar McDonnell Douglas burden-shifting framework. Davidson v. Am. Online, Inc., 337 F.3d 1179, 1189 (10th Cir. 2003).  Under this framework, Edmonds-Radford must first raise a genuine issue of material fact as to each element of her prima facie case: (1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of the job with or without accommodation, and (3) she suffered an adverse employment action because of her disability.  Id. at 1188.  If Edmonds-Radford can establish a prima facie case, the burden shifts to Southwest to offer a legitimate, nondiscriminatory reason for the termination. Id. at 1189.  If Southwest does so, the burden shifts back to Edmonds-Radford to show a genuine issue as to whether Southwest's reason was pretextual.  Id.

There is no dispute that Edmonds-Radford is disabled or that her termination constitutes an adverse employment action.  Instead, we conclude that her claim fails because she cannot establish that (1) Southwest terminated her because of her disability, or (2) Southwest's proffered reason for the termination was pretextual.[7]

---

[7] In addition to relying on these two issues, the district court held that Edmonds-Radford could not show she was a qualified individual because she could not establish that she could perform the essential job functions if afforded reasonable accommodations.  We think this a close question, because Southwest agreed to give Edmonds-Radford additional accommodations after reinstatement, raising the

(continued)

19

### (1)    Termination "Because of" Disability

"Liability in a disparate-treatment case depends on whether the protected trait . . . actually motivated the employer's decision." Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003) (alteration in original) (quotation omitted).  Here, that means that Edmonds-Radford must show that the circumstances surrounding her termination give rise to an inference that it was based on her disability.  Lincoln, 900 F.3d at 1192–93.  This requires some affirmative evidence that the disability was a determinative factor in Southwest's decision.  Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1259 (10th Cir. 2001).

We conclude that Edmonds-Radford has not identified any evidence tending to show that she was terminated because of her disability.  Critically, Edmonds-Radford does not refute the evidence showing that the Southwest decisionmakers involved in her termination, Michele Benze, Gayla Sims, and Tammy Knoblock, did not know of her disability.  Indeed, nothing in the record suggests that any Southwest manager, supervisor, or other decisionmaker at DIA was aware of Edmonds-Radford's disability.[8] (See R., vol. V at 47–99 (Southwest internal communications regarding Edmonds-

---

possibility that she might have been able to perform the job with those accommodations.  But because reinstatement never occurred, we cannot know whether she would have become qualified had she received those accommodations.  Because this presents a close question, we simply assume that Edmonds-Radford has shown that she is qualified, and we resolve this claim on other grounds.

    [8] Edmonds-Radford adequately alleged that she told her classroom trainer in Dallas that she had a learning disability.  But the record suggests that the Dallas classroom trainer did not transmit that information to anyone at DIA.  (See R., vol. II at 462 (note from Dallas trainer to DIA managers, mentioning that Edmonds-Radford struggled in class but not mentioning a learning disability).)  Nothing in the record supports a reasonable inference to the contrary.

Radford's struggles and the additional training provided, with no mention of a learning disability).) Nor is Edmonds-Radford's learning disability the sort of disability that is obvious or visible, such that Southwest must have known of it.

In addition, Southwest has an established process for reporting disabilities to the company and requesting accommodations for them—communication with the ACT Team. Had Edmonds-Radford followed that process, Southwest unquestionably would have been on notice of her disability and the need for accommodations, yet she failed to do so. Although this consideration is not dispositive of Edmonds-Radford's claims because Southwest decisionmakers might have been made aware of her disability through other channels, Edmonds-Radford's failure to use the appropriate channels of communication is relevant as further evidence of Southwest decisionmakers' unawareness of her disability.

The only evidence Edmonds-Radford offers to the contrary is her own deposition testimony in which she stated that she asked her Southwest DIA managers and supervisors for additional training (a request not expressly connected to a disability), and that while training and learning with her co-workers, she informed them of her disability. This does not rebut Southwest's evidence because it fails to address whether Edmonds-Radford informed the relevant decisionmakers of her disability. Because those decisionmakers were not the individuals providing training, they would not fall into the category of individuals Edmonds-Radford could have informed while training.

Given that there is no evidence that the Southwest decisionmakers knew about Edmonds-Radford's disability and, even supposing they did know, no evidence that they

knew her disability required a further remedy beyond the additional training already

afforded her, Edmonds-Radford's disability could not have been a determinative factor in

her termination.  None of Edmonds-Radford's arguments to the contrary can overcome or

disprove this fatal flaw in her prima facie case.  Because Edmonds-Radford cannot show

that Southwest terminated her because of her disability, her disparate-treatment claim

necessarily fails.

    **(2)**    **Pretext**

Even if Edmonds-Radford could establish her prima facie case, we would still

affirm summary judgment for Southwest because Southwest articulated a legitimate,

nondiscriminatory reason for terminating Edmonds-Radford—unsatisfactory

performance and failure to pass probation—and Edmonds-Radford cannot show that

Southwest's reason was pretextual.  See <u>Selenke</u>, 248 F.3d at 1259–60.

