No. 20-1132

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT
_____

**KRISTA EDMONDS-RADFORD**, Plaintiff-Appellee,

v.

**SOUTHWEST AIRLINES CO.,** Defendant-Appellant
_____

On Appeal from the United States District Court
For the District of Colorado
The Honorable Lewis T. Babcock, Senior District Judge
D.C. No. 1:16−cv−02860−LTB−STV
_____

**Petition for Panel Rehearing
(Pursuant to Fed. R. App. P. Rule 40)**
_____

Katayoun A. Donnelly
*Azizpour Donnelly LLC*
2373 Central Park Blvd., Suite 100
Denver, CO 80238
720-675-8584
katy@kdonnellylaw.com

Blain Myhre
*Blain Myhre LLC*
PO Box 3600
Englewood, CO 80155
(303) 250-3932
blainmyhre@gmail.com

*Pro bono* Attorneys for Plaintiff-Appellant

1

In footnote 9, the panel, in a published opinion, admonishes one of Ms. Edmonds-Radford's two *pro bono* counsel for misrepresenting facts. In doing so, it specifically quotes one statement in Ms. Radford's brief and generally relies on two pages of Southwest's response brief.

> Edmonds-Radford repeatedly asserts that Southwest admitted "in no uncertain terms" via its representative in a Rule 30(b)(6) deposition that "Southwest decided to reinstate Edmonds-Radford because it believed that with appropriate and reasonable accommodations she *could* perform the essential duties of her position." (Aplt. Br. 33.) This misrepresents the deposition testimony, in which Southwest's representative expressly testified that although Southwest wished to give Edmonds-Radford another opportunity to learn the position, it did "not know . . . for sure" if she would be able to do so even with the accommodations. (R., vol. I at 635.) Nor is this the only misrepresentation of fact Edmonds-Radford's counsel made in the briefs and at oral argument. (*See, e.g.*, **Aple. Br.** 14–15.) The Court admonishes counsel and reminds *her* of *her* professional responsibilities as an officer of the court.

Slip. Op. 23, n. 9 (emphasis added).

Ms. Edmonds-Radford respectfully requests that the Court remove footnote 9 from the opinion, for the following reasons.

**I.    The specifically quoted statement in Ms. Edmonds-Radford's brief is supported by the record and by the dictionary definition of its operative term "could".**

The panel took issue with Ms. Edmonds-Radford's assertion that "Southwest admitted 'in no uncertain terms' via its representative in a Rule 30(b)(6) deposition

2

that 'Southwest decided to reinstate Edmonds-Radford because it believed that with appropriate and reasonable accommodations she *could* perform the essential duties of her position.'" Slip. Op. 23, n. 9 (citing Aplt. Br. 33) (emphasis added). It concluded that "[t]his misrepresents the deposition testimony, in which Southwest's representative expressly testified that although Southwest wished to give Edmonds-Radford another opportunity to learn the position, it did 'not know . . . for sure' if she would be able to do so even with the accommodations." *Id*. (citing R., vol. I at 635).

As other courts have noted, however, "[i]n ordinary parlance the use of the word **'could' means something which is 'possible**[.]'" *State v. Bicknese*, 285 N.W.2d 684, 686 (Minn. 1979) (emphasis added); Stromberger v. 3M Co., No. 90 C 7519, 1992 WL 39009, at *3 (N.D. Ill. Feb. 21, 1992), aff'd, 990 F.2d 974 (7th Cir. 1993) ("'**Could' only means possibly; it does not mean definitely**.").

"Could" is regularly used to express future possibility. "She could be the best player of her generation." "Despite her poor grades so far, she could be a very successful student." This corresponds to the dictionary definition of "Expressing objective possibility, opportunity, or absence of prohibitive conditions." *Oxford English Dictionary*. This is the sense in which Ms. Edmonds-Radford's brief used the term, as supported by the record.