In assessing pretext, this Court examines the facts as they appeared to the

decisionmakers, and we cannot second-guess Southwest's business judgment—it matters

not if Southwest's reasoning was correct, just whether it honestly believed in the reason

for the termination.  <u>Id.</u> at 1261.  Edmonds-Radford can establish pretext by showing

weaknesses, contradictions, or inconsistencies in Southwest's reasons such that a

reasonable jury could find them unworthy of belief.  <u>Jaramillo v. Colo. Jud. Dep't</u>,

427 F.3d 1303, 1308 (10th Cir. 2005).

For the same reasons that we conclude that Edmonds-Radford was unable to show

her disability was a determinative factor in her termination, we also conclude that she has

not established pretext.  As discussed above, there is no evidence that the Southwest

decisionmakers were aware of Edmonds-Radford's disability, and even if they were, Edmonds-Radford was terminated when she still did not meet expectations after Southwest provided her with ten days of additional training.  Southwest's honest belief that Edmonds-Radford was unable to perform the essential functions of her position, even after extra training, was a legitimate, non-discriminatory reason for the termination.

Edmonds-Radford attempts to establish pretext by pointing to Southwest's later offer to reinstate her with even more accommodations as a potential inconsistency.  But that Southwest was willing to extend a fair albeit limited opportunity to Edmonds-Radford and later changed course after learning new information (i.e., that Edmonds-Radford was disabled) does not undermine the record evidence showing that the Southwest decisionmakers believed at the time of the termination that Edmonds-Radford was not meeting expectations even after additional training.  See Tran v. Trs. of State Colls. in Colo., 355 F.3d 1263, 1269 (10th Cir. 2004) (an employer's "belief would not be pretextual even if the belief was later found to be erroneous" (quotation omitted)).

Accordingly, we affirm the district court's grant of summary judgment to Southwest as to Edmonds-Radford's disparate-treatment claim.  We turn next to her failure-to-accommodate claim.

**E.      Southwest was entitled to summary judgment on Edmonds-Radford's failure-to-accommodate claim.**

In Edmonds-Radford's second substantive claim, she argues that Southwest violated the ADA by failing to accommodate her disability.  An employer violates the ADA by failing to make reasonable accommodations to the known physical or mental

23

disabilities of an otherwise qualified individual with a disability, unless such accommodation would pose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); Punt v. Kelly Servs., 862 F.3d 1040, 1048 (10th Cir. 2017). Unlike a disparate-treatment claim, a failure-to-accommodate claim does not require proof of a discriminatory animus—any failure to provide reasonable accommodations to an otherwise qualified individual will be sufficient. Id. at 1048.

Under the Tenth Circuit's modified burden-shifting framework for failure-to-accommodate claims,[9] Edmonds-Radford must first make out a prima facie case that she (1) is disabled, (2) is otherwise qualified, and (3) requested a plausibly reasonable accommodation. Id. at 1050. The burden then shifts to Southwest to either rebut one or more elements of Edmonds-Radford's prima facie case, or establish an affirmative defense. Id. If Southwest does so, the burden shifts back to Edmonds-Radford to present evidence establishing a genuine dispute as to the affirmative defenses or as to the challenged elements of her prima facie case. Id.

Applying that framework, we affirm the district court's grant of summary judgment in favor of Southwest on this claim, concluding that (1) Edmonds-Radford

---

[9] Although Edmonds-Radford concedes that this modified burden-shifting framework applies in the Tenth Circuit, she refers to it as the McDonnell Douglas test and argues that it is inapplicable to failure-to-accommodate claims in order to preserve that issue for en banc or Supreme Court review. (Aplt. Br. 42 n.8.)

failed to establish that she requested any accommodations in connection with her disability, and (2) in any event, Southwest provided all requested accommodations.[10]

**(1)    Accommodation Requests Based on Disability**

To succeed on her claim, Edmonds-Radford must have requested accommodations <u>based on</u> her disability.  <u>See</u> <u>Punt</u>, 862 F.3d at 1048 ("The employer must of course know of the employee's disability and of the accommodation the employee wishes to receive in order to have any responsibility for providing such an accommodation.").  So, it is not enough that Edmonds-Radford indisputably requested additional training—she must also have informed Southwest that the request for assistance was made to accommodate a disability.  <u>See</u> <u>E.E.O.C. v. C.R. Eng., Inc.</u>, 644 F.3d 1028, 1049 (10th Cir. 2011).  But as we already concluded above, Edmonds-Radford failed to notify Southwest's DIA decisionmakers of her disability.  And more specifically, as relevant here, she failed to connect her requests for additional training to any disability.