> Q. (BY MS. DONNELLY) That was my question.
> 25 So she **could** have performed the basic functions of the
> 1 job with the accommodations? Is that a **possibility** on
> 2 which you relied to rehire her?
> 3 MR. CARROLL: Objection. Form.
> 4 A. That it was a possibility, yes, but you
> 5 asked basically did we determine that she would be
> 6 able to perform the functions.
> 7 Q. (BY MS. DONNELLY) **I said could. I**
> **8 didn't say would. I apologize if I was not clear**.
> 9 MS. DONNELLY: Can you please repeat the
> 10 question that had the **"could"** piece in it?
> 11 (The question beginning on Page 91, Line
> 12 25, was read back as follows: "So she **could** have
> 13 performed the basic functions of the job with the
> 14 accommodations? Is that a possibility on which you
> 15 relied to rehire her?")
> 16 MR. CARROLL: Same objection.
> 17 A. Okay. **I took could as in saying it would**
> **18 happen. That she had -- that it was possible? Yes,**
> **19 that it was possible. That was part of the rehire.**

ROA Vol. I, 636 & Vol. II, 720 (Watkins Depo. 91:24-92:19 [cited in Aplt. Op. Br., p. 33]) (emphasis added). Ms. Edmonds-Radford's statement that "During the 30(b)(6) deposition, Mr. Watkins in no uncertain terms admitted that Southwest decided to reinstate Ms. Edmonds-Radford because it believed that with appropriate and reasonable accommodations she *could* perform the essential duties of her position," Op. Br. 33 (emphasis added), is supported by the record.

## II.     The factual statements and legal conclusions in Ms. Edmonds-Radford's Statement of the Case are supported by the record.

In pages 13-15 of Appellee's Response brief, on which footnote 9 relies,

4

Southwest criticizes Ms. Edmonds-Radford's statement of the case. There it specifically states that "Southwest **disagrees** with several statements in Edmonds-Radford's **Statement of the Case** (and elsewhere in the Opening Brief) because they are unsupported by the record. Opening Br. 8-16." Aple. Br. 13 (emphasis added). It then goes on to provide the specific instances of its alleged unsupported facts in the Statement of the Case. *Id.,* 14. Because footnote 9 seems to have adopted Southwest's point of view in its totality, Ms. Edmonds-Radford addresses Southwests' disagreements, one by one, below. (The passages from Southwest's brief appear in bold.)

> • **"In Denver, however, she did not receive accommodations." Opening Br. 10. Edmonds-Radford cites no evidence to support this statement.**

The sentence "In Denver, however, she did not receive accommodations"[1] is a "legal conclusion." As such, it does not need a citation. This conclusion is, however, supported by what follows on pages 10-12 of the Opening Brief:

> She [Ms. Edmonds-Radford] informed all her trainers and supervisors about her disabilities and request for training. ROA Vol. II at 684 (depo 112-13); 686-87 (depo 120-21), 691-92 (depo 143-47). Southwest's policy required them to inform the ACT team. They failed to do so, however. ROA Vol. II at 723 (depo 141-42); 706-08 (depo 28-33); 713-14 (depo 61-65).
> 　Although Southwest claimed it provided reasonable accommodations in the form of additional training, in reality it

---

[1] It appears that the word "reasonable" has been inadvertently deleted from this sentence. *See* consistent use of "reasonable accommodations" throughout Ms. Edmonds-Radford's briefs.

5

provided training only for the counter—the area Edmonds-Radford had already done well and received good reviews. Southwest failed to provide the requested training at the gate, where she actually needed it. ROA Vol. II at 682-86 (depo 91-96, 112-18); 697 (depo 177-78); *see also* ROA Vol. II at 467 (email to CEO Kelly, noting "I felt had received support in Dallas however once being hired in Denver I didn't receive the same support. I requested additional training at the gates. **I was assured to have 3 weeks training however I was not provided that training request**.").

Moreover, Southwest had not prepared any of the Denver trainers to provide reasonable accommodations to Edmonds-Radford. The 30(b)(6) deposition describes what went wrong and Southwest could have (and should have) done, but did not do, before it fired Edmonds-Radford. ROA Vol. II at 712-722 (depo 60-62, 65-82, 85-96; 97-100) (describing the reasonable accommodations Southwest could provide after reinstatement—accommodations not provided before her January 2015 termination. Southwest trained new employees in a controlled environment by qualified trainers in Dallas before sending them to the busy, hectic, and fast-paced airport environment. ROA Vol. II at 732-33 (depo 225-31). In the Dallas performance evaluations, Southwest expressed its commitment to follow the federal laws and provide assistance to people with disabilities.

In Denver, however, Southwest used Ms. Edmonds-Radford's untrained co-workers to provide "training" during their own work shifts. ROA Vol. II at 692-94 (depo 148-53); 696 (depo 173-74); 716 (depo 73-76); 732-33 (depo 225-31); 800 (table showing training mostly at counter not at gate). Southwest had not trained any of these Denver "trainers" to train people with a learning disability. In fact, Southwest had not even informed any of them of her disability or need for accommodation. ROA Vol. II at 712-16 (depo 60-62, 65-76). Not surprisingly, any training provided was neither adequate nor reasonable. To the extent she continued to have "issues" at the gate, it was because of the lack of appropriate training—training she had requested. ROA Vol. II at 682-86 (depo 91-96, 112-13, 115-18); 697 (depo 177-78); 800; 712-21 (depo 60-62, 65-82, 85-96).

• **"She informed all her trainers and supervisors about her disabilities and request for training."**

Southwest does not (and cannot) dispute that this was Ms. Edmonds-Radford's deposition testimony. (She informed her trainers and supervisors about her disabilities and request for training. ROA Vol. II at 684 (Depo 112-13); 686-87 (Depo 120-21), 691-92 (Depo 143-47). Southwest's policy required them to inform the ACT team. They failed to do so, however. ROA Vol. II at 723 (Depo 141-42); 706-08 (Depo 28-33); 713-14 (Depo 61-65).)

Southwest disputes only whether Ms. Edmonds-Radford's deposition testimony is legally sufficient to defeat summary judgment on this critical issue. *See* Aple. Br. 42-3. ("To address the fact that she never invoked the accommodation process established by Southwest or requested any accommodation from her supervisors or human resources, Edmonds-Radford relies only on her testimony that she generally informed her trainers at DEN that she did not believe she got the training she needed.").

• **"Not surprisingly, any training provided was neither adequate nor reasonable." Opening Br. 12. Edmonds-Radford cites no evidence to support this statement.**

This is a legal conclusion, supported by the record, Op. Br. 11:

> Although Southwest claimed it provided reasonable
> accommodations in the form of additional training, in reality it
> provided training only for the counter—the area Edmonds-Radford
> had already done well and received good reviews. Southwest failed to

7

provide the requested training at the gate, where she actually needed it. ROA Vol. II at 682-86 (depo 91-96, 112-18); 697 (depo 177-78); see also ROA Vol. II at 467 (email to CEO Kelly, noting "I felt had received support in Dallas however once being hired in Denver I didn't receive the same support. I requested additional training at the gates. I was assured to have 3 weeks training however I was not provided that training request.").

Moreover, Southwest had not prepared any of the Denver trainers to provide reasonable accommodations to Edmonds-Radford. The 30(b)(6) deposition describes what went wrong and Southwest could have (and should have) done, but did not do, before it fired Edmonds-Radford. ROA Vol. II at 712-722 (depo 60-62, 65-82, 85-96; 97-100) (describing the reasonable accommodations Southwest could provide after reinstatement—accommodations not provided before her January 2015 termination. Southwest trained new employees in a controlled environment by qualified trainers in Dallas before sending them to the busy, hectic, and fast-paced airport environment. ROA Vol. II at 732-33 (depo 225-31). In the Dallas performance evaluations, Southwest expressed its commitment to follow the federal laws and provide assistance to people with disabilities.

In Denver, however, Southwest used Ms. Edmonds-Radford's untrained co-workers to provide "training" during their own work shifts. ROA Vol. II at 692-94 (depo 148-53); 696 (depo 173-74); 716 (depo 73-76); 732-33 (depo 225-31); 800 (table showing training mostly at counter not at gate). Southwest had not trained any of these Denver "trainers" to train people with a learning disability. In fact, Southwest had not even informed any of them of her disability or need for accommodation. ROA Vol. II at 712-16 (depo 60-62, 65-76). Not surprisingly, any training provided was neither adequate nor reasonable. To the extent she continued to have "issues" at the gate, it was because of the lack of appropriate training—training she had requested. ROA Vol. II at 682-86 (depo 91-96, 112-13, 115-18); 697 (depo 177-78); 800; 712-21 (depo 60-62, 65-82, 85-96).

- **"The 30(b)(6) deposition describes what went wrong and Southwest could have (and should have) done, but did not do, before it fired Edmonds-Radford." Opening Br. 11. The 37 pages of testimony Edmonds-Radford cites do not support this statement.**

The relevant portion of the transcript supports this statement. *See, e.g.:*

8

> Q. (BY MS. DONNELLY) So at no point in time
> 12 you're informing your leaders that they're dealing
> 13 with an individual with a disability?
> 14 A. That's not correct. We did inform the
> 15 leaders. The people who were training
> 16 Ms. Edmonds-Radford are also CSAs. They are her
> 17 fellow agents.
> 18 Q. Do they need to know that they're
> 19 training somebody who has a disability?
> 20 A. No.
> 21 Q. Why not?
> 22 A. Because they are going to train the
> 23 person to do the job, and then the leadership will
> 24 determine if that training was sufficient or if they
> 25 need to do more.

Vol.II, 716 (Depo. 73).

> Q. …. So she was coming back and
> 18 you told us that her trainers were not aware of her
> 19 disability, and all you were going to do was to give
> 20 her additional time for training?
> 21 A. No. We were going to give her the
> 22 additional time for training and put her with a fewer
> 23 number of trainers, two with one backup, because those
> 24 trainers are able to utilize the collective bargaining
> 25 agreement for their time off, so you must have
> 98
> 1 backups. You cannot just put one person with one
> 2 person.
> 3 Q. Let's focus on Ms. Edmonds-Radford and
> 4 her needs as a disabled person. How are you going to
> 5 accommodate her disability regardless of under what
> 6 circumstances you could provide two trainers or one
> 7 trainer? How are you going to accommodate her
> 8 learning disability other than giving her additional
> 9 training?
> 10 A. We were accommodating her by limiting the
> 11 number of trainers she had --

12 Q. Okay.
13 A. -- and putting her in the environment
14 that she had requested.
15 Q. Which was?
16 A. A slower environment where she had more
17 time without as much pressure.
18 Q. And how would that work at a -- for
19 someone who is a customer service agent? Can you
20 explain to me how you would produce that environment,
21 create that environment?
22 A. In her particular situation, when she was
23 working at the gates, we would have her off to the
24 side with one of her trainers where she wouldn't be
25 required to run the gate. We would have another agent
99
1 that is running the gate, and she would be able to
2 handle situations as they came up on a one-on-one
3 basis rather than handling an entire flight.
**4 Q. And this is something that she hadn't**
**5 received before?**
**6 A. No, she had not.**
7 Q. Why not?
8 A. Because that's not the environment that
9 customer service agents work in on a day-to-day basis.
10 So eventually she would have to show that she would be
11 able to do that.
12 Q. But giving her enough time to do that
13 would be the first step to get her to the comfort
14 zone?
15 A. To be able to learn the job.
16 Q. What else?
17 A. That was the accommodations that we were
18 providing.
19 Q. You mentioned just the gate. So she was
20 fine up front?
21 A. Based on her -- the feedback from the
22 trainer, she didn't have as much problem at the ticket
23 counter or in the baggage service office.

Vol.II, 722 (Depo. 97-9) (emphasis added).

- **"But Southwest interfered with her ability to get reinstated by not permitting her to get her required security badge." Opening Br. 13. Edmonds-Radford cites no evidence to support this statement.**

Again, this is a legal conclusion, for which Ms. Edmonds-Radford provided support in pages 13-14 of her opening brief.

> After Edmonds-Radford notified Southwest that she had obtained the documents necessary for her SIDA badge, Southwest cut off communications with her and did not renew the authorization required by the airport in order to issue her SIDA badge. Southwest thereby prevented her getting her badge. ROA Vol. II 740-43 (depo at 269-76, 281-86); 690-91 (depo 140, 142); 727-30 (depo 168-72, 213-18); 736-38 (depo 253-64).

Op. Br. 14.

> Q. (BY MS. DONNELLY) Okay. Tell me about
> 22 this document and what does it say.
> 23 A. This is an e-mail from Ms. Mary Hollender
> 24 to myself, Bob Watkins, regarding Kris Radford. It
> 25 says, "To keep you in the loop, Kris picked up her
> 214
> 1 application for SIDA yesterday and went to the office
> 2 to get badge. She did not have the correct government
> 3 documents, plus she did not have her marriage license.
> 4 She called me and said that she was not sure if she
> 5 could find any of those. Due to recent bad luck, she
> 6 was not sure if she even still had them. I left her a
> 7 message today to let me know what was going on, no
> 8 call as of yet. We continue to pay, right?"
> 9 Q. What is the date of this e-mail?
> 10 A. July 24th.
> 11 Q. How long are these applications valid?
> 12 A. Thirty -- fingerprints are valid for 30
> 13 days.
> 14 Q. So July 24th, that's -- the validation

```
15 is until when?
16 A. Well, presuming that July 24th is when
17 Mary Hollender actually signed it, 30 days later would
18 be approximately August 23rd or 24th.
19 Q. That is the optimistic view of if she
20 signed it that day?
21 A. If she signed it on the 23rd, it would
22 be from the 23rd to the 23rd. That's when she
23 picked up the application.
24 Q. So this application would expire
25 approximately on August 24th?
215
1 A. Approximately.
2 Q. Was there another one issued after that?
3 A. I do not know.
4 Q. You are not prepared to answer that
5 question?
6 A. I do not know if another application was
7 issued, no.
8 Q. Did you talk to Ms. Hollender to ask if
9 there was another one issued?
10 A. No, I did not.
11 Q. Did you talk to anybody else at the
12 station to see if there was another one issued?
13 A. I did not.
```

Watkins Depo. 213-15.

```
1 Q. (BY MS. DONNELLY) Didn't we just read
2 the e-mail together? Let's go back to 509. And I'm
3 going to let you read that e-mail again.
4 A. From Mary Hollender. "
```
**Hello, I received
5 a phone call from Krista and she stated that she now
6 does have the required documentation to get her SIDA
7 badge. Do we start paying again?** She also stated she
8 needs to go part time because she had to get another
9 job. Are we accommodating this? She is also going to
10 be applying for the catastrophic aid that the company
11 offers and wants me to provide her with the correct

12 forms. Just wanted to touch base and see where we are
13 at with this and get some direction regarding her
14 situation."
15 Q. **So Southwest stopped communicating with**
**16 Ms. Edmonds-Radford after receiving this communication**
**17 from her, correct?**
18 MR. CARROLL: Object to the form of the
19 question.
20 **A. As far as I'm aware, yes.**

Watkins Depo. 272 (emphasis added).

• **"It was only during a November 2018 30(b)(6) deposition that Southwest affirmatively acknowledged it had indeed fired her again, ostensibly at the end of August 2015." Opening Br. 15.**

Ms. Edmonds-Radford's opening brief, in the sentences that followed this statement on page 15, provides citation to the record:

> Southwest later asserted in the district court that it terminated her "sometime after Thanksgiving 2015, retroactive to August 21, 2015." ROA Vol. II at 327. Southwest's position at the 30(b)(6) deposition was that it could not recall the exact date of her second termination. *See* ROA Vol. II. at 744 (depo 289-90). Southwest's records, though, indicate that it terminated her in August 2015. ROA Vol. II at 815-16 (listing the second termination date as 8/21/15).
> Edmonds-Radford had obtained her documents by September 3, 2015. ROA Vol. II at 689 (depo 134). She informed Southwest. Southwest, however, did not reissue the authorization to allow her to obtain the SIDA badge. Neither did it inform her (or the EEOC) that it had terminated her again at the end of August.
> ROA Vol. II at 701-02 (depo 271-73); 724-26 (depo 150-55, 162-64); 745 (depo 354).

As demonstrated above, Ms. Edmonds-Radford's Statement of the Case is

supported by the record. Where, as here, the parties dispute the facts material for final resolution of the legal disagreement, our judicial system leaves it to our juries to decide which party is correct. The parties' disagreement over facts and law or a jury's finding against a party do not mean that the losing party has misrepresented the facts. Ms. Edmonds-Radford respectfully requests that the Court remove footnote 9 from its opinion.

### III. The panel singles out one of the two counsel to admonish.

Ms. Edmonds-Radford has been represented by court-appointed *pro bono* counsel, Katayoun Azizpour Donnelly, in proceedings before the District Court and the Tenth circuit, since October 20, 2017, *see* Doc. 39 (Order of Appointment), and by *pro bono* counsel Blain Myhre since January 20, 2019. *See* Doc. 128. Both counsel signed off on the arguments made in appellate briefs. *See* Op. & Reply Brs. The oral argument tracked the arguments in the briefs.

The panel admonishes only one of the two, her. If the Court decides to deny Ms. Edmonds-Radford's request to remove footnote 9, it seems appropriate to admonish both counsel equally responsible for representing Ms. Edmonds-Radford.

Respectfully submitted this 28th day of October 2021.

*/s/ Katayoun A. Donnelly*
Katayoun A. Donnelly
*Azizpour Donnelly LLC*
2373 Central Park Blvd., Suite 100
Denver, CO  80238
Phone: (720) 675-8584
Email: katy@kdonnellylaw.com

Blain Myhre
*Blain Myhre LLC*
PO Box 3600
Englewood, CO 80155
(303) 250-3932
blainmyhre@gmail.com

*Pro bono* Attorneys for Plaintiff-Appellant

# CERTIFICATIONS

I certify that the following is true and correct to the best of my knowledge and belief, formed after a reasonable inquiry:

(1) This pleading is proportionally spaced and complies with the applicable type-volume limitations.

(2) This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 3,593 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

(3) This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word in 14 pt. Times New Roman.

(4) Any required privacy redactions have been made.

(5) If required to file additional hard copies, the ECF submission is, except for any redactions, an exact copy of those hard copies.

(6) The ECF submission was scanned for viruses with the most recent version of a commercial virus-scanning program Avast Security Mac (Version 14.3), which is continuously updated, and, according to the program is free of viruses.

(7) On October 28, 2021, I electronically filed the foregoing using the CM/ECF system, which will send notification of this filing to opposing counsel.

Margaret Parnell Hogan
Thomas W. Carroll
LITTLER MENDELSON, P.C.
1900 16th Street, Suite 800
Denver, CO 80202
mphogan@littler.com, tcarroll@littler.com
*Attorneys for Appellee*

　　　　　　　　　　　　　　　　　　/s/ *Katayoun A. Donnelly*
　　　　　　　　　　　　　　　　　　Katayoun A Donnelly