As above, Edmonds-Radford's only evidence that she notified anyone at DIA of her disabilities is her deposition testimony that "when [she] was in training, when [she] was learning, period," she informed others of her learning disability, and that she informed her Denver supervisors and managers that she "did not feel like [she] was getting the training that [she] needed with just one person."  (R., vol. II at 684–

---

[10] The district court also resolved this claim on the ground that Edmonds-Radford was not a "qualified individual."  As explained in Part III.D <u>supra</u>, we do not rely on this ground.

85, 686–87.)  The latter statement is not tied to a disability at all, and the former does not help Edmonds-Radford because her "training" and "learning" was done with her co-workers rather than with the managers or supervisors who would have been responsible for providing disability accommodations.

So even though Edmonds-Radford requested additional training, there is no evidence that Southwest (other than similarly situated, lower-level co-workers) knew that those requests were because of a disability.  (See R., vol. V at 47–99 (Southwest internal communications regarding Edmonds-Radford's struggles and the additional training provided contained no mention of a learning disability).)  Accordingly, Edmonds-Radford made no disability-based accommodation requests while working at DIA, and Southwest therefore did not fail to accommodate her.

### (2)    Accommodations Provided

Even if Edmonds-Radford had established that Southwest knew that her requests for additional training were disability-based accommodation requests, her claim would still fail because Southwest provided her with all the accommodations she requested.  The record shows that Southwest afforded Edmonds-Radford additional training above and beyond that which Customer Service Agents usually receive.  Although Edmonds-Radford complains about certain aspects of the training (that it was done by coworkers and that there was not enough training at the gate), the changes she argues for were either not requested at all or not requested until after her termination.  Southwest later offered even more accommodations pursuant to the discussions regarding Edmonds-Radford's

reinstatement, but Southwest cannot be liable for not providing those accommodations earlier when Edmonds-Radford did not request them pre-termination.

Critically, although Edmonds-Radford continued to struggle despite the additional training in both Dallas and Denver, there is no evidence that she informed Southwest prior to her termination that she needed more accommodations.  "It is not the employer's responsibility to anticipate the employee's needs and affirmatively offer accommodation if the employer is otherwise open to such requests."[11] Koessel v. Sublette Cnty. Sheriff's Dep't, 717 F.3d 736, 745 (10th Cir. 2013).

Accordingly, we affirm the district court's grant of summary judgment to Southwest as to Edmonds-Radford's failure-to-accommodate claim.  We turn lastly to her retaliation claim.

## F.    Southwest was entitled to summary judgment on Edmonds-Radford's retaliation claim.

As with Edmonds-Radford's disparate-treatment claim, we apply the McDonnell Douglas framework to ADA retaliation claims.  Foster v. Mountain Coal Co., 830 F.3d 1178, 1186 (10th Cir. 2016).  It is Edmonds-Radford's initial burden to establish a prima facie case of retaliation.  Id.  To do so, she must prove (1) she was engaged in a protected activity, (2) she was subjected to an adverse employment action, and (3) a causal

---

[11] At various points in her briefs, Edmonds-Radford complains that Southwest failed to engage in the interactive disability-accommodation process.  But Southwest's duty to do so is only implicated if it is on notice that an employee has requested disability accommodations.  See C.R. England, 644 F.3d at 1049. Accordingly, it is Edmonds-Radford, not Southwest, that failed to engage in the interactive disability-accommodation process.

connection between the protected activity and the adverse action.  Id. at 1187.  If

Edmonds-Radford can establish her prima facie case, the burden shifts to Southwest to

establish a legitimate, nondiscriminatory reason for the adverse action.  Id. at 1186.  The

burden would then shift back to Edmonds-Radford to demonstrate that Southwest's

purported reason was pretextual.  Id.

Edmonds-Radford claims Southwest engaged in unlawful retaliation by

terminating her for requesting disability accommodations.  In Part III.E.1 supra, however,

we rejected Edmonds-Radford's arguments that she even made any disability-based

accommodation requests, so that necessarily dooms her retaliation claim based on such

requests.  But even if Edmonds-Radford had made disability-based accommodation

requests, her retaliation claim would still fail in light of our conclusions in Part III.D

supra that Edmonds-Radford failed to establish that her disability was a determining

factor in her termination, or that Southwest's legitimate, nondiscriminatory reason for the

termination (Edmonds-Radford's inability to perform the essential functions of her job)

was pretextual.[12]

### IV.    Conclusion

_____

[12] At the district court, Edmonds-Radford also claimed retaliation in
connection with her backpay request and the district court rejected that claim.
Edmonds-Radford did not sufficiently raise that claim again in her opening brief on
appeal, so that issue is waived.  Edmonds-Radford did argue on appeal that
Southwest retaliated against her following her first termination by precluding her
from getting the security badge needed for reinstatement, but that claim is part of her
unexhausted second charge of discrimination and we cannot address it.

For the above reasons, we AFFIRM the district court's grant of summary judgment in favor of Southwest on all claims